IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

```
                              :
UNITED STATES OF AMERICA      :
                              :
        v.                    :        Criminal No. 11-520 (JBS)
                              :
THOMAS REEVES                 :
TODD REEVES                   :        **OPINION**
RENEE REEVES                  :
SHELLROCK, LLC                :
KENNETH W. BAILEY             :
MARK BRYAN                    :
PAMELA MELONEY                :
HARBOR HOUSE, INC.,           :
                              :
                Defendants.   :
                              :
```

APPEARANCES:

Patrick M. Duggan, Esq. (argued)
Wayne D. Hettenbach, Esq. (argued)
U.S. DEPARTMENT OF JUSTICE
ENVIRONMENTAL CRIMES SECTION
P.O. Box 23985
Washington, D.C. 20026
        Attorneys for the United States of America

William J. Hughes, Jr., Esq. (argued)
COOPER, LEVENSON, APRIL, NIEDELMAN & WAGENHEIM, PA
1125 Atlantic Avenue
3rd Floor
Atlantic City, NJ 08401
        Attorney for Defendant Thomas Reeves
        Co-Counsel for Defendant Shellrock, LLC

Edwin J. Jacobs, Jr., Esq.
Michael F. Myers, Esq. (argued)
JACOBS & BARBONE
1125 Pacific Avenue
Atlantic City, NJ 08401
        Attorney for Defendant Todd Reeves
        Co-Counsel for Defendant Shellrock, LLC

Alois Harold Kokes, Esq. (argued)

728 West Avenue
Suite S201
Ocean City, NJ 08226
     Attorney for Defendant Renee Reeves

John S. Furlong, Esq. (argued)
FURLONG & KRASNY, ESQS.
Mountain View Office Park
820 Bear Tavern Road
Suite 304
West Trenton, NJ 08628
     Attorney for Defendant Mark Bryan

Justin T. Loughry, Esq. (argued)
Lawrence W. Lindsay, Esq.
LOUGHRY & LINDSAY, LLC
330 Market Street
Camden, NJ 08102
     Attorneys for Defendant Pamela Meloney

Kevin P. McCann, Esq.
Beth Ann Hellriegel White, Esq. (argued)
CHANCE & MCCANN LLC
201 W. Commerce St.
P.O. Box 278
Bridgeton, NJ 08302
     Attorneys for Defendant Kenneth Bailey


**SIMANDLE**, Chief Judge:

## I.  INTRODUCTION

     This matter is before the Court on several pretrial motions
in the above criminal action.  The instant criminal case involves
an alleged conspiracy to violate the Lacey Act and obstruct
justice.  These charges are based on the alleged over-harvesting
of oysters and falsification of records regarding oyster sales.
In the fifteen count Indictment, multiple Defendants are charged
including Thomas Reeves, Todd Reeves, Renee Reeves, Shellrock,
LLC, Kenneth W. Bailey, Mark Bryan, Pamela Meloney and Harbor

2

House, Inc.

These defendants have intertwined relationships.  Thomas
Reeves and Todd Reeves are brothers.  Both brothers are 50% co-
owners of Shellrock, LLC.  Renee Reeves is the wife of Todd
Reeves.  Mark Bryan is one of the owners and operators of Harbor
House, Inc.  Pamela Meloney is an employee of Harbor House.

Various motions were filed and heard on March 16, 2012.[1]

---

[1] The first motion was filed by Defendant Mark Bryan as to
Mark Bryan and Harbor House, Inc. [Docket Item 97.]  Defendant
Bryan sought the following relief:  (1) requiring the government
to disclose before trial any prior conduct evidence it intends to
use and requesting a pretrial hearing to determine the
admissibility of this evidence; (2) requiring the government to
provide a written summary of the testimony of any expert the
government intends to introduce; (3) requesting early access to
Jencks material; (4) seeking an order for government law
enforcement officers to retain the rough notes taken during their
investigation; (5) requesting that the court sever the trial of
Defendant Bryan from the trial of codefendant Pamela Meloney
pursuant to Fed. R. Crim. P. 14 and Bruton v. U.S., 391 U.S. 123
(1968); (6) seeking all statements made by persons the government
alleges bind the corporation; (7) joining in all pretrial motions
filed by codefendants; (8) seeking leave to file additional
motions which may become necessary.
    The second pretrial motion was filed by Defendant Thomas
Reeves. [Docket Item 98.] Defendant Thomas Reeves seeks to
dismiss Counts VI and VIII of the Indictment which charge the
defendant with obstruction of justice.  Thomas Reeves argues that
these charges are based upon the same set of facts that form the
basis of the False Records violations and the Lacey Act
violations.  In addition, Thomas Reeves argues that the alleged
falsified records are New Jersey state records and the Defendants
had no reason to know of any federal investigation.  Finally,
Thomas Reeves also joins in the motions filed by the other
codefendants.
    The third pretrial motion was filed by Defendant Pamela
Meloney seeking to dismiss the Indictment for prosecutorial
misconduct. [Docket Item 99.] Defendant Meloney argues that the
government infringed on her Fifth and Sixth amendment rights
before the Grand Jury by criticizing her decision to access and

The court resolved all the pending motions during oral argument and through its subsequent March 19, 2012 order [Docket Item 120] with the exception of the following:  (1) Defendant Mark Bryan's motion to sever his trial from the trial of codefendant Pamela Meloney pursuant to Fed. R. Crim P. 14 and Bruton v. U.S., 391 U.S. 123 (1968); (2) Defendant Thomas Reeves' motion to dismiss Counts VI and VIII of the Indictment; and (3) Defendant Pamela Meloney's motion to dismiss the Indictment for prosecutorial misconduct.

During oral argument, the court reserved decision on these issues and also ordered the government to produce certain segments of the grand jury transcript in order to fully evaluate Defendant Meloney's motion to dismiss.  The court, having now fully reviewed the record (including the grand jury transcripts

---

utilize counsel as well as to refrain from speaking with the government.  Defendant Meloney also argues that the government destroyed the fairness of the grand jury's functioning when it misrepresented the evidence regarding earlier statements and suggested to the grand jury that she had changed her story when she had not.

The final pretrial motion was filed by Defendant Pamela Meloney as well and argues the Indictment should be dismissed for lack of specificity, or in the alternative, for a bill of particulars.  [Docket Item 100.]  Defendant Meloney also sought specification of Rule 404(b) material, disclosure of exculpatory evidence, permission to join other defendants' motions, and leave to file further motions.

Defendants Todd Reeves, Shellrock, LLC, Kenneth W. Bailey and Renee Reeves all filed motions to join the pretrial motions of their codefendants.  [Docket Items 101-103.]

The government has opposed all four of the above motions as well as the motions to join.

submitted in camera) and the arguments of counsel, addresses each motion in turn.

## II.  DEFENDANT MARK BRYAN'S MOTION TO SEVER

### A. The Parties' Arguments

Defendant Mark Bryan moves the court to sever his trial from Defendant Meloney's trial on the basis of allegedly incriminating statements made by Defendant Meloney to National Oceanic and Atmospheric Administration ("NOAA") special agents during the execution of a search warrant at the Harbor House premises.  Mark Bryan is one of the owners of Harbor House, Inc., and Pamela Meloney was employed by Harbor House as an office assistant and worked there for fourteen years.  She is not a manager, but works as an employee in a secretarial capacity keeping the company's books and records.

Defendant Meloney made several statements to NOAA special agents during the course of an interview on February 9, 2009. The NOAA special agents interviewed Meloney with regard to the purchase of oysters from the Reeves Brothers.  In particular, the invoices from the Reeves Brothers indicated a specific price for oyster bushels but the check from Harbor House to the Reeves Brothers was often in excess of the invoice amount, sometimes by upwards of $100,000.

Defendant Meloney was responsible for writing the checks to the Reeves Brothers for the oyster shipment, but not for signing

the checks.  During her interview, she stated that Defendant Bryan told her "what amount the checks for oyster purchases should be."  The NOAA agents then asked Meloney about the discrepancies between the invoice amount and the check amount, and Meloney explained, "Bryan was the boss and she does what he asks by putting in the specific check amounts that he dictated." (Def. Ex. 1, NOAA Memorandum of Interview with Pamela Meloney, Feb. 4, 2009, 11:00AM).

Defendant Meloney was interviewed a second time an hour later regarding the discrepancies, and she stated again that "she creates a check in the amount that Bryan tells her" and that "she does what she is told." (Def. Ex. 2, NOAA Memorandum of Interview with Pamela Meloney, Feb. 4, 2009, 12:00PM).

