IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

```
                                  :
UNITED STATES OF AMERICA          :
                                  :
        v.                        :        Criminal No. 11-520 (JBS)
                                  :
THOMAS REEVES                     :
TODD REEVES                       :        **OPINION**
RENEE REEVES                      :
SHELLROCK, LLC                    :
KENNETH W. BAILEY                 :
MARK BRYAN                        :
PAMELA MELONEY                    :
HARBOR HOUSE, INC.,               :
                                  :
                Defendants.       :
                                  :
```

APPEARANCES:

Wayne D. Hettenbach, Senior Trial Attorney
Patrick M. Duggan, Trial Attorney
U.S. DEPARTMENT OF JUSTICE
ENVIRONMENTAL CRIMES SECTION
P.O. Box 23985
Washington, D.C. 20026

William J. Hughes, Jr., Esq.
COOPER, LEVENSON, APRIL, NIEDELMAN & WAGENHEIM, PA
1125 Atlantic Avenue
3rd Floor
Atlantic City, NJ 08401
     Attorney for Defendant Thomas Reeves
     Co-Counsel for Defendant Shellrock, LLC

Edwin J. Jacobs, Jr., Esq.
Michael F. Myers, Esq.
JACOBS & BARBONE
1125 Pacific Avenue
Atlantic City, NJ 08401
     Attorney for Defendant Todd Reeves
     Co-Counsel for Defendant Shellrock, LLC

Alois Harold Kokes, Esq.
728 West Avenue

Suite S201
Ocean City, NJ 08226
     Attorney for Defendant Renee Reeves

John S. Furlong, Esq.
FURLONG & KRASNY, ESQS.
Mountain View Office Park
820 Bear Tavern Road
Suite 304
West Trenton, NJ 08628
     Attorney for Defendant Mark Bryan

Justin T. Loughry, Esq.
Lawrence W. Lindsay, Esq.
LOUGHRY & LINDSAY, LLC
330 Market Street
Camden, NJ 08102
     Attorneys for Defendant Pamela Meloney

Kevin P. McCann, Esq.
Beth Ann Hellriegel White, Esq.
CHANCE & MCCANN LLC
201 W. Commerce St.
P.O. Box 278
Bridgeton, NJ 08302
     Attorneys for Defendant Kenneth Bailey


**SIMANDLE**, Chief Judge:

I.   **INTRODUCTION**

     Under the Lacey Act, 16 U.S.C. §§ 3371-3378, Congress has

provided for federal criminal penalties premised upon the

violation of various state, tribal, foreign and federal fish and

wildlife protection laws.  It is, for example, a federal crime to

knowingly sell or purchase, in interstate commerce, fish or

wildlife that has been taken "in violation of any law or

regulation of any State," 16 U.S.C. § 3372(a)(2)(A).  The

indictment herein charges, among other things, that several

2

defendants violated § 3372(a)(2)(A) by buying or selling or
transporting oysters in interstate commerce that had been taken,
possessed or transported in violation of the laws and regulations
of New Jersey because "the oysters were not reported as required,
and were in excess of the amount authorized to be harvested and
landed" under New Jersey law and regulations.  See Indictment,
Counts III, V, XII and XIV.

This matter, presently on trial upon a 15-count indictment,
is before the Court on the government's request for a
determination of law. [Docket Item 198.]  The government asks the
court to conclude as a matter of law that the oyster harvest
conditions set annually by the New Jersey Department of
Environmental Protection ("DEP") during the years 2004-2007
constituted a state "law or regulation" under 16 U.S.C. §
3372(a)(2)(A) of the Lacey Act.  The government argues that
violations of these harvest conditions requiring oyster
harvesters to comply with the oyster quota, make daily call-ins
and maintain a weekly Harvest Log are sufficient to serve as a
basis for Counts III, V, XII and XIV which charge the Defendants
with trafficking violations under the Lacey Act.

Defendant Thomas Reeves, joined by the other Defendants
charged in those Lacey Act trafficking counts, filed opposition
to this motion and argues that the oyster permit Terms and
Conditions set by the DEP in the years at issue, 2004 to 2007,

did not constitute a state "law or regulation" for purposes of the Lacey Act. [Docket Item 202.]   Specifically, Defendant Reeves argues that, contrary to New Jersey law, these conditions were not passed in accordance with New Jersey's Administrative Procedure Act, N.J.S.A. 52:14B-2(e) and therefore are not considered valid rules or regulations, and the violation of an oyster permit Term and Condition that is not in a New Jersey law or regulation cannot serve as a predicate for a Lacey Act trafficking crime.

For the reasons discussed herein, the court determines that the oyster license harvesting conditions for seed bed quotas, daily call-in and weekly vessel logs set annually by the DEP from 2004 to 2007 and attached as "Terms and Conditions" of the oyster license agreements of 2004-2007 should have been, but were not, adopted as laws or regulations of the State of New Jersey[1] and therefore their violation cannot serve as a basis for the Lacey Act trafficking crimes charged in Counts III, V, XII and XIV.

## II.  BACKGROUND

The instant criminal action involves charges of conspiracy

---

[1] Subsequent to the 2004 to 2007 time period in the indictment for which these oyster license Terms and Conditions were at issue, the New Jersey Department of Environmental Protection in 2010 duly promulgated amendments to its oyster regulations at N.J.A.C. 7:25A-2.1 et seq. (2010) that included these requirements explicitly.  These 2010 amendments are not at issue here, since the crimes allegedly occurred in 2004-2007. See also discussion at Part III.D, below.

and substantive violations of the Lacey Act trafficking and record keeping requirements, as well as obstruction of justice, concerning commercial oystering in New Jersey's Delaware Bay and the interstate sale and transportation of such oysters. These charges are largely based on the alleged over-harvesting of oysters and falsification of records regarding oysters sales by harvesters and dealers. Multiple Defendants are charged including Thomas Reeves, Todd Reeves, Renee Reeves, Shellrock, LLC, Kenneth W. Bailey, Mark Bryan, Pamela Meloney and Harbor House, Inc., except that Bailey is not charged with conspiracy.

As relevant to the present motion, Count III charges Defendants Thomas Reeves, Todd Reeves, Shellrock, LLC, Mark Bryan and Harbor House, Inc. with violating 16 U.S.C. § 3372(a)(2)(A) and 3373(d)(1)(B) of the Lacey Act from August 2, 2006 through on or about October 9, 2006 in the District of New Jersey, and aiding and abetting this crime under 18 U.S.C. § 2. The charging language specifically states that these defendants trafficked fish or wildlife "in a manner unlawful under the laws and regulations of New Jersey." The Indictment incorporates the following New Jersey statutes: N.J.S.A. §§ 50:1-5; 50:3-8; 50:3-16.13; 50:3-16-14 and 50:3-16-21; 8:13-1.1. The Indictment also incorporates the following administrative code provisions: N.J. Admin. Code §§ 7:25A-1.9; 7:25A-4.4 and 7:25A-4.5.

Similarly, Count V charges the same defendants with the

5

identical Lacey Act trafficking violation from April 19, 2007
through on or about October 4, 2007.  Counts XII and XIV charge
Defendant Kenneth Bailey with violating the Lacey Act by
trafficking fish or wildlife "in a manner unlawful under the laws
and regulations of New Jersey" from August 2, 2006 through
November 2, 2006 and April 24, 2007 through October 24, 2007
respectively.  These counts also incorporate the same New Jersey
statutes and provisions of the administrative code as articulated
above.

