IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

```
_____
                        :
UNITED STATES OF AMERICA :
                        :
        v.              :      Criminal No. 11-520 (JBS)
                        :
THOMAS REEVES           :
TODD REEVES             :           OPINION
RENEE REEVES            :
SHELLROCK, LLC          :
KENNETH W. BAILEY       :
MARK BRYAN              :
HARBOR HOUSE, INC.,     :
                        :
              Defendants. :
                        :
_____
```

APPEARANCES:

Wayne D. Hettenbach, Senior Trial Attorney
Patrick M. Duggan, Trial Attorney
U.S. DEPARTMENT OF JUSTICE
ENVIRONMENTAL CRIMES SECTION
P.O. Box 23985
Washington, D.C. 20026

William J. Hughes, Jr., Esq.
COOPER, LEVENSON, APRIL, NIEDELMAN & WAGENHEIM, PA
1125 Atlantic Avenue
3rd Floor
Atlantic City, NJ 08401
      Attorney for Defendant Thomas Reeves
      Co-Counsel for Defendant Shellrock, LLC

Edwin J. Jacobs, Jr., Esq.
Michael F. Myers, Esq.
JACOBS & BARBONE
1125 Pacific Avenue
Atlantic City, NJ 08401
      Attorney for Defendant Todd Reeves
      Co-Counsel for Defendant Shellrock, LLC

Alois Harold Kokes, Esq.
728 West Avenue
Suite S201
Ocean City, NJ 08226
    Attorney for Defendant Renee Reeves

John S. Furlong, Esq.
FURLONG & KRASNY, ESQS.
Mountain View Office Park
820 Bear Tavern Road
Suite 304
West Trenton, NJ 08628
    Attorney for Defendant Mark Bryan and Harbor House, Inc.

Kevin P. McCann, Esq.
Beth Ann Hellriegel White, Esq.
CHANCE & MCCANN LLC
201 W. Commerce St.
P.O. Box 278
Bridgeton, NJ 08302
    Attorneys for Defendant Kenneth Bailey


**SIMANDLE**, Chief Judge:

## I.  INTRODUCTION

     This matter is before the court on four pending post-trial
motions in the above criminal action.  This criminal case arose
out of the alleged falsification of documents relating to
Delaware Bay oysters harvested, sold, and/or purchased by the
respective defendants.  The following defendants filed motions
for judgment notwithstanding the verdict or for new trial
pursuant to Federal Rules of Criminal Procedure 29 and 33: Mark
Bryan and Harbor House, Inc. [Docket Items 276 and 277]; Renee
Reeves [Docket Item 279]; Kenneth Bailey [Docket Items 280]; and
Todd Reeves on behalf of himself, Thomas Reeves and Shellrock,
LLC [Docket Item 282].  The Government filed opposition to all

motions.  [Docket Items 283-286.]  All defendants filed a
response to the Government's opposition.  [Docket Items 290-295.]
Various post-argument submissions were also made and considered.

For the reasons discussed below, the Court will deny all
Defendants' post-trial motions, with the exception that the
motion of Kenneth W. Bailey for judgment of acquittal will be
granted as to Count 15.

### A.    Factual Background and Procedural History

Six individuals and two corporations involved in the oyster
harvesting and distribution industry along the Delaware Bay in
New Jersey and Delaware were indicted in a fifteen-count
Indictment.  Individual Defendants Thomas Reeves, Todd Reeves,
and Todd's wife Renee Reeves were affiliated with Defendant
Shellrock, LLC, d/b/a Reeves Brothers, in Port Norris, New
Jersey.  Thomas and Todd Reeves are brothers who owned and
operated Reeves Brothers, an oyster dealer authorized to buy and
sell oysters under New Jersey law.  Renee Reeves worked in the
Reeves Brothers office and performed functions such as preparing
invoices for oyster purchases and sales.  Thomas and Todd Reeves
also harvested oysters from the Delaware Bay under annual
licenses with a Seaford, Delaware company, Defendant Harbor
House, of which Defendant Mark Bryan was an owner and operator.
Defendant Pamela Meloney was an office employee of Harbor House.

Much of the evidence in the case arose from the state and federal investigations of oyster sales by Reeves Brothers to Harbor House and a system of double-invoicing in which Harbor House could purchase a higher quantity of oysters from Reeves Brothers, as reflected in one invoice, but also maintain a second invoice showing a lower quantity. This understatement of the transaction would be reflected in other records which were required to be accurate for purposes of managing the oyster resources in the Delaware Bay and also for purposes of health monitoring and tracking the source and movement of oysters in commerce. Much of the trial evidence focused on the investigative efforts of New Jersey wildlife enforcement officers and health officers of the U.S. Food and Drug Administration (FDA) and the state health department, as well as the alleged efforts of the Reeves Brothers Defendants and the Harbor House Defendants to falsify required records and cover up violations of law.

The remaining Defendant is Kenneth W. Bailey, Sr., a licensed commercial shellfish harvester working on the Delaware Bay. Bailey also operated as an oyster dealer under his wife's dealer license, doing business under his own name and under a business name of "Conks 'R' Us." Bailey also would sell his oyster catch to Harbor House and is alleged to have kept and

4

furnished records of his oyster transactions that falsely understated the actual quantities involved.

The regulation of oyster harvesting and sales in the Delaware Bay, as mentioned above, proceeds on both state and federal levels and serves dual purposes of natural resource conservation and protection of public health.  During the period at issue, 2004-2007, New Jersey statutes empowered the Commissioner of the Department of Environmental Protection (NJDEP) to control and direct the shellfish industry and protect the shellfish resources throughout the state.  N.J.S.A. 50:1-5.  The Commissioner is empowered to make such rules and regulations as may be necessary for the preservation of the shellfish industry and resources after consultations with the Shell Fisheries Council, id., and it is only lawful to take oysters in certain portions of the Delaware Bay after compliance with Title 50 and the rules and regulations issued pursuant thereto.  N.J.S.A. 50:3-16.3.  The Shellfish Council issues an annual license for taking shellfish for each vessel engaged in oystering, N.J.S.A. 50:3-16.14.  The oystering season's start and finish on the state's seed beds, as well as the quantities of seed bed oysters that can be harvested, is regulated by the NJDEP, in consultation with the Shell Fisheries Council and the Haskin Shellfish Research Laboratory of Rutgers University pursuant to regulations at N.J.A.C. § 7.25A-1.1, et seq.  In

5

addition, a quota for the annual harvest, applicable to the state seed beds, is set by the NJDEP after public meetings, and the per-vessel quota is simply the total seasonal quota for the seed beds divided by the number of licensed oyster dredge vessels. See United States v. Reeves, 891 F. Supp. 2d 690, 693-94 (D.N.J. 2012).[1]

In addition to the public seed beds, to which the annual harvest quota applies, the Delaware Bay includes private leased oyster beds, where no quota and no closed season applies.  Thus, a leased bed owner is permitted to harvest oysters from his own leased oyster beds without concern for a quota or a season. However, if a vessel visited both the seed bed and a leased bed on the same day, the entire catch would count against the seed bed quota for that vessel.  Oyster dealers must account for and record all quantities of oysters that are bought or sold, regardless of origin from the public seed bed or the private leased beds, as explained below.

Oyster dealers in New Jersey are required to file a weekly dealer's report pursuant to N.J.A.C. 7:25A-4.5(b), which includes a record of their purchases and landings of oysters from fishermen, and they are required to submit those records weekly to the state.  Id.  These records must include the date, the

---

[1] For example, for the 2007 season, the total seasonal quota was 79,026 bushels of oysters, and the quota per licensed vessel was 1,040 bushels.

vessel harvesting, and the number of bushels harvested, among
other information.  Id.  Thus, a shellfish dealer who fails to
keep an accurate weekly dealer's report violates a New Jersey
regulation.

The oyster license agreements had certain terms and
conditions attached to them, including:  (1) the seasonal
oystering quota for the vessel; (2) the requirement for placing
calls to the NJDEP at the beginning and end of each seed bed area
harvest reporting the vessel's name, harvest location, quantity,
and intended landing area for discharge of the oysters (the
"call-in" requirement); and (3) the filing of weekly harvester
reports by the license holder.  The Court previously held that
these three terms and conditions upon the oyster license
agreements during the 2004-2007 time period were not requirements
enacted in New Jersey statutes or regulations, although they are
binding conditions upon the licensee.  United States v. Reeves,
891 F. Supp. 2d at 704-709.  Thus, during the 2004-2007 period,
an oyster harvester who violated the quota requirement or who
filed false weekly reports could be subject to administrative
sanctions because of breach of the agreement, including loss of
the oystering license.

Similarly, Delaware law required a commercial purchaser and
shipper of shellfish to maintain a record of shellfish purchases,
including the date of purchase, the person or company from whom

7

the purchase was made, and the quantity of shellfish that was purchased, 7 Del. Admin. Code § 7402.4.4.12.1, and such records were subject to inspection by the state agencies.

Under federal law, the FDA promulgated regulations in 21 C.F.R. § 123.28, requiring those who process, handle, store, shuck, pack, label, unload dockside, or hold oysters to maintain records of the harvest date, harvest location, quantity harvested, and harvester, id., subject to inspection by the FDA. The Indictment charged, in part, that various defendants maintained false FDA logs, sometimes referred to as "health logs," regarding their oystering transactions.

Under federal law, it is a crime to knowingly make a false record, account, or label for fish or wildlife, including oysters, that is transported in interstate commerce involving the sale or purchase of the oysters, in violation of 16 U.S.C. §§ 3372(d)(2) and 3373(d)(3)(A)(ii).  Various defendants were charged with aiding and abetting or committing this crime of false records under the Lacey Act by making or causing another to make records and logs that falsely included the amount of oysters that had been harvested, landed, sold, or purchased by the defendants, in the following counts:

> Count 2:  All Defendants except Kenneth Bailey (2006)
>
> Count 4:  All Defendants except Kenneth Bailey (2007)
>
> Count 11: Kenneth Bailey (2006)

8

              <u>Count 13</u>: Kenneth Bailey, Pamela Meloney, and Harbor
                   House (2007).

Under another provision of the Lacey Act, 16 U.S.C. §§ 3372(a)(2)(A) & 3373(d)(1)(B), it is a crime to knowingly transport, sell, receive, acquire, or purchase fish or wildlife, including oysters, in interstate commerce, knowing that such fish or wildlife was possessed and transported in violation of the laws and regulations of a state.  Various defendants were charged with this crime of trafficking in oysters possessed or transported in violation of New Jersey statutes and regulations, or aiding and abetting this crime, in which the oysters were not reported as required by New Jersey law, in the following counts:

              <u>Count 3</u>: Thomas Reeves, Todd Reeves, Shellrock LLC,
                   Mark Bryan, and Harbor House (2006)

              <u>Count 5</u>: Thomas Reeves, Todd Reeves, Shellrock LLC,
                   Mark Bryan, and Harbor House (2007)

              <u>Count 12</u>: Kenneth Bailey (2006)

              <u>Count 14</u>: Kenneth Bailey (2007).

Further, under federal law it is a crime to falsify entries in a record with intent to impede, obstruct, or influence the investigation and proper administration of a matter (or in relation to and in contemplation of such a matter) within the jurisdiction of a department or agency of the United States, pursuant to 18 U.S.C. § 1519.  Various defendants were charged with falsifying entries (or aiding and abetting same) with intent to impede proper administration of a matter with the FDA, in that

the defendants allegedly maintained a record of their oyster transactions required by FDA regulations that was false, in the following counts:

> Count 6: Thomas Reeves, Todd Reeves, and Shellrock, LLC (2006)
>
> Count 8: Thomas Reeves, Todd Reeves, and Shellrock, LLC (2007)
>
> Count 15: Kenneth Bailey (2007).