Meloney was then interviewed a third time later that same day regarding a binder found in her desk.  The binder was a recorded log book maintained by Meloney for the health department which the NOAA agents told Meloney correctly reflected Harbor House's purchases from the Reeves Brothers, and the lower amounts on the Reeves Brothers' invoices did not reflect the correct number of oyster bushels sold.  Meloney then admitted she knew of the discrepancies between the actual purchase and the lower purchase amount reflected on the invoice for a few years.  (Def. Ex. 3, NOAA Memorandum of Interview with Pamela Meloney, Feb. 4, 2009, 3:00PM).

6

Defendant Bryan argues Meloney's statements during these three interviews directly implicate him of conspiring with the Reeves Brothers to illegally over-harvest oysters and submitting false invoices to regulatory agencies.  Defendant Bryan contends that if the government introduces Meloney's statements and Meloney does not testify, the admission will violate Mr. Bryan's Sixth Amendment confrontation right.  The Defendant cites Bruton v. United States, 391 U.S. 123 (1968) and Richardson v. Marsh, 481 U.S. 200, 207 (1987) in support of his argument.  Further, Defendant Bryan maintains that the proper remedy is severance pursuant Fed. R. Crim. P. 14, which permits a severance where the joinder of defendants appears to prejudice a defendant.  In the alternative, the Defendant seeks an order prohibiting the government from introducing Meloney's statements at a joint trial.

The government opposes the Defendant's motion for severance and opposes the exclusion of the statement from a joint trial.  First, the government argues that Meloney's statements do not facially incriminate Bryan and therefore the Bruton rule does not apply.  The government relies on Bruton, infra, and Richardson, infra, as well as Gray v. Maryland, 523 U.S. 185 (1998).  The government argues that Bruton, which held that a powerfully incriminating statement by a non-testifying witness was inadmissible, has been limited by Richardson and Gray.

7

In particular, the government maintains that <u>Richardson</u> held that a redaction could cure an otherwise facially incriminating statement as long as the statement no longer referred to the named defendant.  <u>Richardson</u>, 481 U.S. at 208.  Since the statement only became incriminating when linked with evidence introduced later at trial, the statement was admissible and not excluded by <u>Bruton</u>.  <u>Id.</u>

The government also relies on the most recent of the <u>Bruton</u> cases, <u>Gray v. Maryland</u>.  In <u>Gray</u>, the Supreme Court held that a redacted confession by a co-defendant which only removed the defendant's name from the statement was impermissibly incriminating.  The court reasoned that this statement violated the Sixth Amendment because the incriminating codefendant confession only required a jury to infer that an unnamed actor was actually the defendant.

The government cites the <u>Bruton</u> case law and argues that for a codefendant statement to be directly incriminating, the statement must be incriminating independent of all other evidence.  Here, the government argues Meloney's statement is only incriminating when viewed in conjunction with other evidence.  Standing alone, the government contends that all Meloney's statements show is that Bryan made the financial decisions regarding payments at Harbor House and that Meloney functioned as Bryan's agent.  Further, the government does not

allege that the amounts written on the checks are false, so the fact that Bryan directed what amount was to be paid to the Reeves Brothers is not on its face incriminating.

**B. Analysis**

It is clear that Meloney's statement does expressly mention Bryan and states that it was his directive to pay the Reeves Brothers substantially more than their invoice and that this was a long standing practice. While this statement is not as drastic as the ones at issue in <u>Bruton</u>, <u>Richardson</u> and <u>Gray</u> (which all had to do with codefendant confessions to murder and armed robbery), Meloney's interview statements do address the heart of Bryan's involvement in the alleged conspiracy to over-harvest oysters. In particular, Count I of the Indictment charges Defendant Bryan with processing invoices and "making payment to REEVES BROTHERS for greater quantities of oysters than the REEVES BROTHERS invoices indicated." (Docket Item 1, ¶ 23.) Therefore, Meloney's statement that Bryan was the one to direct the overpayment to the Reeves Brothers despite the lower amount due on the invoice is arguably as inculpatory here as the statements in <u>Gray</u> and <u>Bruton</u>, which directly incriminated a codefendant for the crime charged.

The Supreme Court made clear in <u>Richardson</u> that the <u>Bruton</u> rule was to be applied narrowly. Specifically, when additional evidence is needed to understand the incriminatory nature of the

codefendant's statement, the <u>Bruton</u> exception does not apply.

The Supreme Court explained:

> evidence requiring linkage differs from evidence incriminating on its face in the practical effects which application of the <u>Bruton</u> exception would produce. If limited to facially incriminating confessions, <u>Bruton</u> can be complied with by redaction -- a possibility suggested in that opinion itself. <u>Id.</u>, at 134, n. 10. If extended to confessions incriminating by connection, not only is that not possible, but it is not even possible to predict the admissibility of a confession in advance of trial.

<u>Richardson</u>, 481 U.S. at 208-09.

The statement that Meloney informed NOAA agents that Bryan told her the amount the check should be and that is why she wrote such a large amount tends to incriminate Bryan of criminal conduct when examined in the context of the crime charged.  This statement by Meloney directly incriminates Bryan as determining that Harbor House would pay a larger amount of money to Reeves Brothers, reflecting the larger number of oyster bushels that were received but not reported on the invoices.

While the context of the crime of underreporting oyster transactions is necessary for a jury to understand the context of Meloney's statement, it does not make Meloney's statement any less incriminating of Bryan on its face under the <u>Bruton</u> analysis.  Meloney's statement that Bryan was the one to direct the overpayment to the Reeves Brothers despite the lower amount due on the invoice is as inculpatory here as the statements in <u>Gray</u> and <u>Bruton</u>, because it directly incriminates Defendant Bryan

10

for the crime charged, specifically the charge of processing invoices and making payment to the Reeves Brothers for greater quantities of oysters than the Reeves Brothers invoices indicated.  Therefore, such statements must be redacted in a joint trial to protect Bryan's rights under Bruton.

Even if Bruton and its progeny in Richardson and Gray (which all dealt with confessions) did not bar evidence of Meloney's statements at a joint trial, the Court must examine the question of whether the Confrontation Clause bars the admission of Meloney's statement.  The government argues that Meloney's statements are party opponent admissions and admissible as non-hearsay.

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI.  In the trial context, the Supreme Court has recognized that "face-to-face confrontation forms the core of the values furthered by the Confrontation Clause." Maryland v. Craig, 497 U.S. 836 (1990) (internal quotations and citations omitted). However, the Court has also made clear that "the right to confrontation is a trial right." Pennsylvania v. Ritchie, 480 U.S. 39, 52 (1987) (plurality opinion) (emphasis in original); see also Barber v. Page, 390 U.S. 719, 725 (1968).

In addition, the Confrontation Clause "does not bar the use

of testimonial statements for purposes other than establishing
the truth of the matter asserted." Crawford v. Washington, 541
U.S. 36, 59 n. 9 (2004) (citing Tennessee v. Street, 471 U.S.
409, 414 (1985)). Rather, it bars the "admission of testimonial
statements of a witness who did not appear at trial unless he was
unavailable to testify, and the defendant had had a prior
opportunity for cross-examination." Davis v. Washington, 547 U.S.
813, 821 (2006) (citing Crawford, 541 U.S. at 53-54).

        The Court described the "core class of testimonial
statements" as follows:

            ex parte in-court testimony or its functional
            equivalent-that is, material such as
            affidavits, custodial examinations, prior
            testimony that the defendant was unable to
            cross-examine, or similar pretrial statements
            that declarants would reasonably expect to be
            used prosecutorially; extrajudicial statements
            ... contained in formalized testimonial
            materials, such as affidavits, depositions,
            prior testimony, or confessions; statements
            that were made under circumstances which would
            lead an objective witness reasonably to believe
            that the statement would be available for use
            at a later trial.

Crawford, 541 U.S. at 51-52 (internal quotation marks and
citations omitted).

        "Only statements of this sort cause the declarant to be a
'witness' within the meaning of the Confrontation Clause." Davis
v. Washington, 547 U.S. 813, 821 (2006) (citing Crawford, 541
U.S. at 51). "It is the testimonial character of the statement

                                12

that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." Id.; see also Melendez-Diaz v. Massachusetts, 557 U.S. 305 (holding that non-interrogations may also be subject to the Confrontation Clause, e.g., such as certificates signed by state laboratory analysts that the Court likened to affidavits).

In this case, it is undisputed that Meloney is an unavailable declarant if she chooses not to testify.  In addition, Defendant Bryan had no prior opportunity to cross examine Meloney.  The remaining issue is whether her statements were testimonial and whether they are going to be offered for purposes other than the truth of the matter asserted.