## III. DISCUSSION

Section 3372(a)(2)(A) of the Lacey Act provides:

(a) Offenses other than marking offenses. It is unlawful
for any person–
...
    (2) to import, export, transport, sell, receive,
    acquire, or purchase in interstate or foreign
    commerce--
        (A) any fish or wildlife taken, possessed,
        transported, or sold in violation of any law
        or regulation of any State or in violation of
        any foreign law;

The narrow issue presented for determination is whether a
violation of the Terms and Conditions of a defendant's seasonal
oystering permit, issued by the DEP during the years 2004 through
2007, is a "violation of any law or regulation" of New Jersey, as
defined in 16 U.S.C. § 3372(a)(2)(A).  The three specific Terms
and Conditions at issue are: the annual quota imposed upon each
licensee for harvesting seed bed oysters (i.e., the "quota"
term); the requirement to call in to the local DEP office to

6

report the daily seed bed catch for that vessel (the "call-in" requirement); and the requirement to maintain a weekly vessel log of seed bed oysters harvested by that vessel (the "weekly vessel log" requirement).

### A. The New Jersey Program Managing the State's Oyster Seed Beds, 2004-2007

A brief word about the context of these Terms and Conditions is necessary.  As discussed further below, the State of New Jersey empowers the Commissioner of the Department of Environmental Protection ("DEP") to control and direct the shellfish industry and protect the shellfish resource throughout the state.  N.J.S.A. 50:1-5.  The Commissioner is empowered to make such rules and regulations as may be necessary for the preservation of the shellfish industry and resources after consultation with the Shell Fisheries Council.  Id.  The Legislature has set forth that it is only lawful to catch and take oysters in certain portions of the Delaware Bay upon compliance with Title 50 "and any rules and regulations issued pursuant thereto. "  N.J.S.A. 50:3-16.3.  By statute, no person may catch oysters from the natural shellfish beds unless the Shellfish Council has issued an annual license for taking shellfish for each vessel so employed, for a term of not more than one year and containing an agreement by the license holder to abide by three statutorily enumerated terms, namely permitting inspections of the vessel and shellfish, delivering a portion of

oyster shells to the Shellfish Council, and payment of a fee to the state representing the value of oyster shells sold to persons not required to be licensed, N.J.S.A. 50:3-16.14(a),(b),(c); none of these statutory conditions upon the annual license agreement is at issue here.

During the years in question in this case, 2004 to 2007, the DEP operated under rather detailed regulations for oyster management promulgated at N.J.A.C. § 7:25A-1.1 through 1.10 (2005), and in particular N.J.A.C. § 7:25A-1.9 pertaining to harvesting oysters from the state's oyster seed beds.  The oyster seed bed regulations at 7:25A-1.9(a) state:

> (a) The Division [of Fish and Wildlife of the DEP] with the advice of the Delaware Bay Section of the Shellfisheries Council and the Haskin Shellfish Research Laboratory of Rutgers University, shall determine the season for the taking of seed oysters from the natural seed beds above the southwest line in Delaware Bay and shall determine which of the natural seed beds above the southwest line shall be opened.  Reasonable notice shall be given by the Division to all oyster dredge boat license holders of the dates of the beds to be opened and the conditions attendant on the opening.  Oyster seed beds shall be closed as determined in accordance with 9(i) below [based on weekly testing of seed bed areas]. Daily harvest shall be from 7:00 AM to 3:30 PM Monday through Friday.

Although none of the applicable statutes or regulations establish a quota on seed bed harvests, the DEP relies on the Delaware Bay section of the Shell Fisheries Council, in consultation with the Haskin Shellfish Research Laboratory, to make annual recommendations of the total quota for harvesting

oysters from the state seed beds.  The Delaware Bay Section is comprised of five commissioners who are members of the shellfish industry and who meet approximately eight times each year in public meetings with Division of Fish and Wildlife officials. The DEP sets the annual quota, though not by regulation nor with general notice or publication, and that quota figure is divided by the number of licensed oyster dredge vessels which intend to participate in the open season of seed bed oyster harvesting. The resulting quota is the same for each vessel, determined each year and subject to change as conditions warrant.

The oyster vessel owners then must sign a Statement of Understanding and Agreement to Terms for the annual direct market harvest season, containing terms and conditions upon the vessel's participation.  For example, Defendant Todd Reeves signed his Statement of Understanding and Agreement to Terms for the 2007 season with the Division of Fish and Wildlife (Exhibit G-17)(the "Agreement"), prior to the start of the 2007 oystering season. This Agreement acknowledges that the Division set a total season quota of 79,026 bushels of oysters and that the quota per licensed vessel was 1,040 bushels.  Id. at ¶ 1.5.  This oystering quota is one of the terms and conditions Reeves is accused of violating by exceeding the quota for the season.

Another disputed requirement is the term in ¶ 1.13 of the Agreement, requiring the oyster harvester to place two calls to

9

the Division's office when harvesting seed bed oysters.  The
first call is prior to the workday reporting the name of the
vessel and the seed bed area where the vessel intends to harvest
oysters.  The second call is at the end of the harvest day, to
report the vessel's name, harvest location, quantity of oysters
harvested, landing area and approximate time the oysters are to
be landed.  Agreement ¶ 1.13.  Reeves is accused of violating the
call-in term by underreporting the actual quantity of seed bed
oysters harvested.

A third disputed term refers to the filing of weekly
harvester reports.  The Agreement provides in ¶ 1.13, in relevant
part:  "Pursuant to the oyster management regulations (N.J.A.C.
7:25A-4.5), harvest reports must be submitted on forms required
by the Bureau."  Agreement ¶ 1.13.  The cross-reference to
N.J.A.C. 7:25A-4.5, however, is a regulation mandating dealers,
not harvesters, to supply to the Bureau of Shellfisheries weekly
oyster landing reports.  N.J.A.C. 7:25A-4.5(a).  Thus the dealer
must keep a log of all oysters received that were harvested from
the Delaware Bay, noting the date, time, vessel license number
and quantity of bushels received, according to N.J.A.C. 7:25A-
4.5(b).[2]  The dealer sends the completed form to the Bureau of

---

[2] The dealer's weekly report requirement in N.J.A.C. 7:25A-
4.5(b) is not at issue in this motion, and several defendants are
also oyster dealers who were obliged by this regulation to file
such reports.  This Opinion instead addresses the separate term
of the Agreement requiring the harvester to furnish a weekly

Shellfisheries at the end of each week.  Id. at 4.5(c).  It is not apparent that the terms and conditions of the Agreement require an oyster harvester to submit weekly harvest reports, but the dealer who receives that harvest must submit weekly reports covering all Delaware Bay oysters received.  In any event, the government concedes that the Agreement's cross-reference to N.J.A.C. 7:25A-4.5(b) is inapt, but it urges nonetheless that the above-quoted statement in Agreement ¶ 1.13 has the force of a regulation requiring each oystering vessel's weekly catch to be reported on a weekly vessel log on a form furnished by the Bureau.  The government alleges that several defendants trafficked in oysters that were harvested in violation of the weekly vessel report requirement because the reports submitted to the state with regard to these oysters were allegedly false.