Finally, the Indictment, in Count 1, charged all defendants except Bailey with a conspiracy in violation of 18 U.S.C. § 371, extending from April 19, 2004 to November 9, 2007, having four objects:

> a. To make a false record or account in violation of the Lacey Act, 16 U.S.C. §§ 3372(d) & 3373(d)(3)(A);
>
> b. To traffic in oysters possessed or transported in violation of state law, contrary to the Lacey Act, 16 U.S.C. §§ 3372(a)(2)(A) & 3373(d)(1)(B);
>
> c. To falsify a record with intent to impede proper administration of a matter within the jurisdiction of the FDA, in violation of 18 U.S.C. § 1519;
>
> d. To obstruct or impede a pending National Oceanic and Atmospheric Administration ("NOAA") of the Department of Commerce, in violation of 18 U.S.C. § 1505.

The manner and means of the alleged conspiracy were spelled out in ¶¶ 18-25 of Count 1 of the Indictment.  In general, Thomas and Todd Reeves used their vessels to harvest oysters from the public seed beds in excess of their quotas, allegedly exceeding their

quotas by 40 percent in 2004, by 25 percent in 2005, by 90
percent in 2006, and by 40 percent in 2007.  (Id. ¶ 20.)  They
would under-report their harvesting activities by, among other
things, keeping false records in their Reeves Brothers oyster
dealer weekly reports with regard to the oysters received from
Thomas and Todd Reeves' vessels; they would record that these
vessels landed fewer oysters and that Reeves Brothers shipped out
fewer oysters than they actually did.  Id. ¶ 22.  Thomas and Todd
Reeves, through Reeves Brothers, sold the oysters to Harbor
House, whereby Reeves Brothers would provide false invoices and
copies of certain false Reeves Brothers records to Harbor House,
indicating that they were selling fewer oysters to Harbor House
than they actually sold.  Id. ¶ 23.  Harbor House's owner Mark
Bryan and its bookkeeper, Pamela Meloney, would process these
sales and make payment to Reeves Brothers for the actual
quantities of oysters, which were greater than the false Reeves
Brothers invoices indicated.  Id.  The Harbor House record of its
oyster purchases, which was required to be kept by federal law
and by Delaware law, contained false entries, coordinated with
the false reports prepared by Thomas, Todd, and Renee Reeves.
Id. ¶ 24.  Further, Meloney and Bryan provided law enforcement
officers with records of the Reeves Brothers oyster sales to
Harbor House, and they presented these records as coming from
Harbor House's own historical files, when in truth they did not.

Id. ¶ 25.  The Indictment then alleged overt acts including hundreds of occasions during the four seasons of 2004-2007 in which the Reeves Brothers' and Harbor House's Oyster Dealer Weekly Reports and Oyster Logs and Reeves Brothers Invoices were falsified to record fewer bushels of oysters than had actually been transacted and transported.

Counts 7, 9, and 10 were dismissed before the case was submitted to the jury.  The jury's verdicts were as follows:

- • Thomas Reeves, Todd Reeves, and Shellrock LLC were found guilty of Counts 1 through 6 and Count 8.

- • Renee Reeves was found guilty of Count 1 and acquitted of Counts 2 and 4.

- • Kenneth W. Bailey was found guilty of Counts 11 through 15.

- • Mark Bryan was found guilty of Counts 1 through 5.

- • Harbor House was found guilty of Counts 1 through 5 and acquitted of Count 13.

- • Pamela Meloney was acquitted of all counts against her, Counts 1, 2, and 4.

## II.  STANDARD OF REVIEW

Under Rule 29(c) of the Federal Rules of Criminal Procedure,

> a court may enter a judgment of acquittal if it finds that as a matter of law the evidence is insufficient to sustain a conviction.  In reviewing a motion for Judgment of Acquittal, the court must "'review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available

evidence.'" <u>United States v. Smith</u>, 294 F.3d 473, 476 (3d Cir. 2002) (quoting <u>United States v. Wolfe</u>, 245 F.3d 257, 262 (3d Cir. 2001)). Further, the court is required to draw "'all reasonable inferences in favor of the jury's verdict.'" <u>Smith</u>, 294 F.3d at 476-77 (quoting <u>United States v. Anderskow</u>, 88 F.3d 245, 251 (3d Cir. 1996)).

The defendant must also overcome the jury's special province in evaluating witness credibility and conflicting testimony. <u>United States v. Hakim</u>, 2002 U.S. Dist. LEXIS 18151, No. 02-CR-131, 2002 WL 31151174, at *6 (E.D. Pa. Sept. 24, 2002) (citing <u>United States v. McGlory</u>, 968 F.2d 309, 321 (3d Cir. 1992)). Further, the court in <u>United States v. Scarfo</u>, 711 F. Supp. 1315, 1334 (E.D. Pa. 1989) held that "a court may not grant a motion for acquittal based on conflicting testimony, that is, testimony of a questionable quality; it is up to the jury to weigh conflicting testimony, determine credibility, and ultimately draw factual inferences." Thus, "a finding of insufficiency should be confined to cases where the prosecution's failure is clear." <u>Smith</u>, 294 F.3d at 477 (quoting <u>United States v. Leon</u>, 739 F.2d 885, 891 (3d Cir. 1984)).

<u>United States v. Carmichael</u>, 269 F. Supp. 2d 588, 594-595 (D.N.J. 2003).

[A] trial court's ruling on the sufficiency of the evidence is governed by strict principles of deference to a jury's findings. In deciding whether to grant the motions for acquittal, the trial court [is] required to view the evidence in the light most favorable to the prosecution and to draw all reasonable inferences therefrom in the government's favor.

<u>United States v. Ashfield</u>, 735 F.2d 101, 106 (3d Cir. 1984) (citations omitted).  More recently, in reversing a district court's granting of a judgment of acquittal, the Court of Appeals

13

found: "The evidence was not overwhelming, but all that was required was that "any rational juror could have found the elements of the crime beyond a reasonable doubt." United States v. Carbo, 572 F.3d 112, 119 (3d Cir. 2009) (quoting United States v. Cartwright, 359 F.3d 281, 286 (3d Cir. 2004)).

Federal Rule of Criminal Procedure 33(a) states that "upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Such a remedy is available in exceptional cases where an injustice would occur if the court failed to act. United States v. Lebovitz, 586 F. Supp. 265, 267 (W.D. Pa.), aff'd, 746 F.2d 1468 (3d Cir. 1984); United States v. Phifer, 400 F. Supp. 719, 722 (E.D. Pa. 1975), aff'd, 532 F.2d 747 (3d Cir. 1976).  Rule 33 affords relief if, for example, the trial court finds prosecutorial misconduct or when the trial court does not believe the evidence supports the jury's verdict.  United States v. Dixon, 658 F.2d 181, 193 (3d Cir. 1981) (reversing judgment of acquittal but remanding for consideration whether to grant new trial under Rule 33 on grounds of juror confusion and insufficient limiting instructions).

> This Circuit has described a district court's consideration of a Fed. R. Crim. P. 33 motion for a new trial based on the "weight of the evidence" as follows: A district court can order a new trial on the ground that the jury's verdict is contrary to the weight of the evidence only if it "believes that 'there is a serious danger that a miscarriage of justice has occurred--that is, that an innocent person has been convicted.'" United

States v. Santos, 20 F.3d 280, 285 (7th Cir. 1994) (quoting United States v. Morales, 902 F.2d 604, 606 (7th Cir. 1990)). Unlike an insufficiency of the evidence claim, when a district court evaluates a Rule 33 motion it does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case. See United States v. Lacey, 219 F.3d 779, 783-84 (8th Cir. 2000); United States v. Ashworth, 836 F.2d 260, 266 (6th Cir. 1988). United States v. Johnson, 302 F.3d 139, 150 (3d Cir. 2002). Thus, "motions for a new trial based on the weight of the evidence are not favored. Such motions are to be granted sparingly and only in exceptional cases." Government of Virgin Islands v. Derricks, 810 F.2d 50, 55 (3d Cir. 1987) (citations omitted).

United States v. Brennan, 326 F.3d 176, 188-89 (3d Cir. 2003).

## III.  HARBOR HOUSE DEFENDANTS' MOTION FOR JUDGMENT OF ACQUITTAL OR FOR A NEW TRIAL

Defendants Mark Bryan and Harbor House ("Harbor House Defendants") were convicted of conspiracy (Count 1), making false records related to the sale or purchase of oysters (Counts 2, 4), and trafficking in oysters possessed or transported in violation of New Jersey law (Counts 3, 5). Harbor House was acquitted of making false records from April 24, 2007 through October 24, 2007 in connection with Kenneth Bailey's oyster transactions with Harbor House (Count 13). The obstruction of justice counts against the Harbor House Defendants were dismissed for lack of venue prior to the jury deliberation.

### A.    Summary of the Motion

Harbor House Defendants filed the instant motion pursuant to Fed. R. Crim. P. 29 for judgment notwithstanding the verdict as to Counts 1-5 based primarily on the argument that the Government

15

failed to prove the original allegations in these counts of the Indictment. [Docket Items 276 and 277.]  Alternatively, the Harbor House Defendants argue a new trial is warranted pursuant to Fed. R. Crim. P. 33 because the proofs varied from the Indictment and in effect constructively amended the Indictment during trial leading to unfair surprise and a violation of these Defendants' Fifth and Sixth Amendment Rights.

First, the Harbor House Defendants argue that the Indictment returned by the grand jury in essence charged these defendants with assisting the Reeves brothers in violating the quota and falsifying documents in order to conceal oysters harvested in excess of the quota.  In particular, the Indictment described violations of the daily call-in requirement and weekly harvester reports.  The Court subsequently held, upon all defendants' motions made after trial commenced, that these requirements were not part of New Jersey law during the relevant time period and therefore could not serve as a basis for the Lacey Act trafficking and falsification offenses charged in this case, United States v. Reeves, 891 F. Supp. 2d 690 (D.N.J. 2012), while falsifying the New Jersey weekly dealer's report, required by N.J.A.C. 7:25A-4.5, could serve as the basis for a Lacey Act crime.  Id.  The Harbor House Defendants argue that the Court's curative instructions were insufficient to cure the prejudice and

16

the jury was unable to evaluate the evidence presented against each defendant fairly.

The Harbor House Defendants maintain that if the verdicts against them were based in any part on the quota system, the verdicts are constitutionally suspect.  The defendants further maintain that the quota evidence could not be recharacterized as motive evidence after it was already proffered by the Government in its opening statement and through its witnesses as a violation of New Jersey law.  The defendants argue this prejudice cannot be dismissed as harmless and requires, at minimum, a new trial.

The Government opposed the Harbor House Defendants' motion for a new trial. [Docket Item 290.]  The Government argues the Harbor House Defendants have not met their burdens under Rule 29 or Rule 33.  First, the Government maintains the defendants are essentially arguing that a variance occurred between the Indictment and the crimes prosecuted.  The Government argues it provided substantial notice of its intent to prove health-related record-keeping violations in the Indictment, pre-trial discovery, pre-trial exhibits and pre-trial motions.  Therefore, the Government contends that the Harbor House Defendants had ample notice that the Government was prosecuting them based on falsification of health records, not just trafficking in oysters that violated the permitted quotas for the Delaware Bay dredgers.

17

In addition, the Government maintains that the Court properly instructed the jury on the limited use of the quota evidence and these instructions cured any prejudice or confusion that may have resulted from this evidence.  The Government also argues that this evidence was relevant for motive and as evidence of overt acts of the conspiracy and was properly admitted. Therefore, the Government maintains this cannot be a basis for a new trial under Rule 33.

**B.   Analysis**

Mark Bryan and Harbor House were convicted on each of Counts 1-5.  The Court finds the Harbor House Defendants have failed to meet their burden under Rules 29 and 33.  The Harbor House Defendants are essentially arguing that a variance occurred between the Indictment and the evidence presented at trial.  The court finds this argument without merit.  The record of the case, particularly the Indictment, discovery and pre-trial motions, gave the defendants adequate notice that the Government was seeking to prosecute them on health-related records offenses arising out of the falsification of FDA logs, in addition to trafficking in oysters in connection with knowingly false oyster dealer logs in which the quantity of the dealer's transaction was intentionally falsified.