It is clear that Meloney's statements are testimonial.  They were pretrial statements made during an interview with NOAA special agents during the execution of a search warrant which a person "would reasonably expect to be used prosecutorially" and an objective witness would reasonably believe that a statement made under these circumstances would be available for use at a later trial.  Crawford, 541 U.S. at 51-52.

The government argues that these statements are not hearsay and therefore, should not be considered testimonial.  This misstates the law since Crawford, which focuses on whether a statement is testimonial, not whether a statement fits within a

13

hearsay exception or can be considered non-hearsay.  In particular, the government argues that Bryan's statements to Meloney are admissions by a party opponent and therefore admissible against Bryan.  Further, the government cites Third Circuit law on the admission of an informant's statement in support of its argument.  Specifically, the government cites U.S. v. Detelich, 351 Fed. Appx. 616, 623 (3d Cir. 2009), which states "the Confrontation Clause does not bar the introduction of the informant's portions of the conversation as are reasonably required to place the defendant or coconspirator's nontestimonial statements into context." Id. at 623.  The government's citation to Detelich presumes Meloney's statements to the NOAA agents who were executing the search warrant were not testimonial.

The government's argument does not address the state of the law since Crawford and Davis which held that any out of court statement that is testimonial in nature is not admissible unless the declarant is unavailable to testify in court or the defendant has had a prior opportunity to cross-examine him or her.  If Defendant Meloney's statement that Defendant Bryan told her what numbers to write in the checks is admitted, and Defendant Meloney exercises her right to not take the stand, then Defendant Bryan will be unable to confront Meloney about her statement and will be forced to take the stand himself to contradict it.  This violates Defendant Bryan's Fifth Amendment right not to testify

14

and his Sixth Amendment right to confrontation.

Finally, the government's argument that Meloney's statements should be admitted for purposes outside of the truth of the matter asserted, such as to prove an agency relationship or verbal act, is without merit.  The existence of an agency relationship is not a contested matter in the case as it is undisputed that Meloney was Harbor House's employee and was supervised by Bryan.  Further, the government does not specify what verbal act these statements establish.  In addition, these statements would be extremely prejudicial to Bryan, since they go to the core of the criminal conduct he is charged with in the indictment.

The Court determines that Meloney's statements to the NOAA agents are directly incriminating against Bryan under Bruton and inadmissible against Bryan under Crawford.  During oral argument, Defendant Bryan agreed that a redaction of Defendant Bryan's name from the statement would cure both the Bruton issue and the Crawford issue.  The court agrees.  Severance is an extreme remedy and should only be used as a last resort.  There is generally a desirability in trying accused co-conspirators together in any conspiracy case.  By redacting the statements to exclude any reference to Defendant Bryan, the statement would be cured of its incriminating nature and would not need to be excluded under Crawford in the event Defendant Meloney chooses

15

not to testify.

Therefore, Defendant Meloney's motion to sever will be denied.  However, the government must properly redact Defendant Meloney's statements and testimony concerning such statements to exclude any reference to Defendant Bryan directing her as to amounts of checks payable to Reeves Brothers prior to admitting testimony regarding these statements into evidence, unless Meloney testifies.

## III. DEFENDANT THOMAS REEVES' MOTION TO DISMISS COUNTS VI AND VIII OF THE INDICTMENT

### A. The Parties' Arguments

Defendant Thomas Reeves filed the second pretrial motion seeking to dismiss Counts VI and VIII of the Indictment which charge Thomas Reeves with Obstruction of Justice in violation of 18 U.S.C. § 1519.  Reeves is also charged with False Records violations under the Lacey Act, in violation of 16 U.S.C. §§ 3372(d)(2) and 3373(d)(3)(A)(ii) which form the basis of Counts II and IV of the Indictment.  Defendant Reeves maintains that the same facts which took place during the same periods of time support both the obstruction charges and the Lacey Act violations.  However, Defendant Reeves argues that Congress, through the Lacey Act, has directly and explicitly addressed the precise unlawful conduct alleged by the Government, and the only material difference between the Lacey Act violation and the obstruction charges is that the obstruction charge imposes a much

16

greater criminal penalty, namely a maximum of twenty years under § 1519 compared with a five-year maximum under 16 U.S.C. 3373(d)(3). Defendant Reeves contends that the government is not allowed to circumvent the penalties prescribed by Congress under the Lacey Act by also charging the Defendant with a broad and general criminal statute, such as the obstruction of justice statute.

In particular, Defendant Reeves cites to <u>Dowling v. United States</u>, 473 U.S. 207 (1985), for the proposition that the Government cannot utilize general criminal statutes to prosecute specific conduct when Congress has clearly spoken as to which criminal statutes (and corresponding penalties) apply to that specific conduct. <u>Dowling</u> dealt with the prosecution of a defendant for manufacturing bootleg copies of Elvis Presley recordings. The defendant in <u>Dowling</u> was charged with violations of copyright laws as well as interstate transportation of stolen property pertaining to the same conduct. The Supreme Court found that the defendant's conduct was explicitly addressed by the copyright laws and should be prosecuted and punished according to the narrowly tailored penalties prescribed by Congress in the Copyright Act, rather than the broader and more severe penalties associated with the transportation of stolen goods. This holding has been reinforced by lower courts in the Third Circuit and has primarily been aimed at prosecuting violations of copyright law.

17

See <u>United States v. Alsugair</u>, 256 F. Supp. 2d 306 (D.N.J. 2003)(dismissing mail fraud charge because conduct fell squarely within copyright infringement and citing <u>Dowling</u> for support); <u>United States v. Brooks</u>, 945 F. Supp. 830 (E.D. Pa. 1996)(dismissing false statement charges because the Copyright Office was not an agency under 18 U.S.C. § 1001 and stating in a footnote that under <u>Dowling</u>, 18 U.S.C. § 1001 was too broad and general to encompass copyright violations); <u>United States v. Vitillo</u>, 490 F.3d 314 (3d Cir. 2007)(applying the principles articulated in <u>Dowling</u> to analyze a charge under 18 U.S.C. § 666 for theft concerning a program receiving federal funds); <u>United States v. Hodge</u>, 321 F.3d 429, 437 (3d Cir. 2003)(applying <u>Dowling</u> to interpret the scope of the Analog Act, 21 U.S.C. § 802(32)(A), and noting that "[i]t is particularly important to confine ambiguous criminal statutes to their intended scope").

The government does not dispute Defendant Reeves' interpretation of the <u>Dowling</u> case but argues that <u>Blockburger v. United States</u>, 284 U.S. 299 (1932) applies to the instant action. The government maintains that Defendant Reeves is in essence arguing he is being subjected to double jeopardy, and therefore, the <u>Blockburger</u> test applies. In particular, the government argues that different elements are required to prove violations of the Lacey Act and obstruction of justice. Specifically, falsification of records under the Lacey Act requires proof that

the false record is for a fish, wildlife or plant and also that
the fish has been, or is intended to be, traded in interstate
commerce.  16 U.S.C. § 3372(d)(2).  Obstruction of justice
requires proof that the defendant intended to impede a proper
federal administration or investigation, as well as a showing
that a federal department has jurisdiction to administer or
investigate the said act.  18 U.S.C. § 1519.

The Defendant argues that even if Blockburger applies,
charging Defendant Reeves with falsification of records under the
Lacey Act and obstruction of justice is unconstitutionally
duplicative and satisfies the Blockburger test for double
jeopardy.  The Defendant maintains that the government must rely
on the false records which violated the Lacey Act in order to
prove their obstruction of justice charge.

Finally, Defendant Reeves also maintains that the alleged
falsified records at issue are creatures of state regulation and
that no federal investigation existed at the time the records
were falsified.  The government opposes this argument and
contends that the falsified records at issue were required to be
maintained by the Federal Food and Drug Administration ("FDA"),
21 C.F.R. § 123.28, and the FDA may conduct an inspection at any
time pursuant to 21 C.F.R. § 123.9(c).  Therefore, the government
maintains that these falsified records properly form the basis of
an obstruction of justice charge.

**B. Analysis**

After considering the arguments of the parties and reviewing the relevant case law, the court determines that the statutory interpretation analysis set forth in <u>Dowling</u> is applicable to the instant action.  While <u>Dowling</u> has been applied primarily to copyright infringement, the court finds the Supreme Court's reasoning applies to guide this court's interpretation of the relevant provisions of the Lacey Act, which similarly addresses a specific problem and was amended multiple times by Congress in order to diligently address the issue of falsification of documents in connection with trading in fish, wildlife or plants.[2]  The court also notes that the Third Circuit has relied

---

[2] The current form of the Lacey Act was first enacted in 1981 when Congress addressed both the Lacey and Black Bass Acts in recognition of the widespread illegal trade in fish and wildlife.  Criminal operations gained substantial profits from this illegal trade and also caused severe harm to the environment.  To address this problem, the Black Bass Act was repealed and both laws were combined under the current form of the Lacey Act.  (S. Rep. 97-123 (May 21, 1981)).  The new law created extensive criminal penalties for offenses arising out of the illegal trading of fish, wildlife and plants.