Against this background, the court will examine the meaning of the Lacey Act's phrase "in violation of any law or regulation of any State" (Part III.B), and then analyze the law of New Jersey with respect to the authority of the DEP to promulgate regulations (Part III.C).  The court will then determine whether the terms and conditions in dispute were required to be promulgated pursuant to the New Jersey Administrative Procedure Act (Part III.C.1), and whether these terms and conditions can be inferred from existing state regulations (Part III.C.2), and

---

report.

whether their adoption was in substantial compliance with the New Jersey APA (Parts III.C.3 and III.C.4).  Then the Court will determine whether the Defendants' challenge to these terms and conditions is barred by the New jersey APA's one-year statute of limitations.  (Part III.C.5).

### B. Necessity for a valid predicate offense under state law

The United States Supreme Court in United States v. Howard, 352 U.S. 212 (1957), provided a framework for a court to analyze what constitutes a "law or regulation" for purposes of the Black Bass Act, the predecessor to the Lacey Act.  As briefed by the parties, Howard remains relevant to analyze the meaning of "law or regulation" under the Lacey Act and will serve as a basis for this court's discussion.

In Howard, the Supreme Court held that rules included in the Florida Game and Fresh Water Fish Commission was sufficient to constitute the "laws of Florida" under the Black Bass Act and serve as a basis for criminal prosecution.  Id. at 214.  In reaching its conclusion, the Supreme Court looked to the procedural requirements of Florida to determine whether the rules of the Game Commission were part of the laws, regulations or rules of the State.  In particular, the Supreme Court found that the rules of the Gaming Commission complied with the procedural requirements dictated under the relevant Florida rulemaking statute.  These requirements provided that no regulation was

12

effective until 30 days after the filing of a certified copy of the provisions with the secretary of state, the regulation be published in each county in a newspaper of general circulation, and the Commission compile its rules in a code book which was circulated without cost to all county judges and principal sporting goods and license dealers.  Id. at 217.  Public hearings were also conducted to give interested parties an opportunity to discuss their views on proposed changes in the rules.  Id. at 217-18.  Also, the court noted that these rules were enforceable as a misdemeanor under another pertinent Florida statute.  Id. at 215.  Therefore, the Supreme Court found that rules of the Gaming Commission, passed in compliance with the procedures set forth in the Florida statute for promulgating such rules and enforceable by Florida statute as a misdemeanor, were part of the "laws of Florida" as encompassed in the Black Bass Act.

The government's central argument is that the Terms and Conditions to the annual New Jersey oystering license agreement can serve as a predicate for a Lacey Act violation even if these Terms and Conditions are not promulgated as laws or regulations under New Jersey state law.[3]  In support of this argument, the

_____

[3] It is undisputed by the parties that the Terms and Conditions of the License Agreement are not statutes or regulations.  During oral argument, the government struggled to characterize the essence of these Terms and Conditions for purposes of the Lacey Act and repeatedly referred to them as "things" since "law" or "regulation" was an inaccurate description.  The use of the word "thing" repeatedly in oral

13

government cites a multitude of cases which actually undermine
its central legal theory.  First, the government relies on one
case which interpreted the statutory language of the Lacey Act at
issue in this case, specifically the phrase "in violation of any
law or regulation of any State."  United States v. Borden, 10
F.3d 1058 (4th Cir. 1993).  In Borden, the Fourth Circuit
determined that the applicable statute of limitations for a Lacey
Act charge predicated on a violation of a state statute is the
federal "catchall" statute of limitations in 18 U.S.C. § 3282
rather than the statute of limitations which would apply under
state law.  Id. at 1060.  In particular, the Fourth Circuit noted
that the Lacey Act "incorporates the substantive elements of
state law in describing a distinct federal offense, but it is not
designed to incorporate state procedural law."  Id. at 1062.  The
Fourth Circuit reasoned that statutes of limitations are
procedural in nature and that the Lacey Act does not state "that
a viable or prosecutable state law violation is necessary to
support federal charges."  Id.  Importantly, the Fourth Circuit
reasoned that "[b]ecause the running of the statute of
limitations does not change the fact that [the defendant]
violated state law by acquiring, possessing, transporting and
selling mussel shells, it cannot relieve [the defendant] of
criminal liability under the Lacey Act."  Id.

_____

argument typifies the issue presently before the court.

Contrary to the government's argument, <u>Borden</u> does not stand for the proposition that an invalid state law can serve as a predicate for a Lacey Act violation.  In <u>Borden</u>, there was no dispute that the statute at issue was valid and enforceable.  The only issue was whether the state's one-year statute of limitations applied or whether the federal five-year statute of limitations applied to the Lacey Act prosecution.  While the Fourth Circuit emphasized that the procedural requirements attendant to a state statute, such as the statute of limitations, are not incorporated into the Lacey Act, this reasoning cannot be stretched to support the government's argument that an invalid regulation that was not passed in accordance with the laws of the state can serve as a Lacey Act predicate.

Importantly, the statute of limitations in <u>Borden</u> did not change the fact that the defendant violated the state law when he engaged in the alleged conduct.  Indeed, the Fourth Circuit in <u>Borden</u> emphasized that the substantive elements of the state law are incorporated into the Lacey Act.  It necessarily follows that without a valid substantive state law, there would be no basis for a Lacey Act charge.

Next, the government relies on numerous cases which deal with foreign law as a predicate for a Lacey Act violation.  In each of these cases, it was not disputed that the predicate for the Lacey Act violation was in fact a law or regulation and the

15

deciding court looked to the foreign forum to interpret the substantive elements and scope of the foreign law or regulation at issue.  See United States v. 594,464 Pounds of Salmon, more or less, 871 F.2d 824 (9th Cir. 1989)(holding a Taiwanese regulation constitutes "foreign law" under the Lacey Act and can serve as a predicate for a forfeiture action under the Lacey Act); United States v. Lee, 937 F.2d 1388 (9th Cir. 1998)(finding a Taiwanese regulation constitutes "foreign law" under the Lacey Act and can serve as a predicate for a criminal prosecution under the Lacey Act); United States v. Molt, 599 F.2d 1217 (3d Cir. 1979)(looking to legal experts from Fiji and Papa New Guinea to determine whether the foreign law related to the protection of wildlife). The court first notes that the Ninth Circuit cases relied on by the government are not precedent or binding on this court in its decision.  The Third Circuit case, which is binding, clearly articulates that a court is to look to the law of the forum, in the case of Molt to Fiji and Papa New Guinea, in order to determine the law's validity, scope and purpose.