The Defendants have a Fifth Amendment right to be tried only on the charges indicted by the grand jury.  See U.S. CONST. amend.

V ("No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury.").

> A constructive amendment occurs where a defendant is deprived of his "substantial right to be tried only on charges presented in an indictment returned by a grand jury." United States v. Miller, 471 U.S. 130, 140, 105 S. Ct. 1811, 85 L. Ed. 2d 99, (1985) (quoting Stirone v. United States, 361 U.S. 212, 217, 80 S. Ct. 270, 4 L. Ed. 2d 252 (1960)) (internal quotation marks omitted). A constructive amendment to the indictment constitutes "a per se violation of the fifth amendment's grand jury clause." United States v. Castro, 776 F.2d 1118, 1121-22 (3d Cir. 1985).

United States v. Syme, 276 F.3d 131, 148 (3d Cir. 2002).

"Moreover, the Sixth Amendment guarantees that criminal defendants be given sufficient notice of the nature of the charges in order to defend against them." United States v. Thomas, 610 F.2d 1166, 1173 (3d Cir. 1979).

> [T]wo types of variations between the indictment and evidence exist: amendments, which occur when the charging terms of the indictment are altered, and variances, where the charging terms are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment. [United States v. Somers, 496 F.2d 723, 743 n.38 (3d Cir.), cert. denied, 419 U.S. 832, 95 S. Ct. 56, 42 L. Ed. 2d 58 (1974)] (quoting Gaither v. United States, 134 U.S. App. D.C. 154, 413 F.2d 1061, 1071 (D.C. Cir. 1969). The difference between these variations is not merely academic, for we observed that Supreme Court precedent indicated that if the variation were characterized as an amendment, it would constitute a per se violation of the fifth amendment's grand jury clause. Somers, 496 F.2d at 743. Variances, however, are subject to less strict case-by-case inquiry, and would only constitute reversible error in those cases where the variance prejudiced the defendant's defense. Id. at 743-44. Our analysis led us to conclude that:

19

> in evaluating variances, we must first determine
> whether there has been a modification in the
> elements of the crime charged . . . . If such a
> modification exists, we will apply the per se
> rule of [Stirone v. United States, 361 U.S. 212,
> 80 S. Ct. 270, 4 L. Ed. 2d 252 (1960)] so as to
> preserve the shielding function of the grand
> jury. If, on the other hand, the variance does
> not alter the elements of the offense charged,
> we will focus upon whether or not there has been
> prejudice to the defendant. . . .

Somers, 496 F.2d at 744 (citations omitted).  United States v.
Castro, 776 F.2d 1118, 1122 (3d Cir. 1985).

In this case, there has been no modification of the elements
of the charged crimes.  The Court's ruling precluded a Lacey Act
conviction based solely on evidence that certain oyster permit
requirements for harvesting quotas, daily call-ins, and weekly
harvester logs were violated; the Court did not expand the basis
for the Lacey Act charge, but instead narrowed it to those
records explicitly required by New Jersey's statutes or
regulations during that 2004-2007 time period including the
weekly oyster dealer's report.  The Court's analysis consequently
focuses on whether there was any prejudice to the Defendants as a
result of the Court's ruling that over-harvesting was not a
violation of New Jersey law that could form the basis for a Lacey
Act violation.

In the beginning of trial, the Government presented over-
harvesting to the jury during the Government's opening as
unlawful and the first several government witnesses presented

quota violations as unlawful conduct.  No defendant objected to
the Indictment's characterization of harvesting oysters in excess
of the seasonal quota as a violation of New Jersey law, either
during pretrial motions, or during the Government's opening
statement, or during the course of testimony of these early
witnesses.  Ultimately, upon motion by Defendant Thomas Reeves,
joined by others, the Court ruled that quotas, daily call-ins,
and weekly harvester logs were not part of the laws and
regulations of the state of New Jersey during the time period
covered by the Indictment, and a violation of the permitting
standards for oysters quotas, call-ins, and weekly harvest logs
could not be a basis for a Lacey Act prosecution.  United States
v. Reeves, 891 F. Supp. 2d at 704-709.  Consequently, the court
issued a curative instruction informing the jury that this
evidence of harvesting oysters in excess of permit requirements
could only be considered for the limited purpose of considering
whether defendants had a motive and lack of mistake for the
crimes charged, and that overharvesting itself could not be a
basis for finding the Defendants guilty of criminal conduct.  The
jury was instructed that violations of the permitting standards
for oyster quotas, for call-ins of the day's activity and catch,
and the weekly harvest logs, if any, did not constitute
violations of New Jersey law, and could not be considered in
determining whether the defendants trafficked in oysters that

have been taken in violation of a New Jersey law or regulation
for purposes of the Lacey Act, 16 U.S.C. § 3372(a)(2)(A).  The
Court also clarified that the jury could consider the weekly
harvest log (but not seed bed quotas or daily call-in reports) as
a "record" in connection with the Lacey Act false records crimes
charged in Counts 2, 4, 11, and 13 in violation of 16 U.S.C. §
3372(d)(2).  The limiting instruction given by the Court after
reviewing with all counsel, was as follows:

> i.   Evidence of the New Jersey oyster license terms
> and conditions on seedbed quotas, call-in reports and
> submitting weekly harvest logs, and any breaches of those
> license conditions, may be considered for only limited
> purposes as I will explain to you now.  The jury may
> consider such evidence as it pertains to a motive for the
> various crimes charged, or as it relates to a lack of
> inadvertence or mistake in compiling subsequent oyster
> dealer receiving and shipping logs.
>
> ii.   These terms and conditions (seed bed quotas,
> call-in reports and submitting weekly harvest logs) were
> not provisions of New Jersey statutes or regulations in
> 2004-2007, and any violation of these terms or conditions
> cannot serve as a basis for finding any Defendant guilty
> of trafficking in oysters that have been taken in
> violation of a law or regulation of New Jersey, as
> charged in Counts 3, 5, 12 and 14 under the Lacey Act
> trafficking statute, 16 U.S.C. § 3372(a)(2)(A);
>
> iii.   The jury may, but is not required to, consider
> the weekly harvest log (but not seed bed quotas or daily
> call-in reports) as a "record" in connection with
> determining whether a Defendant has knowingly made a
> false record of the amount of oysters that had been
> harvested, landed, sold and purchased, as charged in
> Counts 2, 4, 11 and 13 under the Lacey Act false records
> statute, 16 U.S.C. § 3372(d)(2);
>
> iv.   The commingling of oysters harvested by the
> same vessel from seed beds and leased beds on the same
> day is precluded by a New Jersey regulation, N.J.A.C. §
> 7:25A-1.9(m) which states:
>
> > "No vessel shall take or possess seed oysters
> > from the natural seed beds above the southwest

line on the same day such vessel works or harvests on leased shellfish grounds."

v. Another regulation, under N.J.A.C. § 7:25A-1.9(o), states how commingled oysters are to be treated under the regulations, providing as follows:

"If a vessel works any part of the day on the seed beds, all oysters in possession shall be deemed seed oysters, and must be planted as required in (c) above and in accordance with this chapter before the vessel may return to harvesting from the seed beds."

vi. Whether or not oysters were actually harvested from the leased beds and whether any defendant who failed to record commingled oysters in a weekly vessel harvest log or dealer log acted knowingly are among the issues for you, the jury, to determine.

vii. The Indictment does not allege that any Defendant commingled oysters in violation of New Jersey regulations, and any such commingling shall not be a basis for finding that oysters were possessed or transported in violation of New Jersey law or regulations.

viii. Evidence of commingling is relevant for limited purposes, namely, in determining whether records in dealer receiving and shipping logs (which were required to state the total quantity of oysters from all sources that were being purchased or sold) were knowingly false, as well as in considering any explanation offered on behalf of any Defendant regarding oysters from leased beds being bought or sold together with oysters from seed beds.

This instruction was given after lengthy consultation with all counsel, immediately after the Court issued its opinion finding violations of the quota, the weekly harvester log and the call-in requirements were not violations of New Jersey laws or regulations and consequently could not form the basis of the Lacey Act charges in this case. No defendant moved for a mistrial at this time or argued that the limiting instruction was insufficient to cure the prejudice resulting from the

Government's submission of overharvesting as substantive evidence of guilt rather than motive evidence.

At the close of the case, the Court reiterated its limiting instruction while charging the jury.  Specifically, the court instructed the jury:

> There are additional New Jersey provisions which may be considered only for limited purposes with respect to Counts Three, Five, Twelve, and Fourteen.  Those provisions are:
>
> 1)   A vessel may not take or possess oysters harvested from seed beds on the same day such vessel works or harvests on leased shellfish grounds.  If a vessel works any part of the day on the seed beds, all oysters in possession shall be deemed seed oysters, and shall be planted back on the seed beds before the harvester returns to harvest further from seed beds, as set forth in New Jersey Administrative Code 7:25A-1.9.
> 2)   A licensed New Jersey harvester shall not harvest more than his allocated quota from the state seed beds.
> 3)   A licensed New Jersey harvester must call-in to the New Jersey Bureau of Shellfisheries his intent to work on seed beds, and must call-in to report the amount of oysters actually harvested from the seed beds.
> 4)   A licensed New Jersey harvester must submit a weekly harvest report which includes the total number of oysters harvested from the seed beds that week.
>
> You may not use these additional provisions as a basis to find that the oysters were possessed or transported in violation of New Jersey law or regulation. The purposes for which you may use these additional provisions are limited:
>
> 1)      As evidence of whether the defendants' dealer reports, charged as a requirement of underlying law or regulation in these counts, were false;

2)      As  evidence  of  a  lack  of  mistake  or
inadvertence  in  compiling  those  same  oyster
dealer reports as charged in these counts; and
3)      As to whether a motive to commit any of
the various crimes charged existed.

You  may  not  use  a  violation  of  these  provisions  as
evidence  that  any  defendant  has  a  bad  character  or
propensity to commit crimes.

[Docket Item 261, Jury Instructions, Instruction No. 33.]  Thus,

the jury was focused upon the key issue of whether the dealer

reports were false, and not the product of inadvertence or

mistake, as well as whether the defendants were instructed to

fabricate the dealer reports to hide overharvesting activity as

shown by other evidence, such as false daily call-ins or false

weekly harvest reports of oysters harvested from seed beds.  The

closing arguments of all counsel, delivered after the Court's

final jury instructions, also proceeded carefully along these

lines.

This was sufficient to cure any prejudice suffered by the

Defendants and as a result, the Defendants' argument regarding a

variance is without merit.  There can scarcely be prejudice to a

defendant when the Court acts, upon defendants' motion, to narrow

the evidence which the jury can consider as a violation of the

underlying state oyster regulations.  Moreover, there was no

basis for striking evidence of the underlying overharvesting when

the purpose for which it could be considered was relevant but

limited to supplying a motive for the undercounting in the

required oyster dealer records, namely, to hide the fact of overharvesting the oysters that were being transacted, as well as being probative of the lack of mistake in the falsified dealer reports.  To have stricken evidence of the violations of oyster license conditions, such as the overharvesting beyond the vessel's quota, would have eliminated from the case evidence that was highly probative and intrinsic to the jury's determination of whether the eventual dealer reports were knowingly false and the motive for such falsification.  As explained above, the jury was duly instructed, on multiple occasions, regarding the limited purposes for which evidence of the quotas, the call-ins, and the weekly vessel log requirement could be considered in determining whether the required dealer logs were falsified.  Therefore, the Harbor House Defendants' post-trial motions will be denied as they have failed to meet their burden under Rule 29 and Rule 33.