However, Congress was concerned that a simple general intent requirement under the Lacey Act would result in too much potential for abuse and indiscriminate enforcement.  Congress emphasized that the Lacey Act criminal provisions were carefully crafted so as to avoid penalizing "individuals who do not know and who could not be expected to know the illegal nature of the fish, wildlife or plants" that were taken or sold. (S. Rep. 97-123 (May 21, 1981)).  Therefore, Congress clarified that for criminal penalties to attach, the government must be able to show that the defendant in the exercise of due care should have known his actions regarding the wildlife violated the law.  (S. Rep. 97-123 (May 21, 1981)).

The Lacey Act was amended again in 1988 to further clarify

on Dowling to caution that "it is particularly important to confine ambiguous criminal statutes to their intended scope." Hodge, 321 F.3d at 437.  The court finds that the Obstruction of Justice statute falls within this directive.

The provision of the Lacey Act at 16 U.S.C. § 3372(d)(2) charged in this case provides:

> **It is unlawful for any person to make or submit any false record, account, or label for, or any false identification of, any fish, wildlife, or plant which has been, or is intended to be--**
>
> **. . .**
>
> **(2) transported in interstate or foreign commerce.**

16 U.S.C. § 3372(d)(2).

The Obstruction of Justice Statute at 18 U.S.C. § 1519, also charged in this case, provides:

> **Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20**

_____

the criminal provision at issue in this case.  Specifically, Congress addressed the falsification of documents related to shipments of fish, wildlife, or plants.  The 1988 amendment broadened the scope of the falsification offense to include penalties for falsifying documents related to wildlife, fish or plants intended for import, export or transport.  16 U.S.C. § 3372(d).  Congress also required that any violation of this provision be "knowing."  16 U.S.C. § 3372(d)(3).

**years, or both.**

18 U.S.C. § 1519.

The court must now determine the issue of whether the alleged falsification of fishery documents in this case falls within the scope of the Obstruction of Justice Statute. A review of <u>Dowling</u> is important to address the instant issue and provides guidance to the court in analyzing the appropriate and intended scope of broad federal criminal statutes such as the Obstruction of Justice statute at issue here.

In determining that a criminal charge for the transportation of stolen goods should not supercede Congress's clear intent to penalize the alleged conduct under the copyright act, the Supreme Court in <u>Dowling</u> reasoned that Congress carefully calibrated the penalties that should be associated with this particular unlawful conduct and that the power of defining crime and prescribing punishment is exclusively a legislative function.

First, the Supreme Court in <u>Dowling</u> recognized that federal crimes are solely creatures of statute and therefore, "penal laws are to be construed strictly." <u>Dowling</u>, 473 U.S. at 213. The Court emphasized that "it is the legislature, not the Court, which is to define a crime, and ordain its punishment." <u>Id.</u> at 214.

Next, the Supreme Court addressed whether the alleged unlawful conduct met the elements of transportation of stolen

22

goods.  The Court concluded that the unlawful conduct "fits but awkwardly with the language Congress chose - 'stolen, converted or taken by fraud' - to describe the sorts of goods whose interstate shipment § 2314 makes criminal."  Id. at 218.  However, the Court reasoned that "when interpreting a criminal statute that does not explicitly reach the conduct in question, we are reluctant to base an expansive reading on inferences drawn from subjective and variable understandings."  Id. at 218.

The Supreme Court then analyzed the legislative history surrounding the enactment of § 2314, and concluded that the "premise of § 2314 - the need to fill with federal action an enforcement chasm created by limited state jurisdiction - simply does not apply to the conduct the Government seeks to reach here."  Id. at 221.

The Supreme Court then turned to the Copyright Act and after reviewing the legislative history at issue, concluded that Congress "acted with exceeding caution" in imposing criminal penalties.  Id. at 221.  The Court noted that "the history of the criminal infringement provisions of the Copyright Act reveals a good deal of care on Congress' part before subjecting copyright infringement to serious criminal penalties."  Id. at 225.  The Court found the government's argument to impose the harsher penalties of § 2314 for conduct expressly addressed within the Copyright Act unpersuasive and reasoned:

23

> the Government's theory of this case presupposes a
> congressional decision to bring the felony provisions of
> § 2314, which make available the comparatively light fine
> of not more than $10,000 but the relatively harsh term of
> imprisonment of up to 10 years, to bear on the
> distribution of a sufficient quantity of any infringing
> goods simply because of the presence here of a
> factor—interstate transportation—not otherwise thought
> relevant to copyright law. The Government thereby
> presumes congressional adoption of an indirect but
> blunderbuss solution to a problem treated with precision
> when considered directly. To the contrary, the
> discrepancy between the two approaches convinces us that
> Congress had no intention to reach copyright infringement
> when it enacted § 2314.

Id. at 225-26.  The Supreme Court reasoned that the government

was seeking "to utilize an existing and readily available tool to

combat the increasingly serious problem of bootlegging, piracy,

and copyright infringement." Id. at 228.  The Supreme Court

concluded that this utilization was improper and held:

> the deliberation with which Congress over the last decade
> has addressed the problem of copyright infringement for
> profit, as well as the precision with which it has chosen
> to apply criminal penalties in this area, demonstrates
> anew the wisdom of leaving it to the legislature to
> define crime and prescribe penalties.

Id. at 228.

In the instant case, the issue before the court is whether

Congress intended to reach falsification of fishery documents

when it enacted the obstruction of justice crime defined in 18

U.S.C. § 1519.

Congress amended 18 U.S.C. § 1519 with the Sarbanes-Oxley

Act in 2002 to "protect investors by improving the accuracy and

reliability of corporate disclosures made pursuant to the

24

securities laws, and for other purposes." PL 107-204, 2002 HR
3763, at 1 (July 30, 2002).   The Senate explained that after the
Enron crisis, Section 1519 was intended to "close loopholes in
the existing criminal laws relating to the destruction or
fabrication of evidence and the preservation of financial and
audit records." (S. Rep. 107-146 at 14 (May 6, 2002)).   In
enacting this provision, the Senate reasoned that the state of
federal law prior to this amendment regarding destruction of
evidence was "full of ambiguities and technical limitations" that
contributed to the Enron crisis and therefore the law was in need
of correction. (S. Rep. 107-146 at 14 (May 6, 2002)).   The
Senate Report explained that Section 1519 is an "anti-shredding
provision" and this section is "meant to apply broadly to any
acts to destroy or fabricate physical evidence so long as they
are done with the intent to obstruct, impede or influence the
investigation or proper administration of any matter, and such
matter is within the jurisdiction of an agency of the United
States." (S. Rep. 107-146 at 14 (May 6, 2002)).   The Senate
Report explained:

> This statute is specifically meant not to include any
> technical requirement, which some courts have read into
> other obstruction of justice statutes, to tie the
> obstructive conduct to a pending or imminent proceeding
> or matter. It is also sufficient that the act is done "in
> contemplation" of or in relation to a matter or
> investigation. It is also meant to do away with the
> distinctions, which some courts have read into
> obstruction statutes, between court proceedings,
> investigations, regulatory or administrative proceedings

> (whether formal or not), and less formal government
> inquiries, regardless of their title. Destroying or
> falsifying documents to obstruct any of these types of
> matters or investigations, which in fact are proved to be
> within the jurisdiction of any federal agency are covered
> by this statute.

(S. Rep. 107-146 at 14-15 (May 6, 2002)). A violation of this provision carries the potential for incarceration of up to twenty years.

In contrast, the Lacey Act was amended more than ten years prior in 1988 to include the criminal provision at issue here, 16 U.S.C.A. § 3372(d)(2), which specifically addresses the problem of over-harvesting wildlife, such as oysters, and the falsification of such records. The purpose of the 1988 amendments providing criminal penalties for falsification of records regarding the identification of wildlife was "to enhance the ability of the Federal Government and the States to conserve fish and wildlife resources." S. Rep. 100-563 (Sept. 30, 1988). The amendment to the false labeling provision was made to clarify that "false labeling of fish and wildlife products is an offense under the Lacey Act regardless of whether the wildlife was taken in violation of an underlying Federal or State law." Id. A violation of the Lacey Act labeling provision carries a maximum sentence of five years imprisonment or a fine under Title 18 or both. 16 U.S.C.A. § 3373(d)(3)(A)(ii).