One of the main cases applying foreign law relied upon by the government is United States v. McNab, 331 F.3d 1228 (11th Cir. 2003).  The government maintains that this case stands for the proposition that the validity of the underlying predicate law does not matter for purposes of a Lacey Act prosecution.  In McNab, Honduran laws served as the predicate for the Lacey Act

16

prosecution.  During the time period charged in the indictment
and the trial before the district court, these Honduran laws were
considered valid by the Honduran government.  Id. at 1240.  After
the trial, the Honduran government changed its position and
maintained that the laws were invalid prospectively.  Id.  A
Honduran Court, after the federal trial concluded, found that the
laws were promulgated through an incorrect procedure and voided
the regulations for purposes of future applicability.  Id. at
1243.  The Ninth Circuit explained that "the crux of this case is
the validity of the Honduran laws during the period covered by
the indictment."  Id. at 1240.  Importantly, the Ninth Circuit
emphasized that "[i]f the laws were valid in Honduras during the
time period covered by the indictment, the defendants violated
the Lacey Act by importing the lobsters in violation of those
laws."  Id. at 1240-41.  The Ninth Circuit then held that since
the Honduran Court invalidated the laws prospectively only, that
the laws were valid at the time charged in the indictment and
therefore could serve as a predicate for the Lacey Act violation.
Id. at 1243-44.

     Contrary to the government's argument, the Ninth Circuit in
McNab emphasized the importance and necessity that the underlying
law or regulation be valid during the time period charged in the
indictment.  Without a valid law or regulation, there would be no
basis for a Lacey Act prosecution, because the government must

17

prove that the defendant was importing "Fish or wildlife that was taken, possessed, transported, or sold in violation of . . . any foreign law," in violation of 16 U.S.C. § 3372(a)(2)(A).

The government also cites to Lacey Act cases involving a federal law as a predicate for a Lacey Act violation.  See United States v. Cameron, 888 F.2d 1279 (9th Cir. 1989)(holding the International Pacific Halibut Commission did not exceed its authority in promulgating a duly enacted and authorized regulation limiting the amount of fish caught and that such regulation was authorized pursuant to treaty and federal statute) and United States v. Cannon, 345 Fed. Appx. 301 (9th Cir. 2009)(finding an unpublished federal regulation could serve as a predicate for the Lacey Act if the defendant had actual notice of the provision as required by the federal Administrative Procedure Act, 5 U.S.C. § 552(a), and subsequently reversing the conviction as there was insufficient evidence to show the defendant had notice of the regulation at issue).  Cameron merely affirmed a conviction under the provision of the Lacey Act barring trafficking in fish "taken or possessed in violation of any law, treaty or regulation of the United States," 16 U.S.C. § 3372(a)(1), where the catch was shown to exceed the quota set in the Commerce Department's regulations at 50 C.F.R. § 301.3(c)(1987), see Cameron, 888 F.2d at 1281; there was no doubt that the quota was set in that federal regulation which served as

18

the Lacey Act trafficking predicate.

The government heavily relies on <u>Cannon</u> for the proposition that even though a regulation is not published, as long as the defendant had actual notice of the regulation, it is sufficient to serve as a basis for a Lacey Act violation.  The government's reasoning is unpersuasive in this matter, as the <u>Cannon</u> case relied on the actual notice provision expressly contained in the federal Administrative Procedure Act, 5 U.S.C. § 552(a).  This act requires, among other things, that federal administrative agencies publish their rules of procedure and substantive rules of general applicability in the Federal Register.  However, there is an exception to the publication requirement under the federal Administrative Procedure Act which provides: "Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published." 5 U.S.C. § 552(a).

It is this escape hatch provision that permitted the Ninth Circuit in <u>Cannon</u> to find that an unpublished federal regulation could serve as a predicate under the Lacey Act as long as the defendant had actual notice of the regulation.  In this case, the predicate conditions at issue are creatures of New Jersey state law, not subject to the federal Administrative Procedure Act or its actual notice exception to the publication requirement.  No

analog exists in the New Jersey Administrative Procedure Act providing that actual notice is sufficient when the regulation at issue was not duly published.  Therefore, <u>Cannon</u> is unpersuasive as the federal Administrative Procedure Act is not relevant to the instant action.

Finally, the government cites to cases involving violations of 18 U.S.C. § 1382, which criminalizes violations of regulations governing military bases, to support its argument that a defendant may be prosecuted for violating an unpublished regulation as long as the defendant had actual notice of the regulation.  <u>See</u> <u>United States v. Hall</u>, 742 F.2d 1153 (9th Cir. 1984)(holding the actual notice provision of the federal Administrative Procedure Act, 5 U.S.C. § 552(a), applied to military regulations and therefore as long as defendant had actual and timely notice of the unpublished regulation, defendant could be prosecuted under 18 U.S.C. § 1382); <u>and</u> <u>United States v. Mowat</u>, 582 F.2d 1194 (9th Cir. 1978)(finding as long as defendants had actual knowledge of the prohibition contained in the unpublished regulation, as required by the federal Administrative Procedure Act, defendants could be prosecuted under 18 U.S.C. § 1382).  These cases relied upon by the government are unpersuasive for two main reasons.  First, these cases do not interpret that Lacey Act and do not involve the incorporation of a state law into a federal criminal offense.

20

Most importantly, these cases, like Cannon, deal with the actual notice provision in the federal Administrative Procedure Act, 5 U.S.C. § 552(a), which is inapplicable to the instant case.  As New Jersey has no actual notice provision in its administrative procedure act to save an otherwise procedurally defective regulation,[4] these cases are not analogous to the issue presently before the court.

After reviewing the cases relied upon by the government, the court is persuaded that the underlying predicate offense under the Lacey Act must be a violation of a valid New Jersey law or regulation and the court must look to New Jersey law to determine whether the annual oyster permit Terms and Conditions constitute a "law or regulation" of the State of New Jersey for purposes of 16 U.S.C. § 3372(a)(2)(A).  All of the above cases, beginning with the Supreme Court in Howard, look to the forum where the regulation, law, or in this case condition, was promulgated in order to determine its validity and effect.  The government has presented no case in which the federal court looked to federal law to determine whether a state or foreign law was a proper predicate for a Lacey Act violation.  Rather, courts have looked directly to state law, and in the only Third Circuit case presented, called directly upon experts of foreign law to determine the validity of the underlying predicate offense under

------

[4] See discussion in Part III.C.3, infra.

21

foreign law.

Therefore, in order to determine whether the Terms and Conditions of the License Agreement constitute a "law or regulation" of the State of New Jersey for purposes of 16 U.S.C. § 3372(a)(2)(A), the court must look to New Jersey law to determine whether the Terms and Conditions were duly promulgated as laws or regulations of New Jersey.  If the Terms and Conditions are not considered to be state laws or regulations, then the violation of such a Term or Condition cannot serve as a basis for this Lacey Act prosecution.  United States v. Sohappy, 770 F.2d 816, 823 (9th Cir. 1985)("the federal government must establish the validity of the state regulations underlying a Lacey Act prosecution"); United States v. Gehl, 852 F. Supp. 1150 (N.D.N.Y. 1994)(holding defendants in a Lacey Act prosecution are entitled to challenge the validity of the underlying state law before the district court at trial)(citing United States v. Alexander, 938 F.2d 942 (9th Cir. 1991)).