## IV.   DEFENDANTS TODD REEVES, THOMAS REEVES AND SHELLROCK, LLC'S MOTION FOR JUDGMENT OF ACQUITTAL OR FOR A NEW TRIAL[2]

Todd Reeves, Thomas Reeves and Shellrock, LLC ("Reeves Defendants") were found guilty of all charges against them in the Indictment.  These charges include: conspiracy (Count 1); false records related to oysters (Counts 2, 4); unlawful trafficking in

---

[2] Thomas Reeves filed a motion to join this motion for acquittal or a new trial, as well as the post-trial motions filed by his other co-defendants.  [Docket Item 281.]  The Government did not file opposition to this motion for joinder, and thus Thomas Reeves is deemed to have joined.

oysters (Counts 3, 5); and obstruction of justice (Count 6, 8).
The motion of Defendant Renee Reeves, who was found guilty of
conspiracy (Count 1), is considered separately below in Part V.

### A.    Summary of Motion

The Reeves Defendants move for a judgment of acquittal or in
the alternative, a new trial pursuant to Rule 29 and Rule 33.
The Reeves Defendants contend that the grand jury presentation
and the Indictment were limited to seed-bed oysters only.
Relying on this limited presentation, the Defendants argue they
crafted a defense intending to show that the oysters allegedly
not reported were not seed bed oysters but in fact came from
their own private leased bed grounds.  Midway through the trial,
Defendants maintain the Government changed its trial strategy and
used their defense against them arguing that the Indictment and
charges encompassed all oysters in the Delaware Bay, not just
seed bed oysters.  The Defendants argue they were then convicted
for failing to report or record the harvest of oysters from their
private leased beds and this charge is outside the scope of the
Indictment.

The Reeves Defendants argue that the Government's change in
theory resulted in a constructive amendment which requires at
minimum a new trial.  The Reeves Defendants argue they relied on
the Indictment which was narrowly tailored to oysters from the

27

public seed beds.  During the course of trial, Defendants argue the Indictment was constructively amended through evidentiary testimony, prosecutorial arguments and jury instructions which supported alternative theories not alleged in the Indictment.

The Reeves Defendants further argue that the Government engaged in two willful acts of prosecutorial misconduct.  First, the Defendants point to Mr. Duggan's opening statement where he told the jury Rosemary Rahe would testify at trial that Mark Bryan ordered her to fill out false invoices to help Defendants in their conspiracy to overharvest seed bed oysters.  The Defendants maintain that Ms. Rahe never made such a statement to the grand jury or in any <u>Jencks</u> material.  The Defendants also state that no such statement was ever proved up at trial.  The Reeves Defendants argue this prejudicial statement was willfully injected into the trial by Mr. Duggan when Mr. Duggan knew he could not prove such a statement occurred and this is a basis for prosecutorial misconduct.

Second, the Reeves Defendants argue that Mr. Hettenbach improperly cross examined Todd Reeves by stating that Todd Reeves was not mentioned in any of the corporate records of Longreach Marina, Inc.  In fact, Todd Reeves was listed as Vice President from 2002 onward for this corporation and government witness Craig Tomlin previously testified that Todd Reeves owned and cultivated 4,000 acres of leased grounds during 2007.  The

28

Defendants argue Mr. Hettenbach improperly stated that Todd Reeves had no connection with Longreach, Inc., in order to cast doubt on his ownership of the additional 3,000 acres of leased oyster grounds.  The Defendants argue that Mr. Hettenbach wanted the jury to infer something he knew to be false and this is a basis for prosecutorial misconduct.

Therefore, Defendants argue their motion for acquittal or a new trial should be granted.

The Government opposes the Reeves Defendants' motion and first lays out an analysis of the relevant law regarding constructive amendment.  The Government relies on United States v. Lee, 359 F.3d 194, 208 (3d Cir. 2004) as providing a narrow standard for what constitutes a constructive amendment. The Government argues this case held that "in order to rise to the level of an impermissible amendment, a variance must act to modify the indictment so that the defendant is convicted of a crime that involves elements distinct from those of the crimes with which he was originally charged." Id.  While this language is included in the court's holding, the Government omits the paragraph immediately following wherein the Court of Appeals explains this holding.  Specifically, the Third Circuit reasoned:

> Thus, where trial evidence [has] amended the indictment
> by broadening the possible bases for conviction from that
> which appeared in the indictment, the variance violates
> the defendant's substantial right to be tried only on
> charges returned by a grand jury. If, on the other hand,
> the variance does not alter the elements of the offense

29

charged, [courts] focus upon whether or not there has been prejudice to the defendant. <u>Id.</u>

<u>Id.</u> (citations omitted).

The Government maintains that none of the Reeves Defendants' bases for arguing a constructive amendment satisfy this standard. First, the Government argues the Indictment was never limited to seed bed oysters and none of the charges limited the Lacey Act violations to seed bed oysters.  Further, the Government argues there was not sufficient evidence for a jury to find that any leased bed oysters were harvested by the Reeves brothers during the time period charged in the Indictment and that the evidence supported a finding that all the oysters falsely reported came from the seed beds.

With respect to the trafficking counts, the Government argues these charges were permissibly narrowed, not broadened. The Government maintains that the elimination of the overharvesting aspect of the trafficking offense was permissible, did not constitute an unconstitutional amendment to the Indictment and did not impact the Government's ability to proceed against the Defendants on the false reporting aspect of the trafficking charge.

Similarly, the Government argues the Lacey Act reporting violations were not limited to seed bed oysters.  Instead, the Government contends that these charges reached all oysters, regardless of location of harvest.  The Government relies on ¶ 11

30

of the Indictment, which cites the obligation of oyster dealers to report all oysters landed, even oysters harvested from the leased beds.  The Government also argues that the court properly struck any reference in the Indictment to "Bay Direct Market Season" which was irrelevant for the years charged and would only have confused the jury.  This striking, the Government maintains, did not result in a constructive amendment, but it narrowed the charges.

The Government also argues that all documents relied upon during trial - weekly oyster harvest reports, dealer reports, health records, invoices and bills of lading -- were encompassed within the Indictment, provided to the Defendants during discovery, and served as a proper basis for the Lacey Act charges.  The Government argued that it did not introduce harvest tags as false reports but rather introduced altered tags as circumstantial evidence supporting their case that public seed bed oysters were harvested but not reported.

The Government summarizes its opposition by stating that the defendants argued that they commingled leased bed oysters and seed bed oysters and were unaware that this defense would not exculpate them from the charges in the Indictment.  Now the Government maintains that the Reeves Defendants are trying to recharacterize their unsuccessful defense as a constructive amendment by the Government.

As to the prosecutorial misconduct aspect of Defendants'
motion, the Government argues that Defendants' claims are
meritless.  The Government points out that none of the bases for
prosecutorial misconduct were raised at trial and are thus
subject to plain error review.

First, the Government states that Mr. Duggan properly
characterized Rosemary Rahe's testimony - that she would testify
to filling out the blank invoices given to her by Mark Bryan.
The Government further argues it proved up this evidence when
questioning Rosemary Rahe, even though Rosemary Rahe testified
that she could not remember the act of filling out the forms and
instead verified her handwriting.  The Government contends that
it presented sufficient evidence throughout the trial to support
Mr. Duggan's remarks in his opening statement.

Second, the Government argues that Mr. Hettenbach properly
cross-examined Todd Reeves and did not raise any improper
inferences from his questions about Longreach, Inc.  Since the
corporate records of Longreach Marina and an online search of New
Jersey corporation records revealed no connection with Todd
Reeves, the Government argues Mr. Hettenbach had a good faith
basis to ask Todd Reeves about his affiliation with this
corporation.  Further, the documents now attached by the Reeves
Defendants in their post-trial motion showing Todd Reeves was the
Vice President of Longreach Marina were not produced to the

32

prosecution during trial or offered as exhibits at trial, despite the Defendants' opportunity to do so.  The United States was entitled to reciprocal discovery of documents supporting Todd Reeves' defense, and this type of document identifying Todd Reeves as a Longreach Marina corporate officer would have been among them but was not furnished.  These additional documents are meeting minutes, and the Government argues these are not public records.  Since Mr. Hettenbach had a good faith basis for his question and defense counsel had an opportunity to object or present evidence and did not, the Government maintains that there was no prosecutorial misconduct.

**B.   Analysis**

The Court finds the Government's arguments persuasive.  This motion lacks merit because it relies on the incorrect premise that the Defendants were convicted for misconduct relating to their leased bed oysters.  In fact, the evidence presented by the Government against the Reeves Defendants showed that all oysters that were the subject of false reporting and subsequent illegal trafficking came from the public seed beds.  There appears to be no evidence introduced at trial that any particular bushel of oysters was harvested by Reeves Brothers from the leased beds.  By introducing volumes of evidence of seed bed harvesting of oysters, the Government did not vary from the charges set forth in the Indictment.  The Indictment, as the Government points out,

did not limit the charges only to seed bed oysters, and indeed pointed out that the accurate recording of the harvest location is part of the FDA record-keeping regulations, see Indictment ¶ 14, and that oyster dealer logs must report all oyster transactions, whether from seed beds or leased beds.

Defendants Todd and Thomas Reeves also argued that the jury's verdicts on all counts involving allegedly falsified records of oyster transactions were against the weight of the evidence because other records in the dealer reports and the health logs were not incorrect. They argue, essentially, that they were required to report only on the transactions of oysters harvested from the seed beds, and they did so, while they actually also transacted oysters from the Reeves' private leased beds which did not have to be recorded. Thus, according to this argument, the Reeves could sell to Harbor House a shipment of oysters, some which were from leased beds and some of which were from seed beds, and be paid for the higher total quantity, while reporting only the lower quantity comprised only of seed bed oysters. Thus, at trial, Todd Reeves testified that they would harvest from the public seed beds, and then harvest from the Reeves' leased beds, and return to port with the whole catch. (See Todd Reeves Testimony, Tr. July 11, 2012 at 20:3-15.)

Other than Todd Reeves' testimony and a few scant records indicating some oysters originated at the Reeves' private leased

34

beds, the evidence of any substantial leased bed oystering activity is contradicted by the surveillance evidence, documentary evidence, statements of defendants in interviews, and testimony of Eugene Givens, a Reeves employee.  The jury was free to accept the evidence that the Reeves engaged in essentially no leased bed oyster harvesting from their private beds during the years in question, and to reject Todd Reeves' testimony that leased bed harvesting was the norm.

For example, Eugene Givens, an experienced deck hand for years on Reeves' vessels, testified that he did not go even once to the leased beds in 2007, and that during the years 2003 to 2006, he might have gone to the leased beds only a couple of times.  (See Eugene Givens Testimony, Tr. June 27, 2012 at 8:12 and 21:2.)

The evidence also showed that Defendant Mark Bryan had been questioned by law enforcement agents about the discrepancies in the records and specifically why Harbor House was paying Reeves Brothers more than was due on the invoiced oysters.  Bryan never said that the discrepancy was due to the presence of leased bed oysters; instead, he stated on two occasions that he was actually "tipping" Reeves Brothers for their oysters, which the jury was free to find was a ludicrous attempt at a self-exculpatory statement that fails to explain the discrepancy.

35

Also during the investigation, when agents covertly
surveilled the offloading of the Reeves vessel Brandy Lee
Bateman, they counted 126 bushels of oysters being offloaded from
the vessel onto the Harbor House truck, unbeknownst to the
Reeves, who reported only 76 bushels for that day.  The evidence
showed that Todd and Thomas Reeves were both asked how many
bushels of oysters they landed that day, and both stated that the
Brady Lee Bateman had landed only 76 bushels, as they reported,
and they claimed that the other 50 bushels came from the day
before harvested by their vessel Miss Lil.  But the Miss Lil's
harvest from October 3 had already been inspected and documented
in its shipment records to Harbor House, so the excess oysters
could not have been from that source.  Instead, the evidence
showed that all 126 bushels on the intercepted vehicle on October
4 were tagged by the Reeves as public seed bed oysters in origin,
according to Captain Mark Canale, and the evidence showed that
such tags were only used for seed bed oysters.  The evidence also
showed that, following the questioning of the Reeves on October
4, 2007, the Reeves' record (Ex. 353) was whited out to obscure
the actual entry, and new information -- that the 50 bushels were
harvested from leased beds by the vessel Martha Meerwald -- was
added.  The jury could conclude that all 126 bushels were from
public seed beds, as observed in the surveillance and as marked

36

with the seed bed tags, and that the story about leased bed
oysters was a fabrication.