The government argues that the allegedly false records at issue were required by state law as well as FDA regulation, and

26

the FDA had a right to examine these records at any time. Therefore, the government maintains that in essence, these oyster records were perpetually under federal investigation and thus under the purview of the obstruction of justice statute as well as the Lacey Act.  The government maintained at oral argument that even if these records were never presented to the FDA and remained locked and unseen in an employee's file drawer, as they were in this case, these records have obstructed justice and criminal penalties should be imposed under both 18 U.S.C. § 1519 and 16 U.S.C. § 3372(d)(2).

In this case, it can be argued that the unlawful conduct at issue here "fits but awkwardly" into an obstruction of justice violation, because no federal investigation was alleged in the indictment as taking place at the time the records regarding the bushels of oysters were falsified.  Dowling, 473 U.S. at 218. However, the presence of the FDA regulation requiring these records to be kept for 1 to 2 years and available upon request for review can plausibly be the basis for finding the proper administration of a federal agency was impeded.  The court recognizes that Congress intended that the amendment to § 1519 be applied in a manner not requiring a pending or imminent investigation, so long as the falsification occurs "in contemplation" of such a federal investigation, see S. Rep. 107-146 at 14-15 (May 6, 2002), supra.

27

This legal argument must be viewed in light of the facts of the instant case.  The present case does not concern itself with public health concerns regulated by the FDA, as this is fundamentally a case about alleged falsification of the quantity of oysters, not the dates or origins of the oyster catch or its wholesomeness.  Here, it is undisputed the FDA never reviewed or requested the records at issue.  In addition, the purpose of the FDA regulations is not to account for the quantity of oysters, like the Lacey Act, but rather to ensure that the oysters are harvested from safe waters and are healthy for human consumption.[3]  In this case, none of the defendants have been

_____

[3] The Federal Food and Drug Administration provides specific regulations addressing the processing of fish and fishery products.  First, Part 123 of the regulations at issue here state that the "purpose of this part is to set forth requirements specific to the processing of fish and fishery products".  21 C.F.R. § 123.5(b).  The legislative history states that this section of regulations was adopted by the FDA:

> to ensure the safe and sanitary processing of fish and fishery products . . . The regulations mandate the application of Hazard Analysis Critical Control Point (HACCP) principles to the processing of seafood.  HACCP is a preventive system of hazard control that can be used by processors to ensure the safety of their products to consumers.  FDA is issuing these regulations because a system of preventive controls is the most effective and efficient way to ensure that these products are safe.

60 F.R. 65096 (December 18, 1995).

In specifically addressing Raw Mulluscan Shellfish in Subpart C of Part 123, the regulations state "[t]his subpart augments subpart A of this part by setting forth specific requirements for processing fresh and frozen molluscan shellfish, where such processing does not include a treatment that ensures

charged with violating FDA regulations and there is no allegation
that the oysters harvested by the defendants were from unsafe
waters or unfit for human consumption.  Consequently, the
attenuated legal argument presented by the government is not
supported by the circumstances of this case, which pertain to
overharvesting and undercounting, as there are no allegations
that the defendants actually impeded the proper administration of
the FDA or that public health was threatened.

     The most important difference between the obstruction of
justice charge and the Lacey Act violation is the heavy penalty
associated with the obstruction of justice charge as opposed to
the Lacey Act.  Indeed, the government's argument that because
the FDA had a right to inspect the oyster records at any time,
and therefore, these wildlife records are always "under
investigation," means that any falsification of a wildlife record

---

the destruction of vegetative cells of microorganisms of public
health concern." 21 C.F.R. § 123.20.
     The direct record-keeping provision at issue in this case is
entitled "Source Control" and requires records to be kept by
shellfish processors "[i]n order to meet the requirements of
subpart A of this part as they apply to microbiological
contamination, chemical contamination, natural toxins, and
related food safety hazards." 21 C.F.R. § 123.28(a).  Processors
are also required to show "how they are controlling the origin of
molluscan shellfish they process" and to keep tags which indicate
the date of harvest, the location of the harvest, the quantity
and type of shellfish, the date of receipt by the processor and
the identity of the harvester.  21 C.F.R. § 123.28(a) and (c).
The purpose of the tag requirement is to enable the FDA and state
regulatory agencies to trace implicated shellfish to their
sources in the event of an illness outbreak.  60 F.R. 65096,
65167 (December 18, 1995).

would always be considered obstruction of justice and impeding the administration of the FDA, a federal agency. Critically, this would apply a maximum twenty year imprisonment penalty for conduct that Congress has expressly recognized in the Lacey Act should only be subject to a maximum of five years of incarceration. This would subvert Congress's deliberate calculation of penalties under the Lacey Act and instead, impose harsher penalties under a more generalized criminal statute having an attenuated connection to the actual circumstances of this case.

The Lacey Act provides precise and carefully calculated penalties to address the need for the preservation of wildlife and to prevent over-harvesting. Like in Dowling, "the Government's theory of this case presupposes a congressional decision to bring the felony provisions" of 18 U.S.C. § 1519, which makes available the harsh term of imprisonment of up to 20 years, to bear on falsification of oyster harvesting records simply because of the presence of FDA regulations and "thereby presumes congressional adoption of an indirect but blunderbuss solution to a problem treated with precision when considered directly" by Congress under the Lacey Act, contrary to Dowling, 473 U.S. at 225-26.

This discrepancy is indicative that Congress had no intention to reach false labeling of oyster harvesting when it

enacted the general obstruction of justice statute in § 1519. Further, § 1519 was enacted to "close loopholes in the existing criminal laws relating to the destruction or fabrication of evidence and the preservation of financial and audit records." (S. Rep. 107-146 at 14 (May 6, 2002)).  The Lacey Act was enacted in 1988 to carefully prescribe the penalties for falsification of wildlife records and therefore cannot be considered a "loophole" in need of closing by the application of Section 1519 more than ten years later in 2002.

After reviewing the arguments and submissions of the parties, the court finds that the obstruction of justice charges under § 1519 contained in Counts VI and VIII of the Indictment must be dismissed because the same conduct, already the basis of Counts II and IV under the Lacey Act, has been specifically addressed by Congress, which has provided a substantially lesser maximum penalty.  The court is mindful that "due respect for the prerogatives of Congress in defining federal crimes prompts restraint in this area" and a "narrow interpretation" of criminal statutes is appropriate.  Dowling, 473 U.S. at 213.

> The rule that penal laws are to be construed strictly, is perhaps not much less old than construction itself. It is founded on the tenderness of the law for the rights of individuals; and on the plain principle that the power of punishment is vested in the legislative, not in the judicial department.  It is the legislature, not the Court, which is to define a crime, and ordain its punishment.

Id. at 213-14

The court finds unpersuasive the government's argument that Congress intended to encompass the falsification of fishery records within the Obstruction of Justice statute when the alleged falsified documents were already regulated by the Lacey Act and there is no indication in the congressional record that the Obstruction of Justice statute was meant to supersede the penalties already imposed under federal law.  In addition, while the Obstruction of Justice statute is meant to be construed broadly, the Indictment in this case does not sufficiently allege that the falsification of these documents as to quantities of oysters harvested and sold impeded the proper administration of a federal agency, the FDA, as to public health, as discussed above.

To hold otherwise would imbue the Obstruction of Justice statute with a sweeping interpretation that would criminalize conduct which is already expressly addressed in the Lacey Act and encompass conduct that has no impact on the actual administration of the FDA on matters of public health.  Congress expressed its intent, in other words, that falsification of required records in connection with oyster harvesting and sales be prosecuted and punished under the Lacey Act rather than under the more general provisions of the 2002 amendments to Section 1519.

Therefore, the court will dismiss Counts VI and VIII of the Indictment against Defendant Thomas Reeves.  Defendants Todd Reeves and Shellrock, LLC, joined this motion as both of these

Defendants are also charged with obstruction of justice in violation to § 1519 in Counts VI and VIII as well as violations of the Lacey Act for the same time period in Counts II and IV. The reasoning articulated above applies equally to these defendants and therefore the court will also dismiss the obstruction of justice charges under 18 U.S.C. § 1519 in Counts VI and VIII against Defendants Todd Reeves and Shellrock LLC.

In addition, Defendants Kenneth Bailey, Mark Bryan, Pamela Meloney and Harbor House LLC joined this motion. While these defendants similarly face charges for violations of the Lacey Act as well as obstruction of justice,[4] the facts underlying these charges differ from the charges brought in Counts VI and VIII.