**C. Analysis of New Jersey State Law**

The government puts forward several arguments to support its contention that the Terms and Conditions are enforceable as New Jersey laws or regulations under state law.  First, the government argues that the Terms and Conditions are inferable from the regulatory scheme in N.J.A.C. 7:25A-1.9.  Therefore, the government maintains these conditions attendant to the harvest

22

season were not required to be issued in compliance with New
Jersey Administrative Procedure Act, N.J.S.A. 52:14B-
4(a)(hereinafter the "APA" or "Administrative Procedure Act").
In the alternative, the government argues that these Terms and
Conditions substantially complied with the New Jersey APA and
should be deemed the equivalent of duly promulgated regulations.
Finally, the government argues that the APA bars Defendants'
procedural challenge because the Defendants are outside the one
year limitations period prescribed in the APA and therefore the
Defendants lack standing to challenge the procedural deficiencies
of the Terms and Conditions as they have not exhausted their
administrative remedies.

The Defendants maintain that these Terms and Conditions are
rules subject to the requirements of the APA because they are
agency statements of general applicability which implement the
law or policy of the New Jersey Department of Environmental
Protection ("DEP").  Therefore, the Defendants argue the
requirements of the APA applied and the DEP's failure to follow
these requirements deprives the quota, daily call-in requirement
and the weekly harvester vessel log requirement of the status of
a "regulation" under New Jersey law.  The Defendants further
argue that these Terms and Conditions are not laws or regulations
of the State of New Jersey because they were not adopted in
compliance with the New Jersey APA.  Consequently, the Defendants

maintain that since these Terms and Conditions were not promulgated as regulations under New Jersey law, their violation cannot form the basis for a federal prosecution under the Lacey Act as the Terms and Conditions cannot be considered a "law or regulation" of New Jersey.

The court will now examine the New Jersey law at issue to determine if the oyster quota, daily call-in requirement and weekly log requirement in 2004 to 2007 were valid laws or regulations under New Jersey state law sufficient to serve as a basis for a Lacey Act prosecution under 16 U.S.C. § 3372(a)(2)(A).

In this case, there are three relevant New Jersey statutes at issue.  First, N.J.S.A. 50:1-5(a) provides:

> The Commissioner of Environmental Protection shall have full control and direction of the shellfish industry and resource and of the protection of shellfish throughout the entire State, subject to the provisions of this Title.  The commissioner shall make **such rules and regulations as may be necessary** for the preservation and improvement of the shellfish industry and resource of the State, after consultation with the Shell Fisheries Council and subject to the disapproval, as hereinbefore provided, of the Marine Fisheries Council.

Id. (emphasis added).  In addition, N.J.S.A. 50:3-8 provides:

> ... no oysters shall be dredged for, caught or taken from any of the lands lying under the tidal waters of the Delaware River, Delaware Bay or Maurice river cove, above the southwest line, **except at the times and in the manner prescribed by the commissioner** after consultation with the Delaware Bay Section of the Shell Fisheries Council.

Id. (emphasis added).  Finally, N.J.S.A. 50:3-16.13 provides:

> It shall be lawful to catch and take oysters, clams and crabs in that portion of the Delaware Bay, hereinbefore described as Areas Nos. 2 and 3, upon compliance with the provisions of this Title **and any rules and regulations issued pursuant thereto**.

<u>Id.</u> (emphasis added).

The statutory language above expressly authorizes the Commissioner to act through rules and regulations in controlling the shellfish industry and oyster harvesting in the natural seed beds.[5]   The central inquiry then becomes whether the conditions set by the DEP as Terms and Conditions of maintaining an oyster license constitute rules and regulations consistent with the above statutes.   The New Jersey Constitution provides:

> No rule or regulation made by any department, officer, agency or authority of this state, except such as relates to the organization or internal management of the State government or a part thereof, shall take effect until it is filed either with the Secretary of State or in such other manner as may be provided by law. The Legislature shall provide for the prompt publication of such rules and regulations.

N.J. Const., Art. V, Sec. IV, ¶ 6.   N.J.S.A. 52:14B-2(e), which provides the definition for "rule" under New Jersey law, states:

> "Administrative rule" or "rule," when not otherwise modified, means each agency statement of general

---

[5] In 2008, N.J.S.A. 50:1-5(a) was amended to expressly require the Commissioner to comply with the New Jersey Administrative Procedure Act in promulgating rules and regulations.   Specifically, the following underlined language was added:   "The commissioner shall <u>adopt, pursuant to the "Administrative Procedure Act," P.L. 1968, c.410 (C.52:14B-1 et seq.)</u>, such rules and regulations as may be necessary for the preservation and improvement of the shellfish industry. . . ."  <u>See</u> N.J.S.A. 50:1-5(a).

applicability and continuing effect that implements or interprets law or policy, or describes the organization, procedure or practice requirements of any agency. The term includes the amendment or repeal of any rule, but does not include: (1) statements concerning the internal management or discipline of any agency; (2) intraagency and interagency statements; and (3) agency decisions and findings in contested cases.

### 1.   Whether these Terms and Conditions were Rules subject to New Jersey APA

We must first consider whether the Terms and Conditions at issue here were rules subject to the rulemaking requirements of the New Jersey APA.

The Supreme Court in Metromedia v. Director, Division of Taxation, 97 N.J. 313 (1984), instructed the court to look at six factors in determining whether a condition is a rule subject to the requirements of the APA:

> [A]n agency determination must be considered an administrative rule when all or most of the relevant features of administrative rules are present and preponderate in favor of the rule-making process. Such a conclusion would be warranted if it appears that the agency determination, in many or most of the following circumstances, (1) is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group; (2) is intended to be applied generally and uniformly to all similarly situated persons; (3) is designed to operate only in future cases, that is, prospectively; (4) prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization; (5) reflects an administrative policy that (i) was not previously expressed in any official and explicit agency determination, adjudication or rule, or (ii) constitutes a material and significant change from a clear, past agency position on the identical subject matter; and (6) reflects a decision on administrative regulatory policy in the nature of the

> interpretation of law or general policy. These relevant
> factors can, either singly or in combination, determine
> in a given case whether the essential agency action must
> be rendered through rule-making or adjudication.

Metromedia, 97 N.J. at 331-32.

It is clear that the conditions set forth by the DEP in the License Agreement requiring oyster harvesters to follow the annual quota requirement, make daily call-ins of their catch and submit weekly vessel reports are intended to be rules because they are of general applicability and implement the preservation policy of the DEP, as articulated in the statutes above.  The Metromedia factors further support the conclusion that these Terms and Conditions should be considered administrative rules for which the DEP was required to promulgate regulations under the New Jersey Administrative Procedure Act.

First, these requirements have wide coverage and affect an entire regulated population - licensed oyster fisherman in New Jersey.  Second, these requirements are intended to apply uniformly to all licensed oyster fisherman in New Jersey who harvest on the seed beds of the Delaware Bay.  These requirements are designed to take effect and be applied for the future harvest season.  The oyster quota, daily call-in requirement and weekly log requirement reflect the administrative policy of the DEP which is not expressly provided for in any agency determination, adjudication or rule.  Rather, these requirements were presented to oyster harvesters as "Terms and Conditions" of their license

27

agreement at the beginning of each oyster season.  In addition,
these requirements directly reflect the preservation and
conservation policy of the DEP as applied annually to the
permitted harvest from the state's oyster seed beds.