There was also no confirmatory evidence of Reeves' alleged
lease bed activity in the records of Harbor House.  Although
Harbor House's dealer logs contained numerous references to
leased bed origins for other companies, there was almost none for
Reeves in the four years at issue.  If Reeves had identified the
excess oysters as coming from leased beds, presumably Harbor
House would have made the proper notation in its records as it
did other oyster purveyors.

Harbor House records also showed that the Reeves had no
sales of oysters outside the public seed bed season, which
typically runs from April to early November.  If the Reeves were
harvesting from their private leased beds, which have no closed
season, those sales would have shown up in the off season when
the seed beds were closed, but there were none.  Again, the jury
could easily find that the notion that their so-called surplus
oysters came from leased beds to be untrue.

The Court therefore finds that ample evidence supported the
convictions of Todd Reeves, Thomas Reeves, and Shellrock, LLC
d/b/a Reeves Brothers and that their Rule 29 motion should be
denied.

Further, the Reeves Defendants' prosecutorial misconduct
claims are without merit as Mr. Duggan's and Mr. Hettenbach's

conduct was proper.  As to Duggan's opening statement, the
Government indeed presented evidence from which a jury could
reasonably find that Rosemary Rahe filled out false invoices that
were instrumental in the conspiracy of her employer, Mark Bryan
(who was also her brother) and Harbor House, with the other
defendants to violate the various reporting and record keeping
requirements.  That Rahe professed an absence of recollection on
14 examples of false invoices presented at most a jury question
regarding Rahe's testimony and not a failure of proof.  As for
Hettenbach's cross-examination, he indeed had a good faith basis
for the questions pertaining to Todd Reeves' affiliation with
Longreach Marina, since the available corporate records and New
Jersey incorporation documents revealed none, and Todd Reeves had
the opportunity to respond in his testimony that Hettenbach was
mistaken in his premise.  Moreover, the Court instructed the jury
on multiple occasions in the initial instructions and the final
instructions that statements of attorneys in openings, closings,
and questioning of witnesses are not evidence and may not be
considered as proof by the jury.  The Court assumes that the jury
followed this and all other instructions.  Therefore, the Court
will deny the Reeves Defendants' motion for acquittal and motion
for a new trial.

## V.   RENEE REEVES' MOTION FOR JUDGMENT OF ACQUITTAL OR NEW TRIAL

Renee Reeves was convicted of conspiracy as charged in Count 1 and acquitted of the false records charges against her in Counts 2 and 4.  The conspiracy count on the jury verdict form did not include a special interrogatory regarding the object of the conspiracy.  Four possible objects were charged to the jury:

> 1) knowingly making or submitting false records for oysters that move in interstate commerce with a value of over $350;
> 2) knowingly trafficking, in interstate commerce, in oysters that were known to have been possessed or transported in violation of New Jersey law or regulations and which had a value of over $350;
> 3) knowingly falsifying entries in a record with the intent to impede, obstruct, or influence the investigation and proper administration of a matter within the jurisdiction of the United States Food and Drug Administration; and
> 4) corruptly influencing, obstructing or impeding the due and proper administration of  law under which there was an investigation by the United States National Oceanic and Atmospheric Administration ("NOAA")

[Docket Item 261, Jury Charges As Delivered July 18, 2012 at 36-37.]

### A.   Summary of Motion

Renee Reeves moves for judgment of acquittal pursuant to Rule 29 or in the alternative, a motion for new trial pursuant to Rule 33.  Renee Reeves supports her motion by arguing three grounds for relief:  (1) the verdict was contrary to the weight of the evidence; (2) there was insufficient evidence to show Renee Reeves was connected to the conspiracy or acted with the requisite knowledge; and (3) the Government failed to prove Renee

Reeves acted knowingly because the Government did not offer evidence of Defendant's actions or failure to act in relation to the conspiracy.

Renee Reeves argues that she was acquitted of both substantive counts against her which included two false records charges in Counts 2 and 4 pertaining to 2006 and 2007 respectively.[3]  With regard to the objects of the conspiracy charging trafficking and obstruction of justice, Renee Reeves argues that the Government failed to prove that these offenses were reasonably foreseeable to her or a necessary or natural consequence of the unlawful agreement.  Renee Reeves relies on the testimony of Russell Babb, which stated that from 2004 to 2007 there was no state requirement to call-in dredging for oysters on the owner's leased beds and that the laws and regulations were confusing and complex.  She also relies on Lt. Karl Yunghans' testimony which confirmed that from 2004 to 2007 oystermen were only required to call-in seed bed oysters and Lt. Yunghans' testimony that Renee Reeves was not present for his conversation between Todd Reeves, Thomas Reeves, Officer Trembly, and Lt. Yunghans on May 13, 2004 wherein Todd and Thomas were warned about following reporting requirements.  Lt. Yunghans also testified that when Renee Reeves prepared a bill of lading for

---

[3] Renee Reeves was not charged in the Indictment with the trafficking offenses or the obstruction of justice offenses.

him, it was true and accurate.  Finally, in his investigative
report following the May 13, 2004 meeting, Lt. Yunghans listed
six persons who appeared to be culpable of record-keeping
violations and Renee Reeves was not one of them.

Next, Renee Reeves maintains the Government did not prove
that she acted knowingly.  The jury was instructed to consider
evidence about what the Defendant said, what she did and failed
to do and how the Defendant acted in order to prove the mens rea
element of the conspiracy.  Renee Reeves maintains that the
Government put forth no evidence against her in its case-in-chief
as to how she acted or how she failed to act in order to
establish that she had knowledge of the unlawful objective of the
conspiracy.

Renee Reeves further emphasizes that her family relationship
to her husband and brother-in-law alone are insufficient to
satisfy the mens rea requirement or membership requirement for
conspiracy.  The Defendant relies on United States v. Ritz, 548
F.2d 510, 522 (5th Cir. 1977) and United States v. Wexler, 838
F.2d 88 (3d Cir. 1988)("the inferences rising from keeping bad
company are not enough to convict a defendant for conspiracy.")
The Defendant also specifically relies on United States v.
Thomas, wherein the Third Circuit held "in order to sustain a
conspiracy conviction, the Government must put forth evidence
tending to prove that defendant entered into an agreement and

41

knew that the agreement had the specific unlawful purpose charged in the indictment."  114 F.3d 403, 405 (3d Cir. 1997).

Renee Reeves contends that the Government failed to put forth any evidence in its case-in-chief that she knew the unlawful objective of the conspiracy.  Accordingly, Renee Reeves argues for a judgment of acquittal or a new trial.

In its opposition to Renee Reeves' Rule 29 and Rule 33 motion, the Government maintains that there was sufficient evidence for a jury to convict Renee Reeves of conspiracy and her motion must be denied.

The Government generally points to the evidence supporting a conspiracy charge for Mark Bryan, Todd Reeves and Thomas Reeves, and cites specific examples of Renee Reeves' knowledge and conduct, especially in 2004, and argues that consequently there was enough evidence to demonstrate the existence of the charged conspiracy at the time Renee Reeves joined it in 2004.

In terms of her membership, the Government argues Rosemary Rahe's testimony of 14 instances where Renee had authored two inconsistent invoices for the same shipment of oysters on the same day in 2004 and furnished same to Harbor House was sufficient to connect her to the conspiracy.  The Government also points to the November 10, 2004 fax from Renee Reeves to Mark Bryan which included a record of oysters with false numbers.

42

(Gov. Ex. 351.)  The cover letter of this fax states, "This is what we have given the New Jersey Dept. of Health."  Id.

In terms of knowledge, the Government relies on the evidence of Renee Reeves' role during 2004 as the secretary for the Reeves Brothers.  There was a significant amount of testimony that Renee Reeves completed many of the invoices, called in the oyster catches under the quota program and was present for the state health inspections.  The Government also points to the July 14, 2004 post-it note to an invoice which stated "we called in 100-bu, we had 135-bu." (Gov't Ex. 433B.)  The Government focuses on the use of the term "we" as evidence of Renee's membership in the conspiracy.  By generating false invoices for Reeves Brothers' shipments to Harbor House, Renee Reeves was working together with both entities to accomplish the objects of the conspiracy, and as evidence of her knowledge that Harbor House needed this information to keep its records consistent in falsely reporting the lower quantity while transacting the higher quantity.

The Government also argues that Renee had to have known of the financial benefit received by the Reeves brothers for under-reporting the number of oysters harvested, which was reckoned to be nearly one million dollars, because she worked in the business, lived with and was married to Todd Reeves, one of the two owners of the business, defendant Shellrock, LLC.

43

Next, the Government maintains the verdict was not inconsistent because Renee was convicted of conspiracy but acquitted of the substantive counts.  The Government argues the verdict resulted from the different time frames alleged in the conspiracy count (which began in 2004) and the substantive counts (which embraced 2006 and 2007).  The Government further argues that case law is clear that even an inconsistent verdict would not be a reason to set the verdict aside.  See United States v. Vastine, 363 F.2d 853, 854-55 (3d Cir. 1966)("Where different offenses are charged in separate counts of a single indictment, an acquittal on one or more of the counts does not invalidate a verdict of guilty on another even where the same evidence is offered in support of each count.").  The Government points out that the evidence against Renee Reeves regarding her knowing membership in the conspiracy in 2004 may have been seen as more compelling than the evidence regarding guilt of substantive counts in 2006 and 2007.

Accordingly, the Government argues Renee Reeves' motion should be denied.

Renee Reeves filed a short reply to the Government's opposition.  First, Renee Reeves argues that Lt. Yunghans admitted in his testimony that she was not a participant in his May 13, 2004 conversation with Todd and Thomas Reeves.  Renee Reeves further argues that except for her being married to Todd

44

Reeves, there was no evidence presented by the Government to show
that she had any knowledge of the financial boon the Reeves
Brothers received by falsifying their oyster records.  Renee
Reeves maintains that there was no evidence that she knew of the
criminal object of the conspiracy and therefore, she should not
have been convicted.

**B.   Analysis - Rule 29(c) Motion**

As noted above, to sustain a conviction in a Rule 29(c)
motion, the Government must demonstrate that "any rational juror
could have found the elements of the crime beyond a reasonable
doubt," United States v. Carbo, 572 F.3d 112, 119 (3d Cir. 2009)
(quoting United States v. Cartwright, 359 F.3d 281, 286 (3d Cir.
2004)), after "view[ing] the evidence in the light most favorable
to the prosecution and . . . draw[ing] all reasonable inferences
therefrom in the government's favor."  United States v. Ashfield,
735 F.2d 101, 106 (3d Cir. 1984) (citations omitted).

The essential elements of conspiracy as charged in Count 1
are:

First:  That two or more persons agreed to commit an offense
against the United States;

Second:  That the defendant was a party to or member of that
agreement;

Third:  That the defendant joined the agreement or
conspiracy knowing of its objective to commit one or more

45

offenses against the United States and intending to join together with at least one other person to achieve that objective; that is, that the defendant and at least one other alleged conspirator shared a unity of purpose and the intent to achieve a common goal or objective, to commit an offense against the United States; and

Fourth:  That at some time during the existence of the agreement or conspiracy, and after August 2, 2006, at least one of its members performed an overt act in order to further the objective of the agreement.

Here, the main issues under Rule 29(c) are whether there was sufficient evidence for a rational jury to find beyond a reasonable doubt that Renee Reeves joined the conspiracy charged in the Indictment as a member and that she knew the criminal purpose or the object of the conspiracy.

The conspiracy between Todd Reeves, Thomas Reeves, and Mark Bryan and their companies allegedly began about April 19, 2004, according to Count 1 of the Indictment.  There is ample evidence that this agreement to falsify the required state and federal oyster transaction records was manifested and that Renee Reeves was a member, albeit in a less prominent role, by May, 2004.  It was on May 13, 2004 that Todd Reeves faxed Shellrock, LLC's oyster health log, required by state and federal health agencies, to Mark Bryan at Harbor House, together with a blank book of Shellrock (Reeves Brothers) invoices and shipping tags.  (Ex.