---

[4] Specifically, Defendants Thomas Reeves, Todd Reeves, Renee Reeves, Shellrock, LLC d/b/a Reeves Brothers, Mark Bryan, Pamela Meloney and Harbor House, Inc., are charged with violating 16 U.S.C. §§ 3372(d)(2)and 3373(d)(3)(A)(ii) of the Lacey Act in Count II from August 2, 2006 through on or about November 13, 2006.  Count VII charges Defendants Mark Bryan, Pamela Meloney and Harbor House, Inc. with violating 18 U.S.C. § 1519 from August 2, 2006 through on or about October 3, 2006.

Similarly, Count IV charges Defendants Thomas Reeves, Todd Reeves, Renee Reeves, Shellrock, LLC d/b/a Reeves Brothers, Mark Bryan, Pamela Meloney and Harbor House, Inc. with violating 16 U.S.C. §§ 3372(d)(2)and 3373(d)(3)(A)(ii) of the Lacey Act from April 19, 2007 through on or about October 4, 2007.  Count IX charges  Defendants Mark Bryan, Pamela Meloney and Harbor House, Inc. with violating 18 U.S.C. § 1519 from August 9, 2007 through on or about October 2, 2007.

In addition, Count XIII charges Defendant Kenneth W. Bailey with violating with violating 16 U.S.C. §§ 3372(d)(2)and 3373(d)(3)(A)(ii) of the Lacey Act from April 24, 2007 through on or about October 24, 2007.  Count XV charges Defendant Kenneth W. Bailey with violating 18 U.S.C. § 1519 from April 24, 2007 through on or about October 31, 2007.

These defendants did not brief their argument for dismissal, the court did not have the benefit of hearing argument on whether dismissal was appropriate as to these additional counts and these counts are distinct from Counts VI and VIII which are the basis of the present motion. Therefore, the court will not dismiss the obstruction of justice charges in Counts VII, IX and XV which charges Defendants Mark Bryan, Pamela Meloney, Harbor House, Inc., and Kenneth Bailey respectively, at this time.

## IV. DEFENDANT MELONEY'S MOTION TO DISMISS FOR PROSECUTORIAL MISCONDUCT

### A. The Parties' Arguments

The third pretrial motion was filed by Defendant Meloney and urges the Indictment be dismissed for prosecutorial misconduct. Defendant Meloney bases her motion on three different instances of alleged misconduct.

First, Defendant Meloney argues that the prosecution diminished Meloney's Sixth Amendment right to obtain counsel by commenting before the Grand Jury on Meloney's decision to retain counsel.

Second, Defendant Meloney argues the prosecution infringed her Fifth Amendment right to remain silent by criticizing her decision not to speak to a government agent prior to her grand jury testimony, in response to the government agent's attempt at reaching out to her several times.

Finally, Meloney contends that the prosecution destroyed the

34

fairness of the grand jury proceeding when the government's attorney misrepresented the content of earlier statements made by Meloney.  Through this alleged false characterization of the evidence, Meloney argues that the government suggested to the grand jury that she had changed her story, when she had not. Specifically, this conduct involved the government questioning Meloney before the grand jury regarding an admission that Meloney made to special agents stating that she falsified the company's oyster purchase logs.  The evidence shows and the parties do not dispute that Meloney never made such an admission to the special agents; indeed, the grand jury heard Meloney's testimony denying she had ever made such an admission to the agents.

The government argues that dismissal of an indictment is an extreme remedy and not warranted in this case.  The government cites to several U.S. Supreme Court and Third Circuit precedents explaining the standard for dismissal of an indictment for prosecutorial misconduct, including <u>Bank of Nova Scotia v. United States</u>, 487 U.S. 250 (1988)(district court may not dismiss indictment for errors in grand jury proceedings unless such errors prejudiced the defendant) and <u>United States v. Perez</u>, 246 Fed. Appx. 140, 143-44 (3d Cir. 2007)(explaining where fundamental error was committed at the grand jury stage so that the structural protections of the grand jury were so compromised as to render the proceedings fundamentally unfair, the court

35

applies a presumption of prejudice).  The government admits that
a court may dismiss an indictment for prosecutorial misconduct
that violates a constitutional guarantee.  United States v.
Williams, 504 U.S. 36 at 46 n.6 (1992).

As to Meloney's allegations that the government violated her
Sixth Amendment right to counsel, the government argues that its
questions regarding Meloney's representation were permissible.
The government maintains that it did not seek or solicit any
attorney-client privileged information.  Further, the government
maintains that its questions stemmed from its concern that
Meloney be represented by conflict free counsel.

The government also denies that it violated Meloney's Fifth
Amendment right to remain silent by asking her questions about
her refusal to talk with government agents.  The government
argues it was laying the foundation for Meloney to be considered
a hostile witness and that its questions about Meloney's rebuffs
of government agents did not prejudice her.

Finally, the government argues that any misstatements made
regarding Meloney's statements to NOAA agents about the accuracy
of the log are not sufficient to dismiss the indictment.  First,
the government argues it had a good faith basis for these
questions because later entries in the log were found to be
inaccurate.  Second, the government maintains that the commission
of mere errors in presenting the evidence to the grand jury does

36

not rise to the level of misconduct.  The government relies on
United States v. Fisher, 871 F.2d 444, 450 (3d Cir. 1989)(holding
that misstatements or mistakes alone are not sufficient to
warrant a finding of misconduct or to justify dismissal of an
indictment and citing to Bank of Nova Scotia v. U.S., 487 U.S.
250 (1988) which held that a prosecutor must have knowledge of
falsity).

    Here, the government argues that any mis-characterization of
Meloney's previous statements to NOAA agents regarding the logs
alone is insufficient to dismiss the indictment and was not
prejudicial to the defendant.  The government argues that since
Defendant Meloney denied the government's offending questions, no
prejudice occurred.  In addition, the government maintains that
there was ample evidence to indict Meloney aside from these two
questions, and has outlined the evidence in its in camera
submission.

    Defendant Meloney replied to the government's opposition and
argued that the government's misstatements signaled to the grand
jurors that Meloney had confessed to the criminal activity under
investigation when in fact she did not and that this misstatement
is extremely prejudicial.  Moreover, the government's
misstatement went to the heart of the indictment - whether
Meloney falsified records.  In support of this argument, the
Defendant cites to U.S. v. Serubo, 604 F.2d 807 (3d Cir.

1979)(where significant improprieties are shown, such as questioning that attempts to link a witness to organized crime without an evidentiary foundation or comment on the veracity of the witness, the indictment should be quashed).

Furthermore, Defendant Meloney contends these misstatements along with the government's alleged infringement of her Sixth Amendment right to counsel and Fifth Amendment right to remain silent unfairly biased the grand jury.  In particular, the Defendant argues that the government chided her for not speaking to the government and then insinuated that she previously confessed to the criminal wrong doing alleged.  Defendant Meloney argues that the government's contention that it was only laying a foundation for a hostile witness is hollow and insufficient to justify the unfairness of the grand jury proceeding.

### B. Analysis

The Supreme Court has held that with regard to non-constitutional violations, "dismissal of the indictment is appropriate only if it is established that the violation substantially influenced the grand jury's decision to indict or if there is grave doubt that the decision to indict was free from the substantial influence of such violations." Bank of Nova Scotia, 487 U.S. at 256 (citations omitted).  In addition, indictments may be "dismissed, without a particular assessment of the prejudicial impact of the errors in each case, because the

38

errors are deemed fundamental." Id.  The cases which fall into
this isolated exception to the harmless error rule "are ones in
which the structural protections of the grand jury have been so
compromised as to render the proceedings fundamentally unfair,
allowing the presumption of prejudice," such as where racial
discrimination occurred in the selection of the grand jurors or
where women had been excluded from the grand jury.  Id. at 257.
This is because the grand jury "is a constitutional fixture in
its own right." United States v. Williams, 504 U.S. at 48
(citations omitted).  Most non-structural constitutional errors
are also subject to harmless error review. Neder v. United
States, 527 U.S. 1, 7 (1999).  A court must look at the
cumulative effect of the alleged instances of misconduct and view
the alleged misconduct in the context of the entirety of the
evidence and proceedings before the grand jury. Bank of Nova
Scotia, 487 U.S. at 263.

Another court has held in a non-published opinion:
"Impermissible comment on a defendant's invocation of the right
to remain silent during grand jury proceedings requires dismissal
of the indictment if it is an impermissible attempt to infringe
on the ability of the grand jury to exercise its own independent
judgment in determining whether there was probable cause."
United States v. Monteiro, No. 03-10329, 2005 U.S. Dist. LEXIS
39122, **5-6 (D. Mass. 2005).  It is well established the pre-

arrest silence may not be introduced as substantive evidence of guilt.  Brecht v. Abrahamson, 507 U.S. 619, 628 (1993); Jenkins v. Anderson, 447 U.S. 231, 238 (holding that pre-arrest silence may be used against a defendant for impeachment purposes only).