Despite the presence of these Metromedia factors, the
government argues that the "Terms and Conditions" should not be
construed as administrative rules because they are clearly and
obviously inferable from the regulatory scheme. The government
relies on a regulation in the New Jersey Administrative Code in
support of this argument.  Specifically, the government contends
that N.J.A.C. 7:25A-1.9(a) states that "[r]easonable notice shall
be given by the Division to all oyster dredge boat license
holders of the dates of the beds to be opened and the conditions
attendant on the opening."  The government maintains that the
daily call-in requirement, oyster quota and weekly log
requirement should be inferred from the "conditions attendant"
language present in N.J.A.C. 7:25A-1.9(a).  After reviewing the
regulatory scheme in effect from 2004 to 2007 and the guidance
provided by the New Jersey Appellate Division in American
Cyanamid, the court cannot agree.

In American Cyanamid v. State of New Jersey, Department of
Environmental Protection, 231 N.J. Super. 292 (App. Div. 1989),
the New Jersey Appellate Division held that the DEP's use of
certain computer technology to delineate flood hazard areas did

28

not constitute a de facto rule which would have required the DEP
to promulgate a regulation pursuant to the Administrative
Procedure Act.  231 N.J. Super. at 304.  In so holding, the court
looked to the express statutory enabling authority, which
directed the DEP to "to adopt rules and regulations which
delineate . . . flood hazard areas" pursuant to N.J.S.A. 58:16A-
52a and mandated that the DEP use floodway delineations "approved
by the Federal Government for the National Flood Insurance
Program" pursuant to N.J.S.A. 58:16A-52b.  Id. at 298, 300.  The
court applied the Metromedia factors discussed above and held
that the use of the computer model employed by the federal
government in delineating flood areas was clearly and obviously
inferable from the enabling statutory authorization and therefore
it was not a de facto agency rule.  Id. at 307.  In fact, the
court noted that the use of the computer models employed by the
federal flood insurance program was mandated by the statute.  Id.
Further, the court found that the use of the computer models was
not uniform because the "federal delineation of the floodway is
the polestar, and the federal government does not use a single
computer."  Id.  Finally, the court found that those affected by
the proposed delineation of a flood area were fully protected
because the final delineations were adopted pursuant to formal
regulations which complied with the Administrative Procedure
Act's notice, public comment, public hearing and publication

29

requirements.  Id. at 308.  Therefore, the Appellate Division
found that the use of certain federal computer models in
delineating flood areas was not a de facto rule subject to the
Administrative Procedure Act.

American Cyanamid illustrates why the Terms and Conditions
should have been subjected to agency rulemaking.  First, and
perhaps somewhat surprisingly, there is no express statutory
enabling authority which states the DEP is authorized to set
oyster quotas, daily call-in requirements or weekly log
requirements.  The government admits as much because they rely on
a vague provision of an administrative code regulation to support
their argument that such requirements are inferable (discussed in
Part III.C.2, below).  Further, the final oyster quota, call-in
requirement and weekly log requirement were not ultimately
adopted by regulation in accordance with the APA, as was the case
in American Cyanamid.  Instead, these "Terms and Conditions" were
attached to the defendants' oyster license without complying with
the APA.  Finally, these conditions were applied uniformly to all
oyster license holders, whereas the methodology to delineate
flood areas in American Cyanamid lacked uniformity.
Consequently, American Cyanamid supports a finding that the
"Terms and Conditions" at issue in this case are de facto rules
subject to the APA and does not support the government's
contention that the DEP could circumvent the APA's procedural

30

requirements.

## 2.  Whether these Terms and Conditions are Inferred from Regulations at N.J.A.C. 7:25A-1.9(a)

To the extent that the government argues these conditions are inferable from N.J.A.C. 7:25A-1.9(a), the court finds this argument unpersuasive for several reasons.  First, N.J.A.C. 7:25A-1.9(a) is an administrative code provision, not an enabling statutory authority, and therefore cannot trigger this factor under Metromedia.  In addition, the express language of N.J.A.C. 7:25A-1.9(a) states that the "conditions attendant" are related to the opening of the seed beds.  The daily call-in requirement, the quota requirement and the weekly log requirement regulate the use of the seed beds, not the opening of the seed beds.  These requirements were not expressly mentioned anywhere in this provision of the administrative code and it is not clear and obvious that such conditions are inferred.  Moreover, the indictment does not allege that Defendants harvested oysters out of season, which could violate the regulation at N.J.A.C. 7:25A-1.9(a), but rather that Defendants harvested in excess of the annual quota that was a condition upon their annual permit.

Most significantly, for the time period 2004-2007, the duly adopted regulations at N.J.A.C. 7:25A-1.9(b)-(s) expressly articulated the rules governing the use of the oyster seed beds during the harvest season with detail and specificity.  For

example, the subsections of this administrative code provision regulate the minimum size for seed oysters taken for market [1.9(e)(1)]; the required marking of license numbers on the oyster vessels harvesting in the seed beds [1.9(l)]; the requirement of oyster harvesters to notify the Bivalve Shellfish Office to give notice of intent to work any leased grounds [1.9(n)]; and the bagging and tagging requirements for the oysters harvested [1.9(e)].  To find that the "conditions attendant" language in subsection 1.9(a) could be read so broadly as to infer that the quota requirement, daily call-in requirement and weekly log requirement were part of this regulation would be to disregard the care and specificity that is present in the express subsections of the actual regulation.

Moreover, the authorizing statutes are clear that the Commissioner must act by passing rules and regulations.  The New Jersey Constitution requires publication of rules and regulations made by an agency.  To allow the "conditions attendant" language, which is present only in this administrative code provision and not in the enabling statutory authority, to serve as a catchall provision for requirements that were not duly promulgated by the DEP would vitiate the express statutory requirement of "rules and regulations" in N.J.S.A. 50:1-5, supra.  Therefore, the court cannot infer that "conditions attendant to the opening" of the oyster season means the same as the daily call-in requirement,

the oyster quota or the weekly log requirement.  While the DEP
exercised its authority to promulgate the oyster management
regulations in N.J.A.C. 7:25A-1.9 for oyster seed beds in effect
for the years 2004-2007, which are quite detailed, nowhere did
these regulations provide for an annual quota, for daily call-
ins, or for weekly vessel reports by harvesters.

Accordingly, the court finds that the Terms and Conditions
of the Oyster License Agreement are administrative rules under
the <u>Metromedia</u> factors and in accordance with the reasoning set
forth in the <u>American Cyanamid</u> case, which must be promulgated
under the New Jersey APA.

### 3.  Requirements for Promulgating Regulations under New Jersey APA

As administrative rules, these "Terms and Conditions" must
have been passed in accordance with the Administrative Procedure
Act to be valid and enforceable.  Specifically, N.J.S.A. 52:14B-
4(d) provides:

> No rule hereafter adopted is valid unless adopted in
> substantial compliance with P.L.1968, c.410 (C.52:14B-1
> et seq.)[The Administrative Procedure Act].

<u>See also</u> <u>In re Highlands Master Plan</u>, 421 N.J. Super. 614, 632
(App. Div. 2011)(holding invalid resolution by Highlands
Commission that should have been adopted through the APA because
of its general effect upon 88 municipalities).  In New Jersey, as
noted above, the New Jersey Constitution, Art. V, Sec. IV, ¶ 6,
underscores that no state agency's rule or regulation may take

33

effect until it is filed with the Secretary of State or as provided by law, and promptly published as a rule or regulation in the manner prescribed by the Legislature, which has been done in the New Jersey APA.