46

350A.)  The jury could find, as testified by Gary Wolf and
Special Agent James Cassin at trial, that there would be no
reason for Todd Reeves to send Harbor House a copy of Reeves
Brothers' health log, blank invoices and shipping tags, unless it
was pursuant to an understanding that Harbor House would match
its records to Reeves Brothers and produce false invoices when
necessary to avoid detection.  When Lt. Yunghans, several weeks
later, requested additional records from Mark Bryan, Yunghans
determined that the invoices from Bryan were inaccurate, that
while they matched the quantity on the Reeves Brothers' faxed
health log, they did not match, and indeed far understated, the
actual quantity of oysters Bryan had paid Reeves for.  (Ex. 83.)
A pad of blank Reeves Brothers invoices was found in the Harbor
House office, and Rosemary Rahe admitted that she drew up Reeves
Brothers' invoices in Exs. 401B through 416B, even though she was
employed by a Harbor House-related entity; she had no explanation
why she prepared the invoices, which were among the allegedly
false invoices supplied by Harbor House to the New Jersey
Division of Fish and Wildlife (by Mark Bryan) for this period
from April 19, 2004 to May 13, 2004. (Ex. 83; Exs. 401B-416B; Ex.
350A.)

     Renee Reeves worked in the Reeves Brothers business as a
secretary. (Ex. 123.)  The evidence shows that Renee Reeves
authored two invoices on the same day for the same transaction

with Harbor House on at least 14 occasions in 2004, as shown by the testimony of Rosemary Rahe.  Ms. Rahe was the office manager for Sanford Lee and Market Brokerage, in the same office as Harbor House, and also co-owned by Mark Bryan.  Ms. Rahe handled certain oyster transaction paperwork for Harbor House and dealt with Renee Reeves often enough to be able to recognize her handwriting, as Renee Reeves was the person communicating to Harbor House on behalf of Reeves Brothers.  For example, on June 2, 2014, Renee Reeves authored an invoice for 56 bushels of oysters and an invoice for 106 bushels. (See Ex. 423.)  Harbor House paid Reeves Brothers for 106 bushels, but only 56 showed up in the Reeves dealer log.  This pattern, in which Renee Reeves was handling much of the Reeves Brothers paperwork and coordination with Harbor House, continued throughout 2004.  (Ex. 203.)  This was in Renee Reeves' handwriting, according to Rahe, including the false numbers of bushels of oysters handled by Reeves Brothers as a dealer in 2004 (Ex. 351.)  The jury could find that she knew these entries were false since she had prepared two invoices for the same transactions, one correct and one incorrect, on multiple occasions in 2004.

The jury could reasonably have further found that she knew she was sending false invoices of oyster transactions that would support the false entries in the dealer logs and health logs in 2004.  It was on July 14, 2004, that she attached a post-it note

48

to the Reeves Brothers invoice to Harbor House for 100 bushels of oysters stating:  "we called in 100-bu, we had 135-bu."  (Ex. 433B.)  This is further evidence of her admission of the discrepancy that they were being paid for 135 bushels but only reporting 100 bushels that day.

It does not matter that there could be a more innocent interpretation of Renee Reeves' conduct such as in providing duplicate invoices and the post-it note acknowledging the difference between what "we reported" and what "we had."  The jury plainly rejected an innocuous interpretation and it is not this Court's role to revisit it.  See United States v. Brodie, 403 F.3d 123, 133 (3d Cir. 2005) ("Courts must be ever vigilant in the context of [Rule 29] not to usurp the role of the jury by . . . substituting its judgment for that of the jury.")  To sustain a conviction for conspiracy, the "contention that the evidence also permits a less sinister conclusion is immaterial . . . .  [T]he evidence does not need to be inconsistent with every conclusion save that of guilt."  United States v. Dent, 149 F.3d 180, 188 (3d Cir. 1998).  The Court need only find that the evidence, taken as a whole, was sufficient for a rational trier of the fact to have found the essential elements of the crime beyond a reasonable doubt.

Renee Reeves, a rational jury could find, was fully engaged in the record-keeping aspects of the Reeves Brothers business and

knowledgeable of oyster regulation matters.  Pamela Meloney of
Harbor House testified she dealt mostly with Renee Reeves on the
many oyster transactions.  She completed many of the invoices in
2004 as well as the health log in 2004.  (Ex. 203.)  New Jersey
Bureau of Shellfish employee Mariea Moore testified Renee would
occasionally visit the office to complete paperwork for Reeves
Brothers, and that she would occasionally make the daily call-in
for their oyster harvests.  She was present at Reeves Brothers
and signed off on New Jersey health inspection reports in 2005
and 2006.  (See Exs. 39 & 40.)  On both occasions, she dealt with
inspector Gary Sudans who reviewed Reeves Brothers HACCP Plan and
shellfish logs.  Id.

This evidence is more than sufficient to sustain the
conspiracy conviction.  The trial evidence of Renee Reeves'
complicity was much more than simply being an employee and the
wife of one of the conspirators.  The jury could reasonably find
beyond a reasonable doubt that she took affirmative steps to help
the conspiracy to succeed in its object of maintaining and
providing false dealer logs and health logs required by state law
and by the FDA regulations for oysters in interstate commerce.
She well knew of the oyster harvesting quota system in the New
Jersey and that the falsification of records by under-reporting
the seed bed catch in the dealer reports and the health logs
would conceal the discrepancy and violate the reporting

requirements that are imposed on dealers under federal law.  The
jury could reasonably find beyond a reasonable doubt that Renee
Reeves' conduct in 2004 satisfied each essential element for
conspiracy as charged in Count 1.

Renee Reeves' Rule 29(c) motion for judgment of acquittal
will be denied.

### C.    Analysis - Rule 33 Motion

As noted above, the Court may order a new trial only if it
"believes that 'there is a serious danger that a miscarriage of
justice has occurred -- that is, that an innocent person has been
convicted.'"  United States v. Santos, 20 F.3d 280, 285 (7th Cir.
1994).

Renee Reeves' principal argument under Rule 33 is that the
jury's verdicts are inconsistent and that there is a danger that
the jury convicted her just because she happens to be Todd
Reeves' wife.

The Court finds that the verdicts of conviction on Count 1
and acquittal on Counts 2 and 4 are not inconsistent nor does
this present a ground for a new trial.  Even if the verdicts were
inconsistent, the Supreme Court has held that "[i]nconsistency in
a verdict is not a sufficient reason for setting it aside."
Harris v. Rivera, 454 U.S. 339, 345 (1981); see also United
States v. Vastine, 363 F.2d 853, 854-55 (3d Cir. 1966).  The
reason is that "[w]here different offenses are charged in

51

separate counts of a single indictment, an acquittal on one or more of the counts does not invalidate a verdict of guilty on another even where the same evidence is offered in support of each count."  <u>Vastine</u>, 363 F.2d at 854 (upholding conviction for conspiracy to commit conversion despite acquittals on the three substantive counts of conversion).  Moreover, Renee Reeves' conviction of conspiracy, where the conspiracy allegedly continued from 2004 to 2008, is not inconsistent with the acquittal on two substantive counts of making false records in 2006 and 2007.  A rational jury could have had a reasonable doubt about the strength of evidence against Renee Reeves in the 2006 and 2007 falsifications, while not having a reasonable doubt about her membership in, and knowing assistance to, the conspiracy, due to the substantial evidence against her in 2004, as discussed above.

Nor is this a case where the court perceives a danger that Renee Reeves was convicted of conspiracy merely by keeping "bad company" in the persons of her husband and brother-in-law.  There was, as discussed, ample evidence of her conduct and statements from which a jury could find her guilty of conspiracy, and a new trial on this ground will also be denied.

## VI.  KENNETH BAILEY'S MOTION FOR JUDGMENT OF ACQUITTAL OR FOR A NEW TRIAL

The jury returned a guilty verdict against Kenneth Bailey for the following counts: making false oyster records in 2006

(Count 6); trafficking in oysters known to have been possessed or transported in violation of New Jersey law in 2006 (Count 7); making false oyster records in 2007 (Count 8); unlawful trafficking in oysters in 2007 (Count 14); and obstruction of justice in 2007 (Count 15).  He was not charged with conspiracy (Count 1).  Defendant Bailey now moves for a judgment of acquittal pursuant to Rule 29 or a new trial under Rule 33.

The Government produced evidence that Kenneth W. Bailey is a licensed oyster dealer in Heislerville, New Jersey who has made his living during the relevant years of 2006 and 2007 harvesting and selling oysters and other shellfish from the Delaware Bay. His oyster dealer licenses for 2006 and 2007 were contained in Ex. 45.  Ex. G-10 is also a copy of Bailey's 2006 license -- there is thus no dispute Bailey was a licensed oyster dealer in both 2006 and 2007.

As a dealer, he had to report to the New Jersey Bureau of Shellfisheries all oysters harvested from the Delaware Bay, N.J. Admin. Code 7:25A-4.5, which had to be accurately reflected in his weekly oyster dealer reporting form.  In addition to the weekly oyster dealer report to the Bureau of Shellfisheries, an oyster dealer who ships oysters interstate must maintain compliance with the shellfish sanitation requirements in N.J. Stat. Ann. § 8:13-1 and the Food and Drug Administration regulations in 21 C.F.R. § 123.28.  These sanitation-related

regulations are part of the HACCP [Hazard Analysis and Critical
Control Point] program for the healthful harvesting, storing,
selling, and shipping of shellfish.  The workings of these health
regulations and record-keeping requirements were explained in
detail by several witnesses, including Calliope Alexander, the
Project Leader for the New Jersey Shellfish Sanitation Project,
and Gary Wolf of the FDA, who was a Regional Shellfish
Specialist.  These records include the maintaining the "FDA log,"
which includes the date and place of harvest of the oysters, the
quantity, and the name of the harvester, sufficient to enable the
FDA and the state Health Department to track a licensed oyster
back to its place of origin and forward to all ultimate
distribution destinations from that place.  The state inspectors
generally visit dealers twice yearly and inspect the facilities
and sanitation records including Health Department reports and
FDA logs, and the FDA may also occasionally visit the licensed
dealers, such as Mr. Bailey, to investigate and determine the
dealer's compliance.  The FDA certifies the New Jersey Health
Department every two years, after an audit assuring that New
Jersey is properly enforcing the federal requirements and its own
HACCP-related requirements.

   The Government produced copious evidence that Kenneth Bailey
was the sole record-keeper for his oyster dealership familiar
with the dates, places, and quantities of the catch.  Evidence

showed Bailey signed his reports and was familiar with the
various reporting requirements.  On numerous occasions, as
discussed infra, the evidence showed that Bailey under-reported
his oyster catch in his weekly dealer reports and FDA log while
actually selling and being paid for higher quantities of oysters
by Harbor House.  When the Harbor House records and payment
checks are compared with Bailey's records, there are numerous
times in 2006 and 2007 when Bailey's weekly dealer reports and
FDA log recorded significantly fewer oysters than he actually
sold to Harbor House and for which he was paid.

Bailey's son, Kenneth Bailey, Jr., testified by way of a
stipulation in response to a government subpoena, read into
evidence on June 21.  His stipulation indicated that he worked
with his father since 2004 on Bailey's oyster fishing boats, and
that his father did all the record-keeping.  He stated that his
father would meet the oyster boats and offload the baskets of
oysters from the boat with a crane and place the oysters onto a
truck or into a cooler, and the son would not see them again, nor
did the son compile invoices or bills of lading.  Bailey, Jr.
stated he was unfamiliar with Bailey's weekly vessel harvest
reports for 2006 and 2007 (Exs. 310 & 315), and that he had never
seen Bailey's 2006 and 2007 New Jersey oyster dealer's weekly
reports (Exs. 309 & 314), thus creating the strong inference that
his father was the person who prepared and maintained these

records.  Bailey, Jr. likewise stated he did not prepare any of
the Conks "R" Us invoices, bills of lading, or other documents
contained in Exs. 700-754 and 900-969.  In short, he stipulated
that "[o]ther than Bailey, Sr., there is no one that completed
any paperwork for the business."  (Stip. of Kenneth Bailey, Jr.,
read by Mr. Hettenbach, Tr. June 21, 2012.)  While this
stipulation mentioned loading oysters in a storage cooler, it did
not mention harvesting oysters from the leased beds.  As
stipulated testimony, Kenneth Bailey, Jr., was not subjected to
cross-examination, so no further explanation was available.