First, the court must determine whether misconduct occurred during the grand jury testimony of Meloney.  There are three instances of alleged misconduct that must be evaluated: (1) the questioning regarding Meloney's choice of counsel; (2) the questioning regarding Meloney's choice to refrain from speaking with the government; and (3) the question which misrepresented the evidence against Meloney and implied that she had admitted to the crime charged.

The court finds that the questions regarding Meloney's choice of counsel were proper.  The government had a good faith basis for asking these questions considering the conflict issue which arose with Meloney's previous counsel, Mr. Reilly, who was subsequently disqualified from this case due to multiple conflicts of interest. [Docket Item 89, Opinion of the Court, December 2, 2011.]  In addition, the government's questions did not violate any attorney-client privilege and the question regarding who paid for Meloney's counsel was proper and not an infringement on of her right to retain counsel, as it was relevant to the necessary conflict inquiry.  Therefore, the court finds that no misconduct occurred as a result of the government's

questions about Meloney's retention of counsel.

The next two issues - questioning Meloney about her refusal
to meet again with the agents, and questioning which suggested
she had admitted to agents that she knew the logs she was keeping
were not accurate - have their origin in statements Meloney did
make to an agent in the course of the execution of the search
warrant at Harbor House on February 4, 2009.  According to the
Memorandum of Interview dated February 10, 2009 (Gov. Ex. %),
Meloney admitted to knowing of discrepancies in the paperwork
between the amounts of actual purchases of oysters for which
Harbor House paid Reeves Brothers and the lesser amounts
reflected on the allegedly false invoices which Harbor House
maintained in its records.  According to the Memorandum of
Interview, the following interchange with Meloney was
memorialized:

> [The Special Agents] presented MELONEY with a white
> binder containing detailed spreadsheets of oyster
> purchases.  The binder found in her desk was titled
> "Oyster Purchases."  MELONEY identified that binder and
> explained that she created and maintained that binder
> spreadsheets [sic] for Delaware Department of Health.
>
> MELONEY was directed to the page outlining the July 18,
> 2007 purchase that was previously discussed in the second
> interview.  The entry in the spreadsheet indicated that
> 165 bushels were purchased from the REEVES Brothers on
> that day, not 100 as the invoices maintained by Harbor
> House suggested.  165 bushels at $43.00 per bushel
> matched the check prices of $7095 exactly.  After viewing
> the information, MELONEY stated "I was going to call you
> about that."
>
> MELONEY stated that she was aware of the conflicting

invoices.  When the truck arrives, the paperwork is given
to her at her desk.  MELONEY stated that the total amount
of bushels for a given transaction are usually written on
the outside of the envelope containing the invoices.
After copying that bushel amount off the envelope, it is
disposed of and the invoices are filed.

MELONEY indicated that the bushel amounts in the
spreadsheets contained in the binder are correct.

MELONEY stated that there was not always a discrepancy in
the paperwork, but it was frequent.  The discrepancies
began "a couple of years ago."  The discrepancies
progressively increased in both frequency and amounts.

(Gov. Ex. 5 at 1-3.)

The Defendant's challenge to the government's questioning

regarding Meloney's refusal to speak with special agents prior to

her grand jury testimony arises from Meloney's indication that

she was going to call the agents about the discrepancies.

Specifically, the examining attorney, Wayne D. Hettenbach,

engaged in the following questions with Meloney during the grand

jury proceeding:

Q.  When you were initially served you were contacted by
a special agent for the government?  Do you recall that?

A.  Yes.

Q.  A Mr. Jim Kasson?

***

Q.  But do you recall Mr. Kasson left you a phone message
after you were served?

A.  Yes.

Q.  In fact, he left you two messages.  Do you remember
that?

A.  Yes.

Q.  Okay.  And Mr. Kasson indicated that he wanted to talk with you and that the government wanted to talk to you about this case.  Do you recall that?

A.  Yes.

Q.  And you didn't return those calls, correct?

A.  No.

Q.  And then last week you completed handwriting exemplars pursuant to a grand jury subpoena, correct?

A.  Yes.

Q.  And before Mr. Kasson contacted you again and spoke with you and said that we would like to talk with you - you didn't have to talk with us, but we wanted you just to hear what we had to say.  Do you recall that conversation?

A.  Yes.

Q.  And you refused to even listen to what the government had to say to you, isn't that right?

A.  Well by - per counsel, yes.

Q.  Okay.  But that was your decision wasn't it?

A.  Yes, uh huh.

Q.  It was your decision not to talk to the government before you came in here today to testify, correct?

A.  Right.  I said I would talk to you when we got in here, yes.

(Def. Ex. B.)

This questioning by the government regarding Meloney's decision not to talk to special agents prior to testifying was poorly framed and it is a close question whether this line of

43

inquiry infringed her Fifth Amendment right.  The prosecutor asked these questions regarding Meloney's decision not to speak with government agents.

In justifying these questions, the government initially posited in its brief that these questions were meant to establish Meloney as a hostile witness pursuant to Fed. R. Evid. 611(c). At oral argument, the government did not pursue its hostile witness theory and instead maintained that these questions were to elicit whether Meloney's decision not to speak with the government was voluntary.  In addition, the government argued that these questions should not be considered commentary on Meloney's right to remain silent because they were questions and not part of the government's summation or phrased in the form of a comment.

First, Meloney's decision not to speak with the government prior to testifying before the grand jury is irrelevant to the crimes for which she was indicted.  In particular, the government did not ask Meloney if she was coerced and rather characterized her actions as a refusal in front of the grand jury.  The government did not ask Meloney whether her decision was "voluntary" until the government had extensively questioned her about the government attempts to contact her and characterized her silence as a refusal to "even listen to what the government had to say."  If the government's objective with this questioning

was to see if Meloney was acting under coercion, then the questions posited by the examining attorney were at best clumsy and failed to attain this objective.

Further, improper questioning by the government in front of the grand jury can constitute an impermissible comment on a defendant's right to remain silent even though these statements were couched in the form of a question and not presented in the government's summation or closing remarks.  The key inquiry is whether the government's questions created an impermissible inference of guilt from a defendant's choice to remain silent. Doyle v. Ohio, 426 U.S. 610 (1976).  The government's question which included the statement that Meloney "refused to even listen to what the government had to say" borders on government comment on Meloney's right to remain silent and arguably characterizes her actions as obstinate instead of a lawful exercise of her constitutional right.

Nevertheless, the court does not find that this questioning rises to the level of intentional misconduct.  The government's questioning was careless and arguably could be seen to criticize Meloney's refusal to speak to the government agents.  However, these questions were set forth at the outset of her testimony, lasted only a short duration and were not were not referenced again for the rest of the Meloney's testimony.  Moreover, it is undisputed that Meloney spoke to the agents at length during the

course of the search warrant execution in February 2009, and indicated to them it was her intent to contact the agents to discuss the discrepancies in her records.  That she later did not do so is thus related to her earlier statement that she had intended to do so.  The grand jury also had the benefit of Meloney's answers and responsiveness to the many substantive questions posed, and it could not have been left with the impression that she was actually invoking a right to silence. Therefore, the court is satisfied that this questioning does not rise to the level of intentional government misconduct.

Finally, the Defendant challenges the government's question which contained the allegedly false premise that Meloney had admitted to falsifying fishery logs when in fact, the logs she kept were accurate and were acknowledged as accurate by the NOAA agents during the execution of the search warrant. Specifically, the transcript states the following:

Q: You told the agents that day you knew the logs weren't accurate when you were keeping them, is that right?

A: No, I didn't.  No, I did not.

Q: You don't remember that?

A: They never asked me.  They just asked me if I kept the logs and I said yes.  Was that my handwriting and I said yes.

Q: Did you tell the agents – when they asked you about the discrepancies between the logs and the amount that Harbor House had bought you said, yeah, I need to talk to you about that?

46

A: No. I don't recall.

Q: No, you didn't, or no, you don't recall saying that just –

A: I don't recall and I don't think I said it.

(Def.'s Ex. B at 55:3-17.)

In fact, the evidence shows that Meloney never made such an admission to the NOAA agents in so many words, but that she had indeed admitted that she "was aware of the conflicting invoices" and that such discrepancies in the paperwork were "frequent.  The discrepancies began a couple of years ago.  The discrepancies progressively increased in frequency and amounts."  (Meloney Memorandum of Interview, Gov. Ex. 5, supra).  Thus, she had acknowledged that she knew that the paperwork discrepancies in her oyster sales recordkeeping regarding the Reeves Brothers transactions were occurring and getting more frequent and larger in amount in the years leading to 2009.