The New Jersey APA sets forth four procedural requirements that each agency must satisfy in order to establish a binding rule or regulation.  These four procedural requirements include:

(1) Give 30 days' notice through publication in the New Jersey Register and other media outlets, providing individuals an opportunity to provide comments;

(2) Publication of a statement explaining the purpose and effect of the proposed rule, its legal authority, and providing various analyses;

(3) Affording all interested persons reasonable opportunity to submit data, views or arguments, orally or in writing; and

(4) Preparing for public distribution a report listing all parties offering comments, summarizing the content and providing the agency's response.

See N.J.S.A. 52:14B-4(a).  The New Jersey APA requirements for an agency's adoption of a rule are unforgiving and contain no actual notice provision to save an improperly promulgated rule as there is under the federal Administrative Procedure Act.  Since the New Jersey Constitution requires, at a minimum, filing and

publication of a final rule or regulation, it is not surprising that neither the Legislature or the New Jersey Courts have engrafted an exception for the situation, as in the present case, where the accused oyster harvesters had actual notice of the Terms and Conditions in their annual oystering permit but these requirements were not filed with the Legislature nor published in the administrative code.

Under N.J.S.A. 52:14B-4.1, the final procedural requirement mandates that every rule proposed by a New Jersey administrative agency, such as the DEP, be submitted to the Legislature for its review.  Without this final procedural step, the Legislature does not have an opportunity to review the proposed rule and determine whether the proposed rule is consistent with the scope of the agency's authority.

It is undisputed that the conditions set forth by the DEP for the oyster quota, the daily call-in requirement and the weekly report were not passed in accordance with the Administrative Procedure Act in 2004 through 2007.  Indeed, these conditions were set forth as part of the Terms and Conditions of the DEP's license agreement with oyster fisherman.  These Terms and Conditions were not noticed in advance through publication in the New Jersey Register, were not explained through a statement of purpose by the Commissioner and Shellfish Council, were not subject to a period for commentary by interested persons, and a

response to the commentary by the Commissioner and Shellfish Council was not provided.  Most importantly, these conditions were not submitted to the Legislature for approval in accordance with N.J.S.A. 52:14B-4.1 and N.J. Const., Art. V, Sec. IV, ¶ 6 nor were these Terms and Conditions published in the New Jersey Administrative Code during the years 2004 to 2007.

### 4.   Whether DEP Substantially Complied with New Jersey APA

The government argues that the promulgations of the "Terms and Conditions" did substantially comply with the Administrative Procedure Act because each licensed oyster fisherman was mailed a copy of the "Terms and Conditions" and therefore had actual notice of the requirements.  In addition, a public meeting of the Shellfisheries Council was held to discuss the "Terms and Conditions" prior to their attachment to the oyster licenses.

As discussed above, actual notice is not an exception to compliance with the New Jersey Administrative Procedure Act as it is with the federal Administrative Procedure Act.  In addition, the New Jersey Appellate Division has previously held that the circulation of a letter promulgating a de facto agency rule is insufficient to satisfy the requirements of New Jersey's Administrative Procedure Act.  See Shapiro v. Albanese, 194 N.J. Super. 418, 428-29 (App. Div. 1984)("There can be no doubt that the circular letter in question is an agency statement of general applicability (to all county welfare agencies) that implements or

interprets a law or policy . . . . It is not an intra-or
interagency statement as contended by the respondent but rather
ad hoc legislation without compliance with the Administrative
Procedure Act."). Consequently, the fact that the individual
oyster harvesters were mailed copies of the "Terms and
Conditions" is irrelevant to whether the DEP substantially
complied with the New Jersey Administrative Procedure Act.

Further, advance notice of these "Terms and Conditions" was
not published in the New Jersey Register, the final version of
these "Terms and Conditions" was not published in the New Jersey
Administrative Code and these "Terms and Conditions" were not
provided to the Legislature for review. See Federal Pacific
Electric Company v. New Jersey Dept of Environmental Protection,
334 N.J. Super. 323, 343 (App. Div. 1989)(invalidating DEP rule
because adequate notice was not given prior to the adoption of
the rule and noting "[t]he notice and comment requirements of the
APA are not to be lightly applied or regarded as obstacles to be
avoided."); Bd. of Educ. v. Cooperman, 209 N.J. Super. 174, 209
(App. Div. 1986)(invaliding guidelines promulgated by the
Commission of Education because the public was not given an
opportunity to submit data and present arguments with respect to
the guidelines and the guidelines were not submitted to the
Legislature for review in accordance with the APA); State v.
Leary, 232 N.J. Super. 358, 368 (App. Div. 1989)(invalidating a

37

rule because advanced notice of the proposed adoption was not
published in the New Jersey Register and the final rule was not
published in the New Jersey Administrative Code).  Accordingly,
New Jersey case law is clear that where advanced notice of the
adoption of a rule is not published in the New Jersey
legislature, opportunity for the public to submit data and
present arguments was not given and the final rule was not
published in the New Jersey Administrative Code, the agency
cannot be said to substantially comply with the Administrative
Procedure Act.  Therefore, as the DEP did not comply with any of
these requirements in promulgating the Terms and Conditions
attendant to the oyster license agreement in 2004 to 2007, these
Terms and Conditions were not promulgated in substantial
compliance with the APA.

     5.  <u>Whether Defendants are Time-Barred from
          Challenging Promulgation of these Terms and
          Conditions</u>

     Finally, the government argues that the Defendants should be
barred from challenging the validity of the Terms and Conditions
because the APA provides a one year limitations period to
challenge the validity of any rule or regulation pursuant to
N.J.S.A. 52:14B-4(d).  This statute provides that "[a] proceeding
to contest any rule on the ground of noncompliance with the
procedural requirements of P.L.1968, c.410 (C.52:14B-1 et
seq.)[Administrative Procedure Act] shall be commenced within one

38

year from the <u>effective date</u> of the rule." N.J.S.A. 52:14B-4(d)(emphasis added).

This provision does not apply to bar the Defendants' challenge to the validity of the Terms and Conditions because the "Terms and Conditions" were not properly noticed in the New Jersey Register and were never published in the New Jersey Administrative Code.  In analyzing the limitations period in N.J.S.A. 52:14B-4(d), the New Jersey Appellate Division explained:

> The limiting language of the statute refers to "any rule" and to "the effective date of the rule." It is intended, obviously, to restrict challenges to rules that are "on the books" but adopted without adherence to a technical procedural requirement.

<u>State v. Klemmer</u>, 237 N.J. Super. 32, 44-45 (App. Div. 1989). This holding was reaffirmed in <u>Liik v. N.J. Dep't. of Pers.</u>, 2009 N.J. Super. Unpub. LEXIS 3208 (July 23, 2009 App. Div.), where the Appellate Division held that the one year limitations period in N.J.S.A. 52:14B-4(d) "only applies where there has been notice of the proposed adoption of a rule and the rule has been published."  <u>Id.</u> at *8.