     Defendant Bailey did not testify, but his counsel argued
that the discrepancies in the record-keeping were explained by
the notion that the oysters in the dealers reports, health logs,
and FDA logs were only those harvested from the public seed beds,
and the difference could be explained by the fact he also sold
oysters harvested from his private leased beds, which he didn't
feel obliged to report due to confusion or complexity of the
requirements.  In response, the Government argued that there is
no evidence that Bailey was harvesting from his private leased
beds, and that the Harbor House logs indicated, for the higher
quantities Bailey actually transacted, that the source was in the
public seed beds, not the leased beds.  Moreover, as demonstrated
throughout the trial, discussed further infra, dealers knew they
had to report and record all quantities of Delaware Bay oysters

56

in the shipment or transaction, whether from seed beds, leased
beds, or both.

Defense counsel also asserted that Mr. Bailey was not highly
educated and that his understanding of the reporting requirements
was limited, and thus that proof of intent and knowledge are
lacking, to which the Government points to Bailey's acknowledged
competence regarding his record-keeping duties, as discussed
below.

### A. Summary of the Motion

Defendant Bailey argues there was insufficient evidence
against him to support a conviction. First, Defendant Bailey
argues that the Government did not put forth any evidence to
reflect the number of oysters harvested from Defendant Bailey's
leased grounds. Bailey argues that all witnesses testified that
oystermen were not required to call-in their intent to harvest on
the leased beds and none of the documents relied upon by the
Government to prove the false records, trafficking and
obstruction counts were designed to track the harvest of an
oysterman's personal leased grounds.

In addition, none of the Government's witnesses testified
that they observed Defendant Bailey on the water and there was no
testimony about where Defendant Bailey harvested his oysters.
There was, however, testimony that Defendant Bailey owns 661
acres of leased grounds.

For the 2006 offenses in Counts 11 and 12, there was no
Health Department/FDA log presented into evidence against Bailey.
Bailey argues the only evidence against him was his weekly dealer
logs and these were insufficient to support a conviction.

With regard to Counts 13 and 14 in 2007, the Government did
present an FDA log into evidence but Defendant Bailey argues this
is still insufficient for conviction.  Specifically, Bailey
maintains that none of the documents used against him to support
this count were obtained from his own records.  Instead, these
documents were obtained from third parties and present
circumstantial evidence at best.  In particular, the
discrepancies in the amount of oysters harvested and sold could
have occurred from oysters sold which were harvested from the
leased beds and/or oysters which were properly stored by the
harvester.  This explanation for the discrepancies was elicited
during cross examination of the Government's witnesses.  Because
the circumstantial evidence required the jury to make too many
inferences in order to convict, Defendant Bailey argues it is
insufficient.  Newman v. Metrish, 543 F.3d 793, 796 (6th Cir.
2008) ("Although circumstantial evidence alone can support a
conviction, there are times that it amounts to only a reasonable
speculation and not to sufficient evidence").

The Government argues that it put forth sufficient evidence
to sustain a conviction against Defendant Bailey and therefore

his motion should be denied.  The Government argues there was evidence to support each element of each crime of conviction.

First, the Government addresses the 2006 false records charge in Count 11.  For example, on May 5, 2006, Bailey recorded 50 bushels of oysters on his weekly oyster harvest log and his weekly dealer report (Gov't Exs. 309 and 310).  However, his invoice to Harbor House for that day was for 102 bushels.  (Gov't Ex. 709B).  Therefore, there was sufficient evidence for a jury to conclude his dealer report was false.

Next, for the 2006 trafficking offense in Count 12, the Government points to evidence of Bailey's oyster transaction on May 24, 2006.  The Harbor House health log indicated that the oysters harvested by Bailey on May 24, 2006 were all from the public seed bed Cohansey.  (Gov't Ex. 359.)  Bailey's dealer and harvest log also indicate that the oysters that day were from Cohansey but reported a lesser quantity.  Specifically, Bailey reported 22 bushels on his weekly oyster dealer reporting form (Gov't Ex. 309) but sold 80 bushels to Harbor House according to Harbor House's health log (Gov't Ex. 716B.)  These oysters were transported to Harbor House in Delaware, thus satisfying the trafficking count.  Therefore, the Government argues there was sufficient evidence for a jury to find that 58 bushels of oysters were unreported and trafficked in violation of the Lacey Act.

The Government similarly addresses the 2007 offenses and points to examples of inconsistencies between Bailey's dealer report and harvest log and Harbor House's invoices.  For Count 13, the Government points, for example, to the transactions between Bailey and Harbor House on July 11, 2007.  Specifically, on July 11, 2007, Bailey recorded 50 bushels of oysters in his weekly harvest log (Gov't Ex. 315) and his dealer report (Gov't Ex. 314).  On the same day, Harbor House received an invoice from Bailey for 88 bushels (Gov't Ex. 920A) and the Harbor House health log reported 88 bushels from Cohansey public seed bed (Gov't Ex. 360).

In addressing Count 14, the Government cites the example of the July 13, 2007 transaction between Bailey and Harbor House. On this day, Bailey reported 50 bushels on his weekly oyster dealer reporting form. (Gov't Ex. 314.)  However, Bailey invoiced Harbor House for 106 bushels on July 13, 2007 (Gov't Ex. 922A) and 106 bushels were reported on Harbor House's health log (Gov't Ex. 360.)  Consequently, 56 bushels of oysters were falsely reported when they traveled in interstate commerce from New Jersey to Delaware.

Finally, as to the obstruction of justice charge, the Government argues Kenneth Bailey's health log (Gov't Ex. 354) contained many discrepancies between the oysters actually harvested as evidenced by his invoices with Harbor House and the

60

oyster bushels reported in the log.  The Government argues it
presented sufficient evidence through the testimony of Calliope
Alexander and the 2007 health inspection report that Bailey knew
how the FDA regulations were administered and the importance of
his health records.  Therefore, the Government asserts that the
jury correctly inferred that Bailey acted with knowledge to
impede the FDA when he falsified his health logs.

The Government also notes that Defendant Bailey presented no
evidence to contest the Government's case-in-chief.  Therefore,
the Government maintains that it satisfied its burden of proof
and Defendant Bailey's motion should be denied.

Defendant Bailey argues in reply that the Government
presented insufficient proof for at least one element of each
count.  Specifically, there was evidence presented by Calliope
Alexander and Conservation Officer Craig James that Defendant
Bailey had a refrigerator truck and nothing was wrong with
refrigerating oysters for several days prior to selling them.
Defendant Bailey essentially argues that the Government presented
no evidence that the discrepancies between the low number of
bushels in his dealer report and harvester log and the larger
number of bushels in the invoices to Harbor House were not due to
Bailey selling refrigerated oysters to Harbor House in addition
to the oysters he caught that day.  Put another way, Defendant
Bailey argues that the Government offered no proof that all the

61

oysters reported as sold on a given day were caught on that same day.

The Government presented no evidence of observation of Bailey on the water and presented no evidence that Bailey did not refrigerate some of his oyster catch to sell at a later time. In fact, Defendant Bailey argues that his son testified by stipulation that he would offload the harvested oysters from the day and place them in a truck or cooler, as noted above.

With regard to Defendant Bailey's reporting violation in 2004, Bailey argues this reporting violation was with regard to commingling. Specifically, Bailey was found guilty of having one boat on the leased grounds and an additional boat on the public seed beds on the same day, and prior to docking the vessels, all the oysters were combined on one vessel. Since the instant case does not involve commingling, Defendant Bailey argues this reporting violation is irrelevant. In addition, there is reasonable doubt that Defendant Bailey sold only the oysters he caught on a given day and did not use his refrigeration system whereby he was able to sell extra refrigerated oysters in excess of the oysters he freshly harvested on the particular day.

Finally, Defendant Bailey asserts there are no discrepancies alleged by the Government between Bailey's weekly harvest log and his dealer log. The discrepancies lie solely between Bailey's records and Harbor House's invoices and FDA logs. Harbor House's

invoices indicated a higher number of oyster bushels sold than
Bailey caught and recorded that particular day.  This
discrepancy, Bailey argues, is explained by the use of his
refrigeration system, where he was able to keep excess bushels of
oysters for several days and sell them at a later date.

This argument applies with equal force to Counts 11 through
14.  Defendant Bailey argues the Government has failed to prove
that he knowingly falsified any of his oyster records at issue in
those counts.

Moreover, with regard to the knowledge requirement,
Defendant Bailey also points to the testimony of Russell Babb who
testified that these reporting regulations were confusing and
complex.  Defendant Bailey argues that the proof at trial showed
he had a high school education and it was difficult for him to
understand what the regulations required with regard to
reporting.

Finally, as to Count 15, Defendant Bailey argues that the
Government did not prove he submitted false documents to Lt.
Yunghans or NOAA Special Agent Cassin with intent to obstruct an
FDA investigation.  Rather, the Government showed at worst
Defendant Bailey submitted incomplete documents.  Defendant
Bailey argues Lt. Yunghans requested documents regarding the
oysters harvested from the public seed beds, which is what Bailey
turned over.  Bailey argues that the evidence at trial did not

show that Lt. Yunghans or Special Agent Cassin asked for documents regarding his leased beds and therefore Bailey did not turn over any documents about his leased beds.  In addition, Lt. Yunghans did not have a warrant or subpoena for this document, but simply requested this information from the Defendant.  No warrant or subpoena was ever served on Defendant Bailey.  He argues that even if the document was incorrect or incomplete, he lacked the intent to obstruct an FDA investigation or program.

Further, Bailey argues the Government presented insufficient proof that the document given to Lt. Yunghans by Defendant Bailey represented his entire FDA health record.  Importantly, the evidence at trial was clear that completed harvest tags could be used to satisfy the FDA health log requirement and if the tags were being used as a health record, they had to be retained for one year.  Lt. Yunghans did not ask Defendant Bailey for his tags and therefore, the tags were not turned over.  Moreover, when the Harbor House vehicle was stopped, Officer Canale testified that Defendant Bailey's oysters were properly tagged and there was no evidence presented against Bailey to show that he did not properly tag his oyster catch.

Bailey asserts the document turned over to Lt. Yunghans (Gov't Ex. 354) was not proven at trial to be Defendant Bailey's complete health record.  Bailey argues it cannot be the basis for an obstruction of justice charge in Count 15.

64

Defendant Bailey also argues that Calliope Alexander's
testimony was insufficient to show that he had knowledge and
understanding of the FDA regulatory reporting requirements.  The
notation in the inspection report that Bailey had basic knowledge
of HACCP principles was admitted by Ms. Alexander as being vague
and unclear.  Therefore, Bailey argues that this cannot prove the
requisite knowledge necessary for an obstruction charge.