During oral argument, the government admitted that this question contained a misleading premise; however, the government maintained that the form of the question was not intended to create a false premise and was the result of inadvertent phrasing by the examining attorney.  At most, the government argues this rises to the level of confusion with the factual premise and not misconduct.  Further, Meloney denied the question, so the government argues there is no prejudice.

The court is satisfied that this question, while based on a

47

false premise that Meloney admitted to maintaining false logs, was the result of inadvertent confusion on the part of the examining attorney and does not rise to the level of prosecutorial misconduct.  The proper question would have been to ask her whether she knew that her invoice records of these transactions had frequent and increasing discrepancies.  However, while this question might not be the result of misconduct, the court recognizes it could cause prejudice to the grand jury.  The effect of the government's questioning could arguably be to place in the mind of the grand jury that she had admitted to maintaining false logs for which she was being investigated, rather than her admission, one step short of that, to maintaining records with ever-larger discrepancies regarding the amounts of oysters involved in the Reeves Brothers account maintained in her office.

After conducting the in camera review, the court concludes that there was not substantial prejudice as a result of these questions and the court is satisfied that the decision to indict Meloney was free from the substantial influence of any negative inferences that could have been drawn from these questions.

In reviewing the grand jury transcript, the court finds the government presented three types of evidence against Meloney - Meloney's testimony, the testimony of the summary agent and documentary exhibits.  The main documents presented to Meloney

during her testimony were a facsimile to her from Defendant Renee Reeves in 2004 and copies of invoices and oyster logs kept at Harbor House.  Both Meloney and the summary agent testified about these documents.

The evidence presented against Meloney is sufficient for the grand jury to have concluded that Meloney knew the logs she kept did not accurately reflect the amount of oysters actually received by Harbor House from the Reeves Brothers and therefore, Meloney knew she was falsifying the fishery logs at issue.  This is a permissible basis for an indictment.

First, the examining attorney's questions elicited that Meloney knew the invoices from the Reeves brothers indicating the amount of oysters harvested did not match her logs she kept for the health department.  The logs that Meloney kept reflected the accurate number of oysters harvested as evidenced by her testimony and the testimony of the summary agent.  However, the logs began to be inaccurate after August, 2007 according to the summary agent.  It does not matter that Meloney was never questioned about these dates.  Each log was signed by Meloney and she was the only employee of Harbor House to certify that the logs were accurate during the 2004 to 2007 time period.  The summary agent also presented testimony that during the execution of the search warrant in 2009, government agents searched Meloney's computer and found two sets of logs for May 2004.  One

log was accurate as to the number of oysters purchased from the
Reeves Brothers and one log was an inaccurate file.

In addition, there was a fax from Renee Reeves to Pamela
Meloney with two invoices for the same day in 2004 that included
different numbers of oysters harvested.  The summary agent
testified that Meloney paid for the higher number of oysters.
Meloney also expressed to the agents that she was aware of the
discrepancies in the invoices from the Reeves Brothers and the
actual number of oysters purchased by Harbor House.  Meloney was
also asked by the examining attorney whether she knew that the
number of bushels she recorded for October 4, 2007 was false
because Harbor House purchased a greater number of bushels from
Reeves Brothers that day.  Meloney denied knowing that her log
entry for this day was false, but the grand jury need not accept
her denial.

The summary agent also testified to an occasion in 2006
where there were two invoices from the Reeves for different
amounts of oysters for the same transaction and the check stub
stapled to the two invoices corresponds to the payment for the
amount of oysters on the higher invoices.  The FDA log for Harbor
House on this date did not match the amount of oysters purchased
from the Reeves Brothers and this log was signed by Meloney.  In
addition, the summary agent testified that Harbor House made
false entries in its FDA log for many dates in 2006 and that

Meloney was the bookkeeper for Harbor House and the preparer of and signatory on all the FDA logs.  There was more than ample evidence that Meloney was the bookkeeper and office worker who kept track of the oyster sales and paperwork, which the grand jury knew to contain gross and frequent discrepancies and falsehoods.

Also, the summary agent testified that on October 5, 2007, Mark Bryan was interviewed by a NOAA agent in Bryan's office and the NOAA agent requested records regarding Harbor House's purchases from the Reeves Brothers from August 2007 to October 2007.  Mark Bryan left his office and spoke with Pamela Meloney. About an hour later, Meloney gave Bryan the Reeves Brothers invoices for that time period and Bryan then turned these invoices over to the NOAA agent.  Bryan represented to the agent that these invoices were from Harbor House files.  These invoices later were found to be false and inaccurately reflected the quantity of oysters purchased by Harbor House from the Reeves Brothers.  It was also later discovered that these invoices were allegedly faxed to Harbor House from the Todd and Renee Reeves' home fax.

The examining attorney later asked a conclusory question of the summary agent about Meloney's involvement in this scheme in order to summarize the evidence against Meloney before the grand jury.  Specifically, the examining attorney asked if during the

execution of the search warrant, Meloney indicated an awareness that the records she was keeping did not in fact correspond to the amounts of oysters that Harbor House was getting.  The summary agent answered in the affirmative.  This is supported by the Memorandum of Interview in which Meloney indicated that while her logs were accurate, she was aware of the conflicting invoices and these discrepancies had increased in number and frequency during the past couple years.

In reviewing the grand jury transcript as a whole, the court is satisfied that the basis for the indictment against Meloney was free from any prejudice that could have been created by the examining attorney's questions regarding Meloney's decision to refrain from speaking with the NOAA agents prior to her grand jury testimony and the question containing the incorrect premise. There was such ample and well-documented evidence supporting the grand jury's finding of probable cause to indict Ms. Meloney that the court is left with no doubt about the validity and fairness of the grand jury process.  There was no structural deprivation of Ms. Meloney's rights.  Therefore, the indictment as to Defendant Pamela Meloney was properly issued and the court will deny Meloney's motion to dismiss.

## V.  CONCLUSION

For the reasons discussed herein, the court finds as follows.  Defendant Mark Bryan's motion to sever is denied;

however, Defendant Meloney's statements must be redacted to remove Defendant Bryan's name if the government wishes to admit these statements into evidence.

Defendant Thomas Reeves' motion to dismiss Counts VI and VIII of the Indictment is granted because the court finds Congress did not intend to reach falsification of fishery documents when enacting the obstruction of justice statute as Congress had already carefully calculated the appropriate penalties for this offense through the Lacey Act.  As Defendants Todd Reeves and Shellrock LLC joined this motion and since these defendants similarly face charges for violations of the Lacey Act in Count II as well as obstruction of justice charges in Counts VI and VIII, the court will also dismiss the obstruction of justice charges against these defendants for the reasoning set forth in Section III above.  However, the court will not dismiss the obstruction of justice charges against Defendants Mark Bryan, Pamela Meloney, Harbor House, Inc., and Kenneth Bailey, as these defendants do not face obstruction charges in Counts VI and VIII and the court has not had the benefit and briefing and argument regarding the additional counts which apply to these defendants, noting that some of these other obstruction counts may embrace criminal conduct extending beyond that covered by the Lacey Act, in contrast to Counts VI and VIII.

Finally, the court will deny Defendant Meloney's motion to

dismiss the indictment for prosecutorial misconduct.  The court finds that the examining attorney for the government did not engage in intentional misconduct by questioning Defendant Meloney in front of the grand jury regarding her decision to not speak with the special agents investigating this case.  While these questions were poorly framed, the court finds that they were not asked with the intention to create an impermissible inference of guilt and stemmed from Meloney's prior statements to special agents and therefore cannot be considered intentional misconduct. In addition, the examining attorney also insinuated that Meloney had confessed to the criminal conduct of falsifying documents by relying on her statements made to special agents during the execution of a search warrant.  The evidence showed that Meloney told the agents that the she was aware of discrepancies between her records and the Reeves Brothers' invoices; however, Meloney's statements did not expressly admit that her own records were inaccurate.  The court finds this question was made in good faith and the misleading premise was the result of inadvertence.

    After conducting an in camera review of the grand jury transcript, the court finds that the decision to indict Defendant Meloney had a proper basis and was free from any negative influence the examining attorney's questions might have created. Therefore, the court will not dismiss the indictment.

The accompanying Order will be entered.


**May 25, 2012**                          **s/ Jerome B. Simandle**
Date                                      JEROME B. SIMANDLE
                                          Chief U.S. District Judge