Here, it is undisputed that the DEP did not provide notice in the New Jersey Register of the proposed adoption of the Terms and Conditions and that the Terms and Conditions were not published in the New Jersey Register or the New Jersey Administrative Code.  Therefore, the one year limitations period

39

in N.J.S.A. 52:14B-4(d) does not apply and Defendants' claim is
not time barred.[6]  See also State v. Leary, 232 N.J. Super. 358,
368 (App. Div. 1989)(holding that rules which did not comply with
the notice and publication requirements of the Administrative
Procedure Act are "nonexistent legally" and therefore the one
year limitation of N.J.S.A. 52:14B-4(d) does not apply).

### D.  Summary

Congress, in enacting the statutory language of 16 U.S.C. §
3372(a)(2)(A), required that the fish or wildlife that was
trafficked in interstate commerce had been taken, possessed,
transported or sold in violation of a "law or regulation of any
state."  The term "law or regulation of any state" requires
reference to the state law to determine if a given requirement
qualifies as a law or regulation under state law.   Having
examined the underlying body of New Jersey law on the subject,
the court holds that the terms and conditions at issue for the
years 2004-2007 did not qualify as a "law or regulation" of New
Jersey; the DEP should have promulgated regulations (as it later

---

[6] Indeed, the government was unable to inform the court of
the effective date of these Terms and Conditions at oral
argument.  The government instead argued that the effective date
should be the date of when the Defendants had actual notice of
the regulation.  This would result in a different effective date
for each Defendant.  This irrational result is further evidence
that the Terms and Conditions cannot be considered a law or
regulation of the State of New Jersey for the purposes of the
Lacey Act, as these Terms and Conditions have no uniform
effective date.

did in 2010) specifying these requirements and it did not do so as required by the New Jersey APA and controlling precedent, nor was there substantial compliance with the APA.  In limiting predicate violations to violations of actual state law or regulations, Congress did not extend the reach of the Lacey Act trafficking provision in 16 U.S.C. § 3372(a)(2)(A) to fish or wildlife taken or transacted in violation of state policies or directives or license conditions, as here, that do not rise to the level of duly promulgated regulations of the state, as determined by state law.  A more expansive reading of § 3372(a)(2)(A) would be disfavored in a criminal statute because it would create ambiguity in the definition of the prohibited activity and fail to give fair notice to those who try to determine what the state's law or regulation is.  New Jersey's own statutes and regulations, as the published sources, answer this question, while terms or conditions contained only in an oystering license do not.

Therefore, the court concludes that the oyster quota requirement, the daily call-in requirement and the weekly vessel log requirement are de facto rules subject to the provisions of the Administrative Procedure Act.  The court further finds that the DEP did not comply with the requirements of the APA as the DEP did not provide prior notice of the Terms and Conditions in the New Jersey Register, did not submit the Terms and Conditions

to the Legislature for review and did not publish the Terms and Conditions in the New Jersey Administrative Code.  As a result of these deficiencies, these Terms and Conditions cannot be considered a law or regulation of the State of New Jersey during the time period charged in the Indictment, 2004 to 2007.

In further support of this court's conclusion that these conditions of the License Agreement were not part of the laws and regulations of the State of New Jersey in the period 2004-2007, the Court notes that the DEP Commissioner properly passed administrative rules and regulations to establish surf claim quotas.  See N.J.A.C.7:25-12.10.  This administrative code provision, adopted in 1993, states:

Harvest limitations; surf clam harvest quota

(a) The Commissioner, with the advice of Council, shall establish annually a season quota of between 250,000 and 1,000,000 bushels of surf clams. The season quota shall not exceed 10 percent of the State's estimated standing stock of surf clams.

(b) By September 15 of each year the Department shall send notice to all license holders by first class mail, and file notice for publication in the New Jersey Register, of the season quota for the upcoming surf clam harvest season.

(c) If the Department does not give notice of the season quota for the surf clam harvest season pursuant to (b) above, the season quota for the upcoming season shall be 500,000 bushels.

(d) Each surf clam license allocation shall be 1/57th of the season quota.

Id.

This surf clam regime from 1993 is precisely the type of regulatory scheme at issue in this oyster case; this provision regulates the number of surf clams annually harvested and the Terms and Conditions here attempt to control the number of oysters annually harvested from the public seed beds.  The important distinction, however, is the surf clam quota was passed pursuant to the APA and is codified in the New Jersey Administrative Code.  Here, the conditions at issue were not passed pursuant to the APA, nor in substantial compliance with the Act, and are not codified in any state regulatory code book.  This distinction supports this court's conclusion that the "Terms and Conditions" attendant to the oyster license agreements were nothing more than terms and conditions of the license and not a DEP determination having the force of a rule or regulation under the laws of the State of New Jersey.

In addition, it is important to note that the daily call in requirement, oyster quota requirement and weekly vessel log requirement were indeed subsequently adopted as provisions of the New Jersey Administrative Code in 2010, pursuant to the requirements of the APA.  See N.J.A.C. 7:25A-2.5 (quota); N.J.A.C. 7:25A-2.3(b)(2)(call-in requirement); and N.J.A.C. 7:25A-2.7 (weekly vessel report).[7]  The DEP thus recognized the

---

[7] The present opinion address only three of the oystering permit Terms and Conditions that existed in 2004 to 2007. Nothing herein suggests any impairment of the current oystering

necessity for promulgating regulations specifying these oystering requirements, updated annually or as needed as the DEP had done for surf clam harvesting 17 years earlier.

Therefore, it is clear to the court that the Terms and Conditions for 2004-2007 set forth in the License Agreements in 2004-2007 were not part of the "laws or regulations of the State of New Jersey" enforceable under the Lacey Act.  At most, these Terms and Conditions could provide for a cause of action to terminate a person's rights under the License Agreement.  They amount to important limitations upon the oystering license, with the assent of the licensee.  However, a violation of these Terms and Conditions is insufficient to serve as a basis for criminal prosecution under the provisions of 16 U.S.C. § 3372(a)(2)(A) when such conditions are not a law or regulation of the State of New Jersey.[8]

---

terms and conditions promulgated under the 2010 regulations in N.J.A.C. 7:25A-2.5, -2.3(b)(2), and -2.7.  Indeed, had such regulations been duly promulgated for the years 2004 to 2007, there would appear to be no issue with their status as a regulation under New Jersey law, the violation of which could serve as a predicate to a Lacey Act violation under 16 U.S.C. § 3372(a)(2)(A), supra.

[8] These Terms and conditions, although not themselves New Jersey law or regulations, are still valid oyster license conditions by agreement of the DEP and the licensees.  Nothing in this Opinion impairs the DEP's enforcement of these provisions of the license in the DEP's licensing arena.  Similarly, nothing herein suggests that information gathered from the call-in reports and the weekly vessel harvest reports cannot be used as evidence of discrepant reporting or maintaining of other records required to be maintained under other law or regulations.

44

## IV. CONCLUSION

For the reasons discussed herein, the court determines that the harvest conditions set annually by the DEP from 2004 to 2007 and attached as Terms and Conditions of the oyster license agreement were not part of the laws or regulations of the State of New Jersey and therefore the violation of these Terms and Conditions cannot serves as a basis for the Lacey Act trafficking crimes under 16 U.S.C. § 3372(a)(2)(A) charged in Counts III, V, XII and XIV. The accompanying Order will be entered.


__July 3, 2012__                          __s/ Jerome B. Simandle__
Date                                      JEROME B. SIMANDLE
                                          Chief U.S. District Judge


45