**B. Analysis**

**1. Counts 11, 12, 13, and 14**

The jury heard scant evidence that could support Bailey's
defenses that the under-reporting of oysters in his dealer logs
was due to storing a prior day's catch in a cooler and then
transacting two days' catch, so that the total was greater than
the sale day's catch alone.  Bailey's records simply do not
reflect such combining of catches into larger shipments.  Thus
the discrepancies between the amounts of oysters Bailey was
selling to Harbor House and what Bailey was reporting in his
weekly harvest reports or dealer logs is not explained by storing
loads in coolers and combining them with a fresh catch for a
bigger sale.  Bailey's son, who stipulated that his father would
unload the oyster catch upon landing into a truck or cooler, was
clear that he did not know what happened to the oysters after
that.  Bailey's cooler truck was described as a white box truck
by Officer Craig James who surveilled at Bailey's dock in

Bivalve, New Jersey, in October 2007 and the Harbor House truck
was stopped nearby.  Bailey's oyster catch was found on the
Harbor House truck on October 4, 2007, on its way to Delaware,
and it would be reasonable to conclude that oysters were not
being stored in Bailey's white box truck.  A reasonable jury
could well find that the fact that Bailey had a cooler or cooler
truck in which fresh oysters could be stored temporarily did not
raise a reasonable doubt about his guilt of the Lacey Act false
records in 2006 and 2007 and his Lacey Act trafficking conduct in
2006 and 2007.  Moreover, according to Special Agent Cassin,
Bailey had told him that he generally sends oysters to Harbor
House every day that he fishes in the summer, suggesting that he
was not apt to store the fresh oysters during the summer.

Likewise, Bailey's argument that he included leased bed
oysters in his sales to Harbor House but he didn't know that he
had to include leased bed oysters in his dealer reports and
health logs is not compelling.  Instead, Bailey's records indeed
mentioned leased bed catches on occasion, as shown in Ex. 354 on
several dates.  In 2009, when Special Agent Cassin questioned
Bailey about the discrepancies, Bailey said that there must have
been conches included with his oysters when sold to Harbor House,
producing a bigger volume; Bailey did not mention his alleged
understanding that leased bed oysters didn't have to be reported
in his dealer log or health log.  The jury could reasonably view

66

Bailey's statement as a false exculpatory statement.  Cassin also testified that Bailey also did not tell Cassin in 2009 that he harvested from leased beds and public seed beds on the same day; indeed Bailey knew he could not visit seed beds and leased beds with the same vessel on the same day or he would be guilty of commingling, for which Bailey had been cited in 2004.  Thus, a reasonable jury could well find beyond a reasonable doubt that Bailey's under-reporting was not the product of mistake or of other species being shipped and transacted at the same time.

There was also more than sufficient evidence that Bailey, as an experienced oyster harvester and dealer in the highly regulated Delaware Bay industry, knew how to keep the necessary records.  While there was testimony from Russell Babb of the New Jersey Division of Fish and Wildlife that the laws and regulations were complicated, it is also true that Bailey's operations were inspected twice yearly and that he was seen as proficient in his understanding.  For example, in a 2007 inspection, the health inspector noted that Bailey "demonstrated a working knowledge for shellfish HACCP." (Ex. 43.)  Further, Mr. Bailey was the only person who performed the record-keeping functions for his business, according to his son's stipulated testimony.  As to the state's record-keeping requirements for the weekly dealer's report, the evidence reflected that Bailey filled out and submitted such reports; nothing suggests that the printed

forms were unclear about the need to declare all oysters being purchased or sold.

The jury also could reasonably rely on the powerful summary charts in evidence against Mr. Bailey, including the analyses of his oyster sales for 2006 (Ex. 255) and 2007 (Ex. 254). Special Agent Cassin compared Bailey's 2007 records (Ex. 354) with Harbor House's record (Ex. 20) for the same transactions, as noted above, and found the rather frequent under-reporting. There was ample evidence of a motive for Bailey to under-report due to quota concerns, as Special Agent Cassin testified to his calculations that Bailey exceeded his 2006 public seed quota by 67.23% and his 2007 quota by 33.71%, even giving Bailey the benefit of the doubt on data entries that were unclear or omitted.

The Court thus finds, reviewing the record in the light most favorable to the government as it must in a Rule 29 motion, United States v. Smith, 294 F.3d at 476, that a rational trier of fact could have found guilt beyond a reasonable doubt on each of Counts 11, 12, 13, and 14, and Kenneth Bailey's motion for judgment of acquittal will be denied.

Defendant Bailey raises no separate grounds for a new trial under Rule 33. To the extent Bailey joins other defendants' Rule 33 arguments, his motion for a new trial is denied as to Counts 11, 12, 13, and 14 for the reasons stated elsewhere herein.

### 2.  Count 15

Count 15 charged Kenneth Bailey with the offense of
knowingly maintaining a record of his oyster transactions
required by federal regulations that was false, in violation of
18 U.S.C. § 1519, from April 24, 2007 through on or about October
31, 2007, with intent to "impede, obstruct, [or] influence the
investigation and proper administration of a matter with the
jurisdiction of an agency of the United States.  (Indictment,
Count 15.)  The Government alleged that Bailey maintained the
record of his oyster transactions required by the U.S. Food and
Drug Administration (FDA), and that he supplied it to Lt. Carl
Yunghans in connection with the ongoing investigation of oyster
transaction reporting in the shellfish HACCP program of the FDA.

With regard to the obstruction count, it is necessary to
review Gov't Ex. 354 and Lieutenant Yunghans' testimony regarding
what document was requested from Bailey.  Bailey was convicted of
obstructing the FDA, not a NOAA investigation.  For the
Government to have sufficiently proved its case, the Government
needed to show that its agent requested Bailey's FDA log and that
Gov't Ex. 354 was Bailey's exclusive health log, that is, that it
served as his FDA log.  If this proof was not met at trial, then
Bailey should not have been convicted of obstruction because the
evidence would have been incomplete.  It would have been possible

69

for Bailey to present other documents to the FDA such as his
harvest tags to meet his reporting requirement.

The testimony about Gov't Ex. 354 and its acquisition by Lt.
Yunghans is sketchy and contradictory.  The origin of Gov't Ex.
354 was first discussed on Yunghans' cross-examination by
Bailey's counsel, Mr. McCann.  The following testimony took
place:

Q:  Now, looking at Exhibit 354, now this has been called
the Federal Drug Administration record, where did you get
this - by the way, strike that.  Did you obtain this from
someone?

A:  Yes.

Q:  From who?

A:  I believe it was - I can't remember offhand.  I think
I received it from -

Q:  Let me make it easy for you, in this case I represent
Kenneth Bailey -

    MR. HETTENBACH:  Objection.  The witness should be
    allowed to answer the question, he was cut off.

    THE COURT:  Go ahead.  You can answer.

A:  I believe I received this from Ken Bailey.

. . .

Q:  How did you come in contact - how did you get this
document?

A:  Without looking at my report for that day, I don't
recall.

. . .

A:  Looking at my report, I don't believe I obtained the
document, it could have been obtained by another officer.

Q:  Did you read Officer Canale's report?

A:  Several years ago, yes.

A:  Okay.  Would you like to look at it now, because he
said he got it from you?

A:  That's fine.

Q:  Okay.  But you don't know – you don't recall getting
it?

A:  I don't recall at this time if I got it or not.

(Testimony of Lt. Yunghan's on cross examination by Kevin McCann,

June 19, 2012.)

After a break, the Government began its redirect of Lt.

Yunghans.  On redirect, Lt. Yunghans testified to the following:

Q:  I'm going to ask you who did you receive [Gov't Ex.
354] from?

A:  Ken Bailey.

Q:  And when Mr. Bailey gave it to you, what document had
you asked him for?

A:  Department of Health records.

Q:  That's what he gave you, correct?

A:  Yes, and I made a copy of it.

(Testimony of Lt. Yunghans on redirect by Wayne Hettenbach, June

19, 2012.)

This is the only testimony regarding the request for

documents from Ken Bailey by Lt. Yunghans wherein Government Ex.

354 was provided by Ken Bailey as his "Department of Health

record."  This is the sole document that forms the basis of the

71

obstruction count as Ken Bailey was charged and convicted of keeping a false health record with the intent to obstruct the proper administration of the Food and Drug Administration.  In order for the Government to have satisfied its burden of proof with regard to the obstruction charge, the Government needed to prove that it requested the FDA-required FDA log and that Bailey produced Government Ex. 354 as his exclusive health record, and that Bailey did so intending to obstruct administration of the FDA program.

After reviewing Lt. Yunghans' testimony and the evidence presented by the Government with regard to the obstruction count against Bailey, the Court finds that a judgment of acquittal should be entered as to Count 15.  First, the Court finds the testimony of Lt. Yunghans is insufficient.  On cross-examination, Yunghans was unable to even remember how Government Ex. 354 was obtained and had no memory of obtaining it himself.  He obviously had no memory of what, if anything, he requested from Bailey. Then, on redirect, he testified that he was the one who made the request to Kenneth Bailey for his "Department of Health Records" and that G-354 was the document Bailey turned over to him.  This is completely inconsistent with his testimony on cross-examination when he could not recall meeting with Bailey, requesting the document, or receiving it.  Without Lt. Yunghan's testimony, this document would never have been identified as

72

Kenneth Bailey's FDA health record and the obstruction charge
against Kenneth Bailey would have been dismissed.

In this case, there is no explanation in Lt. Yunghans'
testimony about his sudden recollection of how he received
Government Ex. 354, what document was requested from Kenneth
Bailey and whether he was the individual who requested this
document from Kenneth Bailey.  Furthermore, there was ample
evidence in the record that harvest tags could be used to satisfy
the FDA health record requirement and that Kenneth Bailey
properly tagged all his harvested oysters and was never cited for
improper tagging.  Yet Lt. Yunghans never requested Bailey's tags
for the 2007 oyster season, which could have supplemented the FDA
paper log for FDA health record purposes.

This is not just a matter of nomenclature.  While there is
evidence that one document can serve the purposes of both the New
Jersey Department of Health and the U.S. Food and Drug
Administrations if it captures all the respective data, it
appears, even accepting Lt. Yunghans' final version of the
conversation, that Yunghans made no specific request for an FDA
log; instead, he was a state officer requesting Bailey to provide
his "Department of Health records."  The FDA is not the New
Jersey Department of Health.  Since the Government must prove
that Bailey had the intent to obstruct or impede an FDA program
(in contrast to a state program), Yunghans' highly equivocal

73

testimony about what he asked for does not demonstrate that
Bailey knew this was an FDA matter or investigation, much less
that Bailey acted with intent to impede the FDA.  Considering the
ample evidence regarding the use of harvest tags as health
records and Bailey's proper tagging of his harvests, it seems
implausible that Government Ex. 354 was Bailey's exclusive FDA
log.  Moreover, the requirements for FDA health records and New
Jersey health records differed.  It is plausible that Government
Ex. 354 was used by Bailey as a state health record and turned
over to Lt. Yunghans in that context since Lt. Yunghans was a
state conservation officer,[4] and his testimony did not reflect
that he asked for any federal health documents.

The Court thus finds that there is insufficient evidence
that when Bailey produced Gov. Ex. 354 to Yunghans, that he did
so with intent to obstruct an FDA program or investigation.
Yunghans did not serve a subpoena or a search warrant for FDA-
required records.  He did not orally request an FDA record.
Yunghans knew Bailey for more than three decades in Yunghans'
capacity as a state conservation officer.  The record is barren
of evidence that Bailey was aware that his furnishing of this
false oyster shipping log would impede an FDA program or

---

[4] Lt. Yunghans also was a deputized Federal NOAA agent, who
can assist NOAA when that agency asks for help.  He did not
describe himself as an FDA agent.

74

investigation, so a fortiori there is insufficient evidence from
which a jury could find that he intended to do so.

Defendant Kenneth Bailey's motion for judgment of acquittal
will be granted pursuant to Rule 29(e) upon Count 15.

**VII. CONCLUSION**

In sum, the Court will deny Mark Bryan and Harbor House's
post-trial motion [Docket Items 276 and 277] as well as Defendant
Todd Reeves, Thomas Reeves and Shellrock, LLC's post-trial
motions [Docket Items 281 and 282].  The Court will also deny
Defendant Renee Reeves' motions under Rules 29 and 33 [Docket
Item 279].  The Court will deny Defendant Kenneth Bailey's
motions for judgment of acquittal and for new trial [Docket Item
280] on Counts 11, 12, 13, and 14, and the Court will grant
Bailey's motion for judgment of acquittal on Count 15.

The accompanying Order will be entered.


**February 4, 2015**                    **s/ Jerome B. Simandle**
Date                                    JEROME B. SIMANDLE
                                        Chief U.S. District Judge